ORIGINAL

DISTRICT C
FILED
SEP 11 2006
CLERK, U.S. DISTRICT COURT
By
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GARY ZAGAMI, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NATURAL HEALTH TRENDS CORP, MARK WOODBURN, TERRY L. LaCORE, CHRIS SHARNG, SIR BRIAN WOLFSON, TIMOTHY DAVIDSON, RANDALL A. MASON, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO. # 3962

CLASS ACTION
**3-06CV1654-D**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAWS

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint, alleges upon the investigation made by and through plaintiff's counsel, which included, relevant public filings made by Natural Health Trends Corp ("Natural Health" or the "Company") with the Securities and Exchange Commission (the "SEC"), as well as press releases, news articles, analyst reports, court filings, and media reports concerning the Company. This complaint is based upon plaintiff's personal knowledge as to plaintiff's own acts, and upon information and belief as to all other matters, except where indicated otherwise.

## NATURE OF ACTION

1.    Plaintiff brings this action as a class action on behalf of himself and all other persons or entities who purchased Natural Health common stock on the open market, other than

defendants and certain persons and entities related to defendants, during the period beginning March 31, 2003, through August 11, 2006 (the "Class Period"), all to recover damages caused to the Class by defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

2.      This action arises under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Gary Zagami purchased Natural Health shares during the Class Period and was damaged thereby as set forth in the plaintiff's certification annexed hereto.

7.      Defendant Natural Health is a Delaware Corporation with its principal place of business located at 2050 Diplomat Drive, Dallas, Texas, 75234.  The Company through its various operating subsidiaries purports to be an international direct- selling company operating in more than 29 markets throughout Asia, North America and Eastern Europe.  The Company

markets personal care products under the Lexxus brand and markets its nutritional supplement products under the Kaire brand.

8.      Defendant Mark Woodburn, ("Woodburn") served in the capacity as President and Secretary for the Company beginning April 1999, as a director of the Company beginning August 2000, as Chief Financial Officer from April 1999 through August 1, 2004, and as the Company's Global Managing Director - Operations beginning October 3, 2005. Defendant Woodburn also served as the Chief Financial Officer of Lexxus International beginning March 2001.

9.      Defendant Terry L LaCore, ("LaCore") served as a director of the Company beginning March 2003, as the Chief Executive Officer of Lexxus International, Inc., a wholly owned subsidiary of the Company, beginning March 2001, and as the Company's Global Managing Director - Business Development beginning October 3, 2005.

10.     Defendant Randall A. Mason ("Mason") served as an independent director beginning May 2003 and as the Chairman of the Board of Directors beginning March 28, 2006. During this period, Defendant Mason served as the Chair of the Audit Committee and as a member of the Compensation and Nominating Committees. As a member of the Audit Committee, Defendant Mason was charged with reviewing and helping to ensure the integrity of the Company's financial statements as well as reviewing the adequacy of the Company's internal accounting controls.

11.     Defendant Chris Sharng, ("Sharng") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since August 2, 2004, and as the Company's interim principal executive officer since April 20, 2006. Defendant Sharng also served from October 3, 2005, through March 28, 2006, alongside defendant Hess as one of three members

comprising the Company's Office of the Chief Executive, an administrative committee established on October 3, 2005 that was responsible for managing the day-to-day operations of the Company. On March 28, 2006, when the Office of the Chief Executive was terminated, Defendant Sharng began serving as a member of the Company's Executive Management Committee, a three member administrative committee that replaced the Office of the Chief Executive and was charged with analogous duties.

12.    Defendant Sir Brian Wolfson ("Wolfson") served as the Chairman of the Company's Board of Directors from 1998 and 2000, and again from May 2003 until his resignation from that position on March 28, 2006. Thereafter, Defendant Wolfson served as a Vice Chairman to the Board. While serving as the Chairman, defendant Wolfson served as a member of the Audit Committee and Chair of the Compensation and Nominating Committees. As a member of the Audit Committee, Defendant Wolfson was charged with reviewing and helping to ensure the integrity of the Company's financial statements as well as reviewing the adequacy of the Company's internal accounting controls.

13.    Defendant Timothy Davidson, ("Davidson"), has served as the Company's Chief Accounting Officer since September 2004.

14.    Defendants Woodburn, LaCore, Sharng, Wolfson, Davidson and Mason are collectively referred herein as the "Individual Defendants."

15.    By virtue of their positions at Natural Health, the Individual Defendants had access to the adverse and undisclosed information about Natural Health's business condition and financial results. The Individual Defendants directly participated in the management of Natural Health, were directly involved in the operations of Natural Health at the highest levels, were privy to information concerning he undisclosed business conditions and financial results of

4

Natural Health and were involved in the dissemination of the materially false and misleading statements and information alleged herein.

16.     By reason of their positions as executive officers and/or directors of Natural Health, the Individual Defendants were at all relevant times controlling persons within the meaning of Section 20(a) of the Exchange Act.  Because of their executive and directorial positions with Natural Health, the Individual Defendants had access to the adverse and undisclosed information about Natural Health's business conditions and financial results. Further, as particularized herein, the Individual Defendants were culpable participants and did control the contents of various reports and public statements regarding Natural Health. Any acts attributed to Natural Health were caused and/or influenced by the Individual Defendants by virtue of their controlling-person positions at Natural Health.

17.     As the senior officers and/or directors of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, traded on The NASDAQ National Market, and governed by the provisions of the federal securities laws, the Individual Defendants have a duty to promptly disseminate accurate and truthful information about the undisclosed and material business conditions of Natural Health, so that the market price of Natural Health publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations. By virtue of their positions of control and authority at Natural Health, the Individual Defendants had the power to and did control the content of the various public statements concerning Natural Health, its business conditions and financial results during the Class Period and indeed made many of the challenged statements described herein.  Accordingly, the Individual Defendants were responsible for the

accuracy of the public statements and releases detailed herein and are primarily liable for the misrepresentations contained therein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of Natural Health during the Class Period and who suffered damages (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable.    While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.    According to the Company's Quarterly Report filed with the Securities and Exchange Commission ("SEC") on August 11, 2006, the Company has 8,199,933 shares outstanding as of August 7, 2006.    Record owners and other members of the Class may be identified from records maintained by Natural Health or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as plaintiffs purchased Natural Health shares during the Class Period and all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants misrepresented material facts and omitted to state material facts necessary to prevent the statements made to the investing public from being misleading during the Class Period concerning its financial statements;

(c)     whether defendants acted knowingly or recklessly in making materially misleading representations or omitting to state material facts during the Class Period;

(d)     whether the market prices of the Company's common share was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and the proper measure of such damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

24.      The Company is a multi-level marketing operation that offers various cosmetic

and lifestyle enhancement products through its wholly-owned subsidiary Lexxus International,

Inc., and distributes nutraceutical products in a range of categories through its wholly-owned

eKaire.com, Inc. ("eKaire") subsidiary.  The company distributes its products through a network

of distributors in North America, Latin America, Australia, Asia, and New Zealand.   The

Company has described its distribution model as follows:

> Generally, network marketing is based upon an organizational structure where
> independent distributors of a company's products are compensated for sales made
> to consumers. But, even more significantly, distributors are compensated for sales
> generated by distributors recruited by such distributor and all subsequent
> distributors recruited by their "down line" network of distributors. This can be
> very lucrative for individual distributors who develop extensive networks of
> distributors that sell company products and recruit additional distributors.
>
> *        *        *
>
> Distributors are independent contractors who purchase products directly from the
> respective subsidiary for resale to retail consumers or for personal consumption.
> Distributors may elect to work on a full-time or a part-time basis. The growth of a
> distributor's business depends largely upon the ability to recruit a down-line and
> the strength of our products in the marketplace.

25.      The Company, in its present constitution, was formed as the result of a reverse

merger of Kaire Nutraceutical, Inc. ("Kaire"), originally incorporated in 1998, into the publicly

traded shell of Natural Health Trends Corp. in 1999.  Defendant Woodburn either served as the

President of Kaire at the time of the reverse merger or had served as a director and Secretary

from October 1992 until February 1999.  During the same period, Defendant LaCore served as

either a "direct selling consultant" or as the President of Kaire.[1]   In 2000, Kaire was sold to

---

[1] Inconsistencies in the roles of defendants are attributable to the Company's public filings.

certain private investors. However, defendant LaCore continued to serve as President of Kaire until February 2001.

26.     Prior to December 7, 2005, the Company maintained a Board of Directors comprised of a mere three members – Sir Brian Wolfson, Randall A. Mason and Robert H. Hesse.  On December 7, 2005, the Company expanded the Board to six members and added Anthony B. Martino, Terrence M. Morris, and Colin J. O'Brien as directors.

27.     In January 2001, the Company along with certain minority investors launched the Lexxus business in the United States. Defendant Woodburn served as the CFO of Lexxus from March 2001 through November 10, 2005. Defendant LaCore served as the CEO of Lexxus from March 2001 through November 10, 2005. The Lexxus subsidiaries ("Lexxus") comprised the largest operation of the Company, accounting for 99% of the Company's consolidated net revenues for its fiscal year 2005. Lexxus conducts business in 15 countries and purports to have approximately 119,000 active distributors.[2]   The Company's expansion into international markets through Lexxus served as the foundation of the Company's purported growth leading up to, and through, the Class Period.

### Materially False and Misleading Statements
### Made During the Class Period

28.     The Class Period begins on March 31, 2003, when the Company filed its Annual Report with the SEC on Form 10-KSB for its fiscal year ended December 31, 2002 (the "2002 Annual Report"). Therein, the Company reported annual revenues for the period of $39,662,347 and net income of $4,102,020, increases over its prior fiscal year of 60% and 103%, respectively. Throughout the Class Period, the Company made certain representations concerning the struc-

---

[2] The Company considers a distributor "active" if he or she has placed at least one product order with the Company during the preceding year.

ture of its business, its distributor base, and the methodology it used in accounting for its sales.

The following statements from the Company's 2002 Annual Report reflect the Company's

representations about certain key characteristics of its business model and accounting practices:

> To become a Lexxus distributor, a person must accept an agreement (posted on our website) to comply with our policies and procedures and to pay a nominal $100 fee. Each potential distributor joins Lexxus by visiting our website and paying the initial fee. To be considered "active", the distributor must order a minimum of $100 of products each year. Out of approximately 75,000 accounts, Lexxus currently has approximately 37,000 active distributors.
>
> To become an eKaire distributor, a person must sign an agreement to comply with our policies and procedures. To remain "active", the distributor must order a minimum of $50 of products each year. Out of approximately 12,000 accounts, eKaire currently has approximately 3,000 active distributors.
>
> We pay commissions to qualified distributors based on sales volumes for each commission period. We offer one of the highest payouts in the MLM industry.
>
>          *       *       *
>
> Distributors generally pay for products by credit card in connection with orders placed through their Internet page at www.mylexxus.com or www.mykaire.com prior to shipment. Accordingly, we carry minimal accounts receivable.
>
>          *       *       *
>
> Sponsoring activities are not required of distributors and we do not pay any commissions for sponsoring new distributors. However, because of the financial incentives provided to those who succeed in building a distributor network that consumes and resells products, we believe that many of our distributors attempt, with varying degrees of effort and success, to sponsor additional distributors. People are often attracted to become distributors after using our products and becoming regular customers or after attending introductory seminars because they are seeking new business opportunities. Once a person becomes a distributor, he or she is able to purchase products directly from us at wholesale prices. The distributor is also entitled to sponsor other distributors in order to build a network of distributors and product users. A potential distributor must agree to our standard terms and conditions, which obligates the distributor to abide by our policies and procedures.
>
>          *       *       *
>
> Product Warranties and Returns

Lexxus

The Lexxus refund policies and procedures closely follow industry and country standards. Distributors may return unopened product that is in resalable condition for a partial refund. All products must be returned within twelve months of the original purchase date for refund eligibility. Lexxus must be notified of the return in writing and such written requests will be considered a termination notice of the distributorship.

The Lexxus refund policies and procedures in other various countries are similar to those of United States and Canada, but vary from fourteen days to twelve months for the return of products for refund eligibility.

eKaire

eKaire product warranties and refund policies are similar to those of other companies in the industry. If a distributor is not satisfied with the product then he/she can return the product to eKaire within 90 days of the first time the product was purchased for a full refund. A distributor may return or exchange products that are unopened and in resalable condition 30 days after the date of purchase.

\*     \*     \*

Revenue Recognition

Revenue from the sale of products is recorded when the products are shipped. Amounts in the sales transaction relating to shipping and handling are included in "net sales," and costs incurred for shipping and handling are classified as "cost of goods sold" in the Consolidated Statements of Operations.

29.     Included in the 10-KSB filed March 31, 2003, was a certification, made pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), of Defendant Woodburn, as President and CFO, attesting to the following:

(1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

30.     Also included in the 10-KSB was a certification by defendant Woodburn pursuant to Section 302 of the Sarbanes-Oxley attesting to the accuracy of the financial report and the

integrity of the Company's internal controls and accounting applications. In the certification, defendant Woodburn attested to the following:

1. I have reviewed this annual report on Form 10-KSB of Natural Health Trends Corp.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and I have:

a) designed such internal controls to ensure that material information relating to the registrant and its subsidiaries (collectively, the "Company") is made known to me by others within the Company, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's internal controls as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report my conclusions about the effectiveness of the disclosure controls and procedures based on my evaluation as of the Evaluation Date;

5. I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors:

a) all significant deficiencies (if any) in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

31.     On April 1, 2003, the Company repeated and reiterated its 2002 annual results through the issuance of a press release announcing "record revenues and earnings" for its fiscal year ended December 31, 2002.  The press release provided that the Company reported net sales of $39.7 million for the year, a 60% increase over the prior year, and net income of $4.1 million, an increase of 203% from the prior year.  The press release attributes Defendant Woodburn as commenting on the Company's financial results as follows:

> We are very encouraged with our results for last year. Currently with 4,628,731 common shares issued and outstanding and our last year's earnings of $4,102,020 we feel that the Company has made great strides over the past two years and we attribute our success to our management team and our dedicated distributors around the globe. In just the past year, we have stabilized our capital structure, successfully deployed our resources in expanding into foreign markets and built a solid platform to support additional growth. The direct selling industry is attracting the attention of both investors and career based individuals and we are committed to enhancing shareholder value.

32.     On April 4, 2003, the Company announced that it would enter the South Korean market in the second quarter of 2003.  The press release in relevant part states as follows:

> Terry LaCore, Chief Executive Officer of Lexxus commented, "South Korea will be the next market we open in our record setting international expansion. Personally, I am so committed to the Korean market that I have been living in Korea for the past three weeks, and I plan to continue living here until we open for business. We have waited for over two years to assemble both the capital and management experience to succeed in this venue, and we are positioning ourselves to thrive in this market."

> Mark Woodburn, President of Natural Health Trends Corp. added, "We have been putting an infrastructure in place in Korea as quickly as possible, and we are excited about the potential of the Korean market. The World Federation of Direct Selling Associations reports that South Korea is the third largest market in the world for direct sales, with sales in excess of $2.9 billion annually. A small fraction of this business could be very significant to our overall success."

33.     On April 13, 2004, the Company filed an amendment to its Form 10-K for fiscal year ended December 31, 2002 to restate certain items in its financial statements as identified as follows:

> During the quarters ended September 30 and December 31, 2003, the Company re-evaluated its financial statements for the years ended December 31, 2002 and 2001, the quarterly periods included in such years and the quarterly periods ended March 31, June 30 and September 30, 2003. As a result of such review, the Company determined that it inadvertently applied the incorrect accounting treatment with respect to the following items:
>
> (i)    revenue recognition with respect to administrative enrollment fees;
> (ii)   revenue cut-off between 2002 and 2003;
> (iii)  reserves established for product returns and refunds;
> (iv)   the gain recorded in connection with the sale of a subsidiary in 2001;
> (v)    income tax provisions; and
> (vi)   stock option based compensation.
>
> *       *       *
>
> In connection with the engagement of a new independent accounting firm and the review of the Company's financial statements, the Company has revised its accounting treatment for administrative enrollment fees received from distributors in accordance with the principles contained in Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements", ("SAB 101") and related guidance. The Company determined that under SAB 101, such fees actually received and recorded as current sales in prior quarters should have been deferred and recognized as revenue on a straight-line basis over the twelve-month term of the membership. The restatement resulted in net sales for the years ended December 31, 2002 and 2001 being decreased by approximately $1,336,000 and $1,155,000, respectively. The restatement in net sales resulted in a corresponding adjustment to cost of sales for direct costs paid to a third party associated with the administrative enrollment fees received from distributors. Compared to amounts previously reported, the restatement decreased cost of sales by approximately $336,000 and $416,000 for the years ended December 31, 2002 and 2001, respectively.
>
> In connection with the 2003 annual audit, the Company reviewed its revenue cut-off as of the beginning of 2003. It was noted that approximately $1,008,000 of sales originally recorded in 2002 were not actually shipped until early 2003. The restatement resulted in net sales for the year ended December 31, 2002 being decreased by $1,008,000 and net sales for the three months ended March 31, 2003 being increased by the same amount. The restatement also

resulted in distributor commissions for the year ended December 31, 2002 being decreased by $459,000 and distributor commissions for the three months ended March 31, 2003 being increased by the same amount.

The Company had not recorded reserves for distributor returns and refunds as of September 30, 2003 and for prior periods. Based upon analysis of the Company's historical returns and refund trends by country, it was determined that the reserves for returns and refunds for prior quarters were required and should be recorded. The restatement resulted in net sales for the years ended December 31, 2002 and 2001 being decreased by approximately $350,000 and $650,000, respectively, with corresponding adjustments to cost of sales for the estimated cost of products returned.

34.     On May 15, 2003, in a press release entitled "Natural Health Trends Corp Q1 Revenue Jumps 57% to $9.6 Million - Profitable Growth Fueled by Strong Lexxus Sales Worldwide" the Company reported "robust sales" and Defendant Woodburn stated, in relevant part:

Our products are rapidly gaining market acceptance and, given our current outlook, we expect this trend to continue.

*     *     *

We will soon launch our operations in Seoul, where even obtaining a small market share should substantially increase our revenues."

Woodburn concluded, "Overall, we are excited with our achievements to date and look forward to the many growth opportunities before us. We entered 2003 built on a strong foundation, where we achieved milestones in terms of sales growth and international expansion. We are confident in continuing this momentum throughout the coming year."

35.     Also on May 15, 2003, the Company filed a quarterly report for its fiscal 2003 first quarter with the SEC on Form 10-QSB.  The quarterly report essentially repeated and confirmed the financial results presented in the Company's May 15, 2003 press release.  The quarterly report provided additional details concerning the sources of the Company's revenues and income.  In addition to certifications filed pursuant to Sarbanes-Oxley attesting to the

truthfulness of the quarterly report and adequacy of the Company's internal controls, the Form

10QSB also made the following assertion with regard to the Company's controls and procedures:

> Within the 90 days prior to the date of this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's President and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Exchange Act Rules 13a-14(c) and 15d-14(c).
>
> Based upon that evaluation, the Company's President and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in enabling the Company to record, process, summarize and report information required to be included in the Company's periodic SEC filings within the required time period.
>
> There have been no significant changes in the Company's internal controls or in other factors that could significantly affect internal controls subsequent to the date the Company carried out its evaluation.

36.     Every quarterly and annual report filed with the SEC by the Company during the

Class Period contained similar, if not the same, certifications pursuant to the Sarbanes-Oxley Act

of 2002 and affirmations concerning the Company's controls and procedures, as set forth in

¶¶29, 30, 35.

37.     On June 23, 2003, the Company announced the opening of its subsidiary in South

Korea and issued a press release that stated, in relevant part:

> Mark Woodburn, President of Natural Health Trends Corp. stated, "We are very committed to the Korean market and believe it will be one of our stronger international markets in the long term. I was very impressed with the enthusiasm of our new Lexxus distributors and with the job that our management team has done in such a short period of time to open up our 30th country."
>
> [Natural Health] has so far received 14,000 requests for distributorships in South Korea, and of that, some 2,500 have already paid to begin training. Products are already being shipped to the country, and the Korean staff of 20 has met with senior American management to ensure a smooth take-off.

38.     On August 14, 2003, the Company announced its second quarter 2003 results in a

press release entitled "Natural Health Trends Corp. Reports Strong Growth in Sales and Earnings

for Second Quarter - Operating Income and Net Income More Than Double" which stated in

relevant part as follows:

> Net sales for the quarter rose by 33% to $12.16 million from $9.12 million in the
> second quarter of 2002. The increased sales were primarily from additional sales
> of Lexxus products and the expansion of Lexxus into new international markets,
> including the launch of Lexxus into South Korea in June 2003. Second quarter
> 2003 gross profit climbed to $10.48 million from $7.54 million in the second
> quarter of 2002.

*       *       *

> Mark Woodburn, President of Natural Health Trends Corp., stated, "We are
> pleased with the results for the second quarter and for the six months of 2003. Our
> expansion outside the United States is proceeding according to plan, and our
> higher sales figures speak clearly for themselves. We anticipate the second half of
> the year to build on these results."

*       *       *

> Mr. Woodburn observed, "The South Korean market, where we have just started
> operations, represents huge growth potential. The World Federation of Direct
> Selling Associations says that South Korea is the third largest market in the world
> for direct sales, with sales in excess of $2.9 billion annually. Even a small market
> share will translate into significant sales, and we have more than sufficient
> interest to make an early success of South Korea."

39.     On September 23, 2003, Natural Health issued a press release announcing the

launch of two new products, wherein Defendant Woodburn is quoted as stating:

> This is a very exciting time for Natural Health Trends Corp. and for its Lexxus
> distributors. We have established ourselves in over 30 countries around the world,
> and we are planning further expansion internationally, as well as increasing our
> domestic United States activities.  This international growth, the development of
> our distributor base and the increasing product line have put us on target to set
> more sales records in the third quarter.

17

40.    On November 7, 2003, the Company announced that it was filing a Notification of Late Filing for the quarterly report for its third quarter 2003.  In the press release issued by the Company, Defendant Woodburn stated in relevant part:

> The Company will require a few more days to prepare its final results for the third quarter of 2003 and we plan to file within the five day extension period. We are currently reviewing our prior accounting practices, particularly with respect to certain revenue recognition matters relating to administrative enrollment fees received from distributors. We have not concluded our analysis, but believe that these revenues actually received and recorded as current income may need to be deferred under generally accepted accounting principles. This would require us to reduce such revenues recorded in fiscal years 2001 and 2002 and increase such revenues for the current year. During this analysis, we are reviewing the adequacy of our reserves for returns and refunds. In addition, we are reviewing the accounting treatment for a disposition of a subsidiary dating back to 2001. While we are not prepared to disclose financial results at this time, I will say that we are extremely pleased with the performance of the business during the third quarter. Management believes that product shipments, the number of independent distributors of our products, and total revenues have all increased substantially compared with the second quarter of this year as well as the third quarter of 2002.

41.    In December 22, 2003, Natural Health announced that it had retained the services of BDO Seidman, LLP as its new independent accountants.  At the same time the Company also stated that it had disclosed in its Form 10-QSB for the third quarter of 2003 that it intended to restate the Company's quarterly and annual reports for the years ended December 31, 2001 and 2002 as well as the quarterly reports for the first two quarters of 2003 due to misinterpretation of certain accounting standards and related guidance pertaining to a) revenue recognition of administrative enrollment fees, b) reserves for returns and refunds, c) a gain on sale of a subsidiary, and d) income tax provisions.   This would be the second restatement of the Company's financial performance during the Class Period.

42.    On March 30, 2004, the Company issuing a press release announcing that it would be unable to timely file its Annual Report for the year ended December 31, 2003, on Form

10-KSB with the SEC.  The press release further provided that management was "very excited and eagerly anticipate reporting [its] year end financial results."  Contemporaneously, the Company filed a Notification of Late Filing with the SEC.  The Notification of Late Filing provided the following reasons for the Company's failure to timely file the Annual Report:

> Late Filing
> -----------
>
> As previously reported, Natural Health Trends Corp. (the "Company") will be restating its financial statements for the years ended December 31, 2002 and 2001, the quarterly periods included therein, as well as the first three fiscal quarters during 2003. As a result, the Company has yet to finalize its financial statements. Accordingly, the Company could not file its Annual Report on Form 10-KSB within 90 days following its year end without unreasonable effort or expense.
>
> Significant Change in Results of Operations
> -------------------------------------------
>
> It is anticipated that there will be a significant change in the Company's results of operations for the year ended December 31, 2003 compared to its results of operations for the year ended December 31, 2002, as restated.
>
> It is expected that net sales increased to approximately $62 million for 2003 from the expected restated net sales of $37 million for 2002. This increase was primarily attributable to (i) an increased number of active Lexxus distributors, (ii) increased sales of Lexxus products, and (iii) Lexxus' expansion into new markets, including Europe, Hong Kong, India, Singapore and the Philippines at varying times during 2002 and in South Korea in 2003.

43.    On April 13, 2004, the Company announced its financial results for the fiscal year ended December 31, 2003, in a press release that stated, in relevant part:

> Net sales were approximately $62.9 million for the year ended December 31, 2003 compared to net sales of just under $37.0 million for the previous year. The 70% increase stems primarily from the increased number of active distributors for its Lexxus division. The expansion of the Lexxus sales network into South Korea in the second quarter of 2003 amounted to 10% of the entire gain, and a further 5% came from the sale of new products introduced during the year. Due to the tremendous growth in certain Asian markets, the Company had a sales backlog at

the end of the year of approximately $4.0 million, which is included in deferred revenue and will be recognized into revenue in the first quarter of 2004.

Year-end gross profit for 2003 was approximately $50.4 million compared to gross profit for 2002 of just under $30.0 million. Increased sales of Lexxus products accounted for this 68% increase, which was tempered by an increase in the cost of sales due to the change of product mix sold in 2003 and higher transportation costs.

* * *

For the fourth quarter ended December 31, 2003, net sales were $22.9 million, compared to $12.4 million for the quarter ended December 31, 2002, an increase of 81.5%. Gross profit for the fourth quarter 2003 was $17.8 million compared to $9.8 million in the same period prior year. Net income reached $1.7 million, or $0.30 per fully diluted share, in the last quarter of 2003 versus $1.9 million, or $0.56 per fully diluted share, in the last quarter of 2002. The drop in the earnings per fully diluted share of $0.26 between the quarters ended December 31, 2002 and December 31, 2003 is the result of the $2.4 million gain recognized in 2002 related to a gain on discontinued operations.

44.     In the April 13, 2004 press release, Defendant Woodburn stated, in relevant part:

We look forward to a prosperous 2004, with continued growth in our existing markets, some additional international expansion and new product introductions. With the restatements behind us, and the revenue recognition issues no longer playing a part in the Company's financial results, we feel that the future is an opportunity for Natural Health Trends Corp. to seek its full potential.

45.     For the third consecutive reporting period, the Company announced, on May 18, 2004, that it would be unable to timely file its quarterly results.

46.     On May 25, 2004, Natural Health announced its first quarter 2004 results in a press release entitled "Natural Health Trends Corp. Net Sales Rise 242% to Top $38 Million for First Quarter; Net Income Increases to $3.1 Million from $1.4 Million". The press release states, in relevant part:

Net sales were approximately $38.4 million for the first quarter of 2004 compared to approximately $11.2 million for the three months ended March 31, 2003. This 242% increase was primarily attributable to the increased number of active Lexxus distributors (amounting to approximately $17.4 million), primarily in the Hong Kong subsidiary, Lexxus' expansion into new markets including South

Korea in the second quarter of 2003 (approximately $1.1 million), sales of new products (approximately $4.7 million) and the shipment of Hong Kong orders in backlog as of December 31, 2003 (approximately $4.0 million).

47.     In the same press release, Defendant Woodburn states, in relevant part:

As the first quarter closed, Natural Health Trends bought Marketvision Communications Corp., which is the exclusive developer and service provider of the direct-selling software we have used since mid-2001. This gives us an opportunity to reduce operating costs and retain control of the development of this mission critical software. I expect more of our top-line growth to reach the bottom line because of this transaction.

48.     On June 25, 2004, the Company issued a press release entitled "Natural Health Trends Corp. Obtains China Business License and Announces Completion of First "Lexxus Experience Store" in Beijing" that stated, in relevant part:

Natural Health Trends Corp. announced today that its wholly-owned subsidiary, Lexxus International (China) Corporation, a company organized under the laws of the People's Republic of China ("PRC") has recently obtained a license to open wholesale-retail establishments within the PRC. The wholesale-retail stores will be called "Lexxus Experience Stores" and will be used to demonstrate and promote the Company's line of premium quality personal care products under the Lexxus brand name.

Since 1998, China has prohibited direct selling, except for certain previously licensed enterprises that agreed to convert their network marketing organization into a "retail store" model. Currently, in order for China to comply with its obligations to the World Trade Organization, the Chinese Ministry of Commerce is drafting a Direct Sales Law that we expect, when enacted, will permit direct selling, subject to compliance with various requirements. We anticipate that the Direct Sales Law will be implemented later this year or early in 2005 and that this new law will also require a "retail store" model.

Mark Woodburn, President of Natural Health Trends Corp. said, "We view the potential direct selling market in China to be a unique opportunity. It may well become the largest direct selling market in the world. We have successfully recruited more than 33,000 active distributors in the Hong Kong market and we feel it is crucial for us to be one of the first entrants into the Chinese marketplace. I believe that our recently issued retail license will provide us with a critical first step towards obtaining a direct selling license. Our recently acquired retail license has a duration of 30 years and requires a capital investment of $12 million, of which $8 million must be funded in cash over a three-year schedule. We are

committed to China and will devote all necessary resources to expand and, if required, modify our existing operations. I am very excited about this very positive development in China and we are more optimistic than ever about our future business prospects in China."

Terry LaCore, CEO of Lexxus International Inc., a wholly-owned subsidiary of NHTC, said "Our retail license will allow us to open wholesale-retail establishments within the People's Republic of China to be called "Lexxus Experience Stores". We expect to open numerous stores in major metropolitan areas. These Experience Stores will be used to demonstrate and promote to our customers and sales personnel the Company's line of premium quality personal care products under the Lexxus brand name. These "brick and mortar" establishments should enable us to enhance our product sales and recruit additional sales personnel. We eagerly await the passage of the new Direct Sales Law so that we can apply for approval, obtain a direct selling license and begin operating in China."

49. On August 13, 2004, the Company issued a press release announcing the financial results for its second quarter 2004 that stated, in part, "[n]et sales ... were up 48%, compared to ... for the same period in the prior year" despite lower gross margins, higher selling, general and administrative expenses, and a higher commission-to-net sales ratio. The press release detailed the impact of the Company's Hong Kong subsidiary on its quarterly results as follows:

The financial results for the Company's Hong Kong subsidiary for the second quarter were adversely impacted by the broadcast of an investigative television program in the People's Republic of China on April 12, 2004. As previously disclosed, after thoroughly investigating the issues noted in the broadcast, the Company's Hong Kong subsidiary instituted intensive training and development sessions for its Hong Kong distributors with regard to applicable Chinese laws and appropriate business communications. The Company also elected to suspend product shipments to its Hong Kong distributors until they had completed the required training sessions. In addition, the Company's Hong Kong subsidiary extended the regular 14-day product return policy to 180 days for orders placed during the two weeks before, as well as two weeks after, the date of the airing of the Chinese television program.

As a consequence of these events, net sales for the second quarter were adversely impacted by approximately $13.9 million, comprised of the following: (i) order backlog at June 30, 2004 totaling approximately $6.6 million that were not shipped because certain distributors had not yet attended training sessions offered by the Company's Hong Kong subsidiary, (ii) sales were reduced by incremental product returns of approximately $1.9 million pertaining to the two week period

before and after April 12th, and (iii) approximately $5.4 million of sales were deferred because of accounting implications of the newly implemented return policy. In addition, distributor commissions as a percentage of net sales increased significantly during the second quarter because the Company did not require the refund of commissions paid on certain returned products and commissions were paid on the $5.4 million of deferred sales.

Gross margin for the second quarter was 81% of net sales, compared to 86% for the comparable period a year ago. The decrease in gross margin was mainly attributable to product mix change and higher air freight to transport products overseas.

Distributor commissions of approximately $12.6 million were 71% of net sales, compared to 41% in the second quarter 2003. This substantial increase resulted from the Company electing not to seek the refund of the commissions paid to independent distributors of its Hong Kong subsidiary, even though products sold by such distributors were returned following the broadcast of the investigative television program in China on April 12, 2004. In addition, commissions were paid on the $5.4 million of deferred sales. (See Exhibit A to this press release for the financial impact to the Company as a result of the events in Hong Kong).

50.     In the August 13, 2004 press release, Defendant Woodburn commented on the

Company's financial performance by stating, in part:

Despite the short-term financial hits from these corrective measures, we believe that we are poised to maintain a long-term and profitable relationship with our independent distributors in Hong Kong. We believe that the proactive steps taken during the second quarter have been well received and we look forward to commencing operations in China when the new direct selling laws are passed, and we obtain the necessary permits and licenses.

51.     In October 2004, certain investors, including Defendants Wolfson, Woodburn,

LaCore and Sharng, entered into a securities purchase agreement with the Company (the "2004

Purchase Agreement"). Pursuant to the 2004 Purchase Agreement, the Company offered to sell

to the investors a total of 1,369,704 "units" of the Company's securities at a price of $12.595 per

unit. Each unit consisted of one share of the Company's common stock and one warrant

exercisable for one share of common stock at an exercise price of $12.47 per share. Defendants

Wolfson, Woodburn, LaCore and Sharng each purchased 1,984 units for an investment of

$25,000. In total, this financing resulted in net proceeds to the Company of $16 million. Beginning January 2005, the price of the Company's common stock increased dramatically from the $10 per share to $12.50 per share range to hit a high of $18.89 per share on March 10, 2005. From March 10, 2005 through September 2004, the price of the Company's common stock mostly traded for above $12 per share and, from July 1, 2005, through October 6, 2005, traded in the approximate price range of $14 per share to $17 per share.

52.     On November 12, 2004, the Company issued a press release announcing the financial results for its third quarter of 2004 which reported, *inter alia*, that the Company experienced quarterly net sales increase of 142% over the prior year and net income for the quarter of approximately $5 million compared to the same period during the previous year of $1.3 million. In discussing the sales recognized during the quarter, the press release states, in relevant part:

> The third quarter sales incorporated approximately $11.9 million in revenue deferred from the second quarter, including $6.6 million in orders taken but not shipped as of June 30, $5.4 million shipped but not recognized until the third quarter and partly offset by $120,000 in incremental product returns.

53.     On February 16, 2005, the Company's common stock began trading on the NASDAQ National Market System. In a related press release issued the same day, Defendant Woodburn commented on the Company's operations as follows:

> In addition to expanding our range of operations, we are constantly developing new and revolutionary products for our distributors. Our strategic plan calls for deepening existing markets as well as broadening our global reach. With that in mind, we intend to unveil several new products in the coming months. For these reasons we have chosen the stock symbol BHIP. By definition "hip" means keenly aware of or knowledgeable about the latest trends or developments. I cannot think of a better definition of what this company stands for, and the type of products that we plan to introduce in the years ahead. Over the last couple of years, Natural Health Trends Corp. is one of the fastest growing direct-selling companies in the world, growing to approximately $63 million in revenues for the

year 2003 and $97 million in revenues for the first nine months of 2004. We have approximately 100,000 active distributors in over 30 countries worldwide and have appointed management teams that will help us in the near future enter the Mexican and Japanese markets, the world's 4th and 2nd largest direct-selling markets, respectively. We expect to grow considerably during 2005 and anticipate doing business in five of the top 10 direct-selling markets in the world by the end of this year. The proceeds from our $17 million private placement last fall, along with the recent expansion of our senior executive team, should help us fund and manage our growth prospects.

54.    On March 23, 2005, the Company issued a press release announcing fiscal 2004

fourth quarter and fiscal year 2004 financial results that states, in relevant part:

Fourth quarter net sales in 2004 were approximately $36.3 million, up 61% from $22.6 million for the comparable period a year ago. The growth in sales was attributable to an increase in the number of distributors. As of December 31, 2004, the operating subsidiaries of Natural Health Trends Corp. had approximately 133,000 active distributors, up from 76,000 at the end of 2003.

Gross profit margin for the fourth quarter was $29.0 million, or 79.8%, versus $17.1 million, or 75.5% a year ago. The improvement can be mainly attributed to the elimination of commissions paid to Marketvision Communications Corp., the Company's Internet-based distributor system service provider, which was acquired by the Company on March 31, 2004.

For the fourth quarter, the Company recorded a net loss of approximately $802,000, or a loss of $0.12 per fully diluted share. In the fourth quarter of 2003, the Company had a net income of $1.1 million, or $0.19 per fully diluted share. The decrease in net income was due to higher commissions paid to distributors and selling, general and administrative expenses, or SG&A, partly offset by the margin flow-through of the higher volume.

*        *        *

For the twelve months ended December 31, 2004, net sales rose 113% to approximately $133.2 million compared to $62.6 million for fiscal year 2003. Two-thirds of this rise was attributable to the increased number of active Lexxus distributors while the balance represented higher sales generated per distributor.

*        *        *

As disclosed in a Form 8-K filed on March 23, 2005, the financial statements of the fourth quarter of 2003 and the first quarter of 2004 have been revised to address certain 2003 revenue and expense cut-off issues. With the revisions, the revenue in the fourth quarter of 2003 was reduced by approximately $310,000,

and the net income was reduced by approximately $650,000. The revenue and net income of the first quarter of 2004 were increased by $310,000 and $650,000 respectively.

\*       \*       \*

Woodburn concluded, "During 2004, we began to devote more of our resources to building a solid infrastructure upon which we can continue to drive our business forward. With an experienced management team now in place, combined with strong distributor growth in 2004, we are optimistic about our performance in the coming year. We expect to start generating revenue from the Japanese and Mexican markets, the world's 2nd and 4th largest direct-selling markets, in the next few months. We also foresee continuing to increase our reach inside our established markets. New products are in the pipeline which we hope will have a significant positive impact on our revenues before the end of the year."

55.     On April 29, 2005, the Company issued a press release announcing its fiscal 2005

first quarter results.  Therein, Defendant Woodburn states, in relevant part:

We are extremely pleased with our strong start in the new year. Our top line continues to grow significantly. Our KGC subsidiary just hosted an event in Moscow with 10,000 people in attendance. We are looking forward to our North American convention in Dallas on April 29th and 30th, where we are expecting up to 1,500 attendants. These events have proven to be highly effective in increasing the number of distributors. We are also very enthusiastic about our new products currently in the pipeline which we hope will have a significant positive impact on our future revenues. Furthermore, we expect to start generating revenue from our Mexican subsidiary toward the end of the second quarter. Also planned for in the second quarter, we intend to begin opening as many as four "experience centers" in China, where prospective consumers can sample our products. In order to fully and effectively serve our Chinese consumers, we plan on opening a manufacturing facility in China during the second half of this year. Finally, our Japanese subsidiary is expected to start producing sales in the third quarter. As you can see, we have a very ambitious schedule for this year. Fortunately, we hired experienced executives and professionals to expand our senior management team in the last several months to help execute this very aggressive slate of projects.

56.     On March 31, 2005, the Company filed its Form 10-K for fiscal year ended

December 31, 2004 which provided, in relevant part:

Product Warranties and Returns

Lexxus. The Lexxus refund policies and procedures closely follow industry and country-specific standards, which vary greatly by country. For example, in the United States, the Direct Selling Association recommends that direct sellers permit returns during the twelve-month period following the sale, while in Hong Kong the standard return policy is 14 days following the sale. We have conformed our return policies to local laws or the recommendation of the local direct selling association. In most cases, distributors may return unopened product that is in resalable condition for a partial refund. Lexxus must be notified of the return in writing and such written requests would be considered a termination notice of the distributorship.

From time to time we alter our return policy in response to special circumstances. For example, in April 2004, an investigative television program was aired in the People's Republic of China with respect to the operations of the Company's Hong Kong subsidiary and the Lexxus representative office located in Beijing. The television program made allegations that Lexxus's Hong Kong operations engaged in fraudulent activities and sold products without proper permits. In order to address the concerns of many independent distributors, Lexxus extended its existing 14-day return policy in Hong Kong to 180 days to allow distributors and customers who purchased products during the two-week period prior to, and the two-week period after, the airing of the television program to return purchased merchandise for a full refund. See "Recent Developments" in Item 1. In October 2004, this special extended product return policy expired.

eKaire. eKaire product warranties and refund policies are similar to those of other companies in the industry. If a distributor is not satisfied with the product then he/she can return the product to eKaire for a full refund within ninety (90) days of the first time the product was purchased. A distributor may return or exchange products that are unopened and in resalable condition thirty (30) days after the date of purchase.

*       *       *

Inventory Valuation. The Company reviews its inventory carrying value and compares it to the net realizable value of its inventory and any inventory value in excess of net realizable value is written down. In addition, the Company reviews its inventory for obsolescence and any inventory identified as obsolete is reserved or written off. The Company's determination of obsolescence is based on assumptions about the demand for its products, product expiration dates, estimated future sales, and management's future plans. Also, if actual sales or management plans are less favorable than those originally projected by management, additional inventory reserves or write-downs may be required. The Company's inventory value at December 31, 2004 was approximately $13,991,000. Inventory write-downs for years 2002, 2003, and 2004 were not significant.

*     *     *

Allowance for Sales Returns. An allowance for sales returns is provided during the period the product is shipped. The allowance is based upon the return policy of each country, which varies from 14 days to one year, and their historical return rates, which range from approximately 1% to approximately 18% of product sales. Sales returns are approximately 4% and 5% of product sales for the years ended December 31, 2003 and 2004, respectively. The allowance for sales returns was approximately $381 thousand and $1,541 thousand at December 31, 2003 and 2004, respectively. No material changes in estimates have been recognized for the years ended December 31, 2003 and 2004.

Revenue Recognition. Product sales are recorded when the products are shipped and title passes to independent distributors. Product sales to distributors are made pursuant to a distributor agreement that provides for transfer of both title and risk of loss upon our delivery to the carrier, which is commonly referred to as "F.O.B. Shipping Point." The Company primarily receives payment by credit card at the time distributors place orders. The Company's sales arrangements do not contain right of inspection or customer acceptance provisions other than general rights of return. Amounts received for unshipped product are recorded as deferred revenue. Such amounts totaled $4.3 million and $4.8 million at December 31, 2003 and 2004, respectively.

Enrollment package revenue, including any nonrefundable set-up fees, is deferred and recognized over the term of the arrangement, generally twelve months. Enrollment packages provide distributors access to both a personalized marketing website and a business management system. Prior to the acquisition of MarketVision Communications Corp. ("MarketVision") on March 31, 2004, the Company paid MarketVision a fixed amount in exchange for MarketVision creating and maintaining individual web pages for such distributors. These payments to MarketVision were deferred and recorded as a prepaid expense. The related amortization was recorded to cost of sales over the term of the arrangement. The remaining unamortized costs were included in the determination of the purchase price of MarketVision. Subsequent to the acquisition of MarketVision, no upfront costs are deferred as the amount is nominal. At December 31, 2004, enrollment package revenue totaling $4.7 million was deferred. Although the Company has no immediate plans to significantly change the terms or conditions of enrollment packages, any changes in the future could result in additional revenue deferrals or could cause us to recognize its deferred revenue over a longer period of time.

57.    On August 11, 2005, the Company issued a press release announcing its financial

results for its fiscal 2005 second quarter. The press release provided, in relevant part:

Net sales in the second quarter of 2005 were approximately $49.9 million, up 182% from the $17.7 million for the comparable period a year ago. This increase was largely due to significant growth in the Hong Kong-based business, which recorded approximately $32.0 million net sales in the three months ended June 30, 2005, up from $2.9 million during the comparable period last year. For the six months ended June 30, 2005, net sales rose 64% to approximately $92.7 million compared to $56.4 million for the same period during 2004.

For the second quarter of 2005, the Company recorded a net loss of approximately $2.2 million, or $0.32 per fully diluted share. In the second quarter of 2004, the Company had a net loss of $6.7 million, or $1.24 per fully diluted share.

Mark Woodburn, President of Natural Health Trends Corp., said, "Our loss in the quarter relates directly to the Company's aggressive investments in growing our business in our most promising markets: China, Japan, Mexico and the U.S. Spending for our market and product expansion is expensed as they are incurred, even though the benefits do not occur in the same quarter."

\*       \*       \*

Mr. Woodburn said, "We are pleased with the incredible top-line growth we are experiencing. With $29 million of cash at the end of the quarter, our business is generating cash and acquiring new distributors at a rapid pace. We are also confident that our investment in the top line will ultimately benefit the bottom line. Our Hong Kong office just celebrated the grand opening of our first Chinese experience center in Guangzhou and a new customer service facility in Hong Kong. We are also preparing a new factory in Zhuhai, China and expect it to be operating and producing products in a few months. We expect this factory to help reduce costs and improve customer services. After a brief delay, our Mexico office started generating revenue in July, and we eagerly await the opening of our Japanese business in the fourth quarter."

58.    On October 6, 2005, the Company issued a press release announcing that it had

appointed defendant Hesse as interim CEO and intended to add independent directors to

"enhance corporate governance." In the press release, defendant Hesse commented as follows:

I have watched Natural Health Trends Corp. evolve in the past 4 years from a small direct selling business in North America, to a multinational organization doing business in over 30 countries, with revenues in excess of $92 million in the first half of this year. In order to help the Company achieve its vision, the Board of Directors has asked me to play a more active role in management and enhance our corporate governance focus, while also concentrating our Company resources on our largest growth opportunities: expanding our Lexxus business in Mexico, Japan and China.

59. On November 15, 2005, the Company issued a press release announcing its

financial results for its fiscal 2005 third quarter. The press release provided, in relevant part:

> Net sales in the third quarter of 2005 were approximately $58.1 million, up 43% from the $40.5 million for the comparable period a year ago. For the nine months ended September 30, 2005, net sales rose 56% to approximately $150.8 million compared to $96.9 million for the same period during 2004.

60. On March 30, 2006, and April 18, 2006, the Company announced that it would

again be delinquent in filing its Annual Report for its fiscal year 2005.

61. On April 3, 2006, the Company issued a press release entitled "Natural Health

Trends Corp. Announces Reorganization" that stated, in relevant part:

> Natural Health Trends Corp., an international direct-selling company, (the "Company") announced on March 28, 2006 that the Board of Directors (the "Board") and Robert H. Hesse mutually agreed that Mr. Hesse has completed his assignment as the Interim Chief Executive Officer of the Company, effective immediately. Mr. Hesse will continue to serve the Company as a member of its Board of Directors.

> In addition, as of March 28, 2006, the Board promoted Curtis Broome from President-Greater China and Southeast Asia to the position of President of NHT Global, which was formerly known as "Lexxus International," and will on an interim basis serve as the Company's principal executive officer. The Search Committee of the Board of Directors continues to conduct an active search for a chief executive officer.

> Mr. Hesse said, "The state of this Company is strong. Our management talent is deep. We made strategic investments in China, Japan and Mexico that are paying off. The Company just concluded a successful convention in Dallas for our North American market. I feel very confident about the Company's future."

> Mr. Broome stated, "Bob has come into this interim role at the helm of the Company at a difficult time and achieved many wonderful accomplishments within a short period of time. We are grateful for his contribution and wish him well in the future."

> The Board also formed an Executive Management Committee (the "EMC"), replacing the Office of the Chief Executive, that consists of Mr. Broome, Mr. Sharng, and John Cavanaugh, the President of the Company's MarketVision subsidiary. Terrence Morris, a member of the Company's Board of Directors, will

have the right to attend all meetings of the EMC and will liase with the Board regarding matters addressed by the EMC. The EMC will manage the Company's day-to-day operations and will report directly to the Board. In the event that the Board determines that continued participation with the EMC would interfere with Mr. Morris' exercise of independent judgment in carrying out his responsibilities as a director, Mr. Morris may be asked to refrain from participating in EMC matters in order to preserve his status as an independent director on the Board. As compensation for Mr. Morris' additional tasks, a monthly payment of $4,000 has been approved by the Board.

Sir Brian Wolfson decided, for personal reasons, to resign as Chairman of the Board and will continue to serve on the Board as its Vice Chairman. In connection therewith, the Board appointed Randall A. Mason, a member of the Board since May 2003, as its Chairman.

62.     On May 9, 2006, Natural Health announced its fourth quarter 2005 results as

follows:

Net sales in the fourth quarter of 2005 were $43.7 million, up 20% from the $36.3 million for the comparable period a year ago. For the twelve months ended December 31, 2005, net sales rose 46% to $194.5 million compared to $133.2 million for the same period during 2004.

For the fourth quarter of 2005, the Company incurred a net loss of $6.3 million, or $0.88 per fully diluted share, compared to a net loss of $0.8 million or $0.12 per fully diluted share a year ago in the comparable quarter. For the full year of 2005, the Company recorded net loss of $5.5 million, or $0.79 per fully diluted share, compared to $1.2 million net income in 2004, or $0.18 per fully diluted share.

63.     On May 8, 2006, the Company filed its Form 10-K for the fiscal year ended

December 31, 2005, which stated in relevant part as follows:

Revenue Recognition

Product sales are recorded when the products are shipped and title passes to independent distributors. Product sales to distributors are made pursuant to a distributor agreement that provides for transfer of both title and risk of loss upon our delivery to the carrier that completes delivery to the distributors, which is commonly referred to as "F.O.B. Shipping Point." The Company primarily receives payment by credit card at the time distributors place orders. Amounts received for unshipped product are recorded as deferred revenue. The Company's sales arrangements do not contain right of inspection or customer acceptance provisions other than general rights of return.

Actual product returns are recorded as a reduction to net sales. The Company estimates and accrues a reserve for product returns based on its return policies and historical experience.

During April 2005, the Company launched a new product line, Gourmet Coffee Café, which consists of coffee machines and the related coffee and tea pods, in the North American market. As the Gourmet Coffee Café is a very different product than the Company's other products and there is no reliable information on the Company's sales returns or warranty obligation, the Company has deferred all revenue generated from the sale of coffee machines and the related coffee and tea pods until sufficient return and warranty experience on the product can be established. The deferral totaled approximately $1.6 million and $1.2 million in revenue and related costs, respectively, for product shipped through December 31, 2005. The deferred costs are recorded in other current assets, as the sales return period for distributors is only for a year. Since the launch, the Company has experienced a high rate of defects and product returns. As a result, the Company has delayed continued sales of our existing inventory of this product and approached the manufacturer for resolution. The manufacturer has agreed to repair all of the machines in our existing inventory and provide discounts on future purchases. The Company is currently planning to re-start the sale of the coffee machines in the second half of 2006.

Enrollment package revenue, including any nonrefundable set-up fees, is deferred and recognized over the term of the arrangement, generally twelve months. During the third quarter of 2004, the Company changed its amortization methodology from a monthly method to the preferred daily method whereby revenues for each enrollment package start the day of enrollment. The change in methodology resulted in additional deferred revenue of approximately $280,000 during 2004. Enrollment packages provide distributors access to both a personalized marketing website and a business management system. Prior to the acquisition of MarketVision Communications Corp. ("MarketVision") on March 31, 2004, the Company paid MarketVision a fixed amount in exchange for MarketVision creating and maintaining individual web pages for such distributors. These payments to MarketVision were deferred and recorded as a prepaid expense. The related amortization was recorded to cost of sales over the term of the arrangement. The remaining unamortized costs were included in the determination of the purchase price of MarketVision. Subsequent to the acquisition of MarketVision, no upfront costs are deferred as the amount is nominal.

Shipping charges billed to distributors are included in net sales. Costs associated with shipments are included in cost of sales.

\*       \*       \*

32

RELATED PARTY TRANSACTIONS

In August 2001, the Company entered into a written lease agreement and an oral management agreement with S&B Business Services, an affiliate of Brad LaCore, the brother of Terry LaCore, former Chief Executive Officer of Lexxus U.S. and former director of the Company, and Sherry LaCore, Brad LaCore's spouse. Under the terms of the two agreements, S&B Business Services provides warehouse facilities and certain equipment, manages and ships inventory, provides independent distributor support services and disburses payments to independent distributors. In exchange for these services, the Company pays $18,000 annually for leasing the warehouse, $3,600 annually for the lease of warehouse equipment and $120,000 annually for the management services provided, plus an annual average of approximately $12,000 for business related services. The Company paid S&B Business Services approximately $150,000, $160,000 and $158,000 during 2003, 2004 and 2005, respectively. As of December 31, 2005, the Company owed approximately $1,400 to S&B Business Services.

The payment disbursement function was transferred to the Company's Dallas head office during the third quarter of 2005. In January 2006, the Company hired Sherry LaCore as an employee and simultaneously terminated the oral management agreement. Additionally, the Company closed the warehouse facility by the end of March 2006 and terminated the related lease agreement.

In September 2001, the Company entered into an oral consulting agreement with William Woodburn, the father of Mark Woodburn, former President and director of the Company, pursuant to which William Woodburn provided the Company with management advice and other advisory assistance. In exchange for such services, the Company starting June 8, 2001 paid to Ohio Valley Welding, Inc., an affiliate of William Woodburn, $6,250 on a bi-weekly basis. The Company paid $168,750 and $118,750 during 2003 and 2004, respectively, to Ohio Valley Welding, Inc. The consulting agreement between the Company and William Woodburn was terminated as of September 30, 2004.

The Company's former controller is married to Mark Woodburn, former President and director of the Company. Her employment with the Company ended in August 2004. The Company paid her approximately $100,000 in each of the years 2003 and 2004.

On March 31, 2004, the Company entered into a merger agreement with MarketVision, pursuant to which the Company acquired all of the outstanding capital stock of MarketVision (see Note 6). As a founding stockholder of MarketVision, Terry LaCore, former Chief Executive Officer of Lexxus U.S. and former director of the Company, received 450,000 shares of the Company's common stock and was entitled to receive approximately $840,000 plus interest

from promissory notes issued by the Company. As of December 31, 2005, no amounts remained outstanding to Mr. LaCore.

On October 6, 2004, certain members of the Company's board of directors and certain of the Company's officers invested approximately $25,000 and purchased 1,984 units upon the same terms and conditions as the other buyers in the private placement (see Note 11).

A director of the Company's China subsidiary is the sole director of Access Int'l (Zhuhai Ftz) Warehousing & Trading Co. Ltd. and its group (collectively, "Access"), a transportation and logistics company, and the owner of Info Development Ltd. ("Info"), an import services company, both of which provided services to the Company's Hong Kong subsidiary. Payments totaling approximately $5.2 million and $0.2 million were paid to Access and Info during 2005, respectively. At December 31, 2005, approximately $3,300 was due to Access.

64.    On May 31, 2006, the Company filed to amend its Form 10-K for the fiscal year

ended December 31, 2005, which stated as follows:

Restatement of Previously Issued Financial Statements

During its review of its financial statements for the first three months of 2006, the Company identified certain importation costs totaling approximately $633,000 incurred by our Hong Kong subsidiary in December 2005 for product not recognized as revenue until 2006. On May 29, 2006, the Company's Chief Financial Officer determined, after discussion with the Company's independent outside auditor, that it would be more appropriate to capitalize this cost in inventories at December 31, 2005, and subsequently expense to cost of sales in the following period.

65.    On June 20, 2006, Natural Health announced its first quarter 2006 results as

follows:

Net sales in the first quarter of 2006 were $39.5 million, compared to $42.8 million for the first quarter a year ago. This net decrease of $3.3 million, or 8%, was due to sale of the Company's 51% equity interest in KGC Networks ("KGC"), effective December 31, 2005. Excluding KGC, the Company's net sales increased $5.1 million, or 15%, over the comparable period in the prior year. This increase was primarily due to growth in the Hong Kong-based business (contributing $3.9 million of the total increase), South Korea ($1.2 million), and the opening of the Japan and Mexico offices (contributing $1.8 million and $1.1 million, respectively), offset by reductions in net sales in North America ($1.8 million) and Southeast Asia ($1.0 million).

34

The overall growth in net sales is attributable to an increase in the number of active independent distributors. As of March 31, 2006, the operating subsidiaries of the Company had 124,000 active distributors, compared to 122,000 and 92,000 active independent distributors at the end of 2005 and the end of the first quarter of 2005, respectively, excluding KGC.

                    *       *       *

Mr. Curtis Broome, President of NHT Global, a subsidiary of Natural Health Trends Corp., said "With the relatively new direct selling environment in China, we anticipate more short-term volatility in the coming months with respect to our Hong Kong-based business. But we are very excited about our progress in Japan, Mexico, South Korea, Taiwan and the Philippines. In addition, we expect that more momentum can be created in Japan with an official opening event in Tokyo."

66.     On July 11, 2006, the Company announced that it had divested its interests in the

Kaire subsidiaries.

67.     On August 11, 2006, the Company issued a press release announcing the financial

results for its second quarter 2006 that stated, in relevant part:

Net sales in the second quarter of 2006 were $36.3 million, compared to $50.0 million for the second quarter a year ago. This net decrease of $13.7 million, or 27%, was largely due to sale of the Company's 51% equity interest in KGC Networks ("KGC"), effective December 31, 2005. Excluding KGC, the Company's net sales decreased $5.4 million, or 13%, over the comparable period in the prior year. This decrease was primarily due to hesitation among the Hong Kong-registered members against an uncertain regulatory environment in China. Hong Kong net sales decreased $7.9 million, or 25%, over the comparable period a year ago. Also, net sales for North America were down $1.1 million, or 24%, versus the comparable period a year ago. Partly offsetting the decrease, South Korea net sales increased $1.4 million, or 66%, compared to the same period in 2005, as it experienced a significant increase in its distributor count and introduced new products to the local market. Japan registered $2.3 million in net sales, and Mexico about $0.8 million. A year ago, advanced sales to Japanese distributors from Singapore were approximately $1.4 million.

As of June 30, 2006, the operating subsidiaries of the Company had 117,000 active distributors, compared to 122,000 and 106,000 active independent distributors at the end of 2005 and the end of the second quarter of 2005, respectively, excluding KGC. This decrease is due to the uncertain regulatory environment in China that is currently impacting the Hong Kong-based business.

For the second quarter of 2006, the Company incurred a net loss of $2.8 million, or $0.34 per fully diluted share, compared to a net loss of $2.2 million, or $0.32 per fully diluted share, a year ago in the comparable quarter. For the first six months of 2006, the Company incurred a net loss of $3.9 million, or $0.50 per fully diluted share, compared to net income of $0.6 million, or $0.08 per fully diluted share, a year ago in the comparable period.

Gross profit margin for the second quarter was 76.6% of net sales, versus 75.1% for the same period a year ago. Excluding KGC, gross profit was 74.1% of net sales in the comparable period in the prior year. The percentage increase results from greater importation cost incurred in Hong Kong a year ago as the Company implemented changes in its logistical processes on product delivered into China.

Distributor commissions were 51.7% of net sales for the three months ended June 30, 2006, compared with 55.3% of net sales for the three months ended June 30, 2005. Excluding KGC, distributor commissions as a percentage of sales decreased five points from 56.7% a year ago primarily as a result of less supplemental commission programs in the current year, specifically in Hong Kong, and a reduction in the overall commission rate in South Korea.

68.     The statements contained in the Company's public filings, press releases and the various public announcements made during the Class Period were each materially false and misleading when made because, among other things:  (a) the Company's revenue and profits were artificially inflated as a result of phony transactions; (b) the Company's internal controls and procedures were inadequate and enabled and assisted the Defendants in engaging in improper transactions; (c) the Company was experiencing significant and material returns by its distributors which reflected the true market penetration and acceptance of its products and which would inevitably, once properly accounted for, result in a significant reduction in the Company's earnings and increase in its expenses; (d) the Company's financial statements were not prepared in accordance with GAAP or SEC regulations. Consequently, the Company's statements concerning its past financial performance and future prospects each misrepresented the quality and nature of the Company's revenues, earnings, assets and prospects.

## VIOLATIONS OF GAAP

33.     The Company failed to file financial statements with the SEC that conformed to the requirements of Generally Accepted Accounting Principles ("GAAP"), such that the financial statements were presumptively misleading and inaccurate.

34.     As a result of the Company's accounting improprieties detailed above, the Company's reported financial results also violated the following provisions of GAAP, for which each defendant is necessarily responsible:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions;

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources;

- The principle that financial reporting should provide information about how management of an enterprise had discharged its stewardship responsibility to owners for the use of enterprise resources entrusted.     To the extent management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities to prospective investors to the public in general;

- The principle that financial reporting should provide information about an enterprise's financial performance during a period.     Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.     Thus, although investment and credit decisions reflect investors'

expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance;

- The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant to a notion that is central to accounting;

- The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions; and

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.

**ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER AND FALSITY**

69.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Natural Health, their control over, and/or receipt and/or modification of Natural Health allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Natural Health, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

70.     At all relevant times, the market for Natural Health securities was an efficient market.

71.     As a result of the foregoing, the market for Natural Health securities promptly digested current information regarding Natural Health from all publicly available sources and reflected such information in Natural Health share price.   Under these circumstances, all purchasers of Natural Health securities during the Class Period suffered similar injury through their purchase of Natural Health securities in an efficient market at artificially inflated prices and a presumption of reliance applies.

## Applicability Of Affiliated Ute Presumption Of Reliance

72.     Neither Plaintiff nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which involves a failure to disclose, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.  This complaint is based primarily on defendants' non-disclosure of the material fact that Natural Health's business could not be sustained as a material portion of the Company's operating earnings were derived from improper sales of its products to certain control persons in violation of GAAP and federal securities regulations.

## DEFENDANTS CAUSED PLAINTIFF'S LOSSES

73.     During the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Natural Health's share price and operated as a fraud or deceit on purchasers of Natural Health shares by misrepresenting the Company's financial condition and business prospects.  Once defendants' misrepresentations and fraudulent conduct were disclosed to the market, Natural Health's share price reacted negatively as the artificial inflation was removed from its share price. As a result of their purchases of Natural Health's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss.

74.     During the Class Period, defendants' false and misleading statements had the intended effect and caused Natural Health shares to trade at artificially inflated levels throughout the Class Period.

75.     As investors and the market became aware of Natural Health's prior misstatements and omissions and that Natural Health's actual financial condition and business prospects were, in fact, not as represented, Natural Health's share price reacted negatively, damaging investors.

76.     Had Plaintiff and the other members of the Class known the truth behind the Company's disclosures, they would not have purchased the Company's shares.

## NO SAFE HARBOR

77.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific misrepresentations of defendants pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Natural Health who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act and Rule 10b-5 Promulgated Thereunder as Against All Defendants

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.     Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of Natural Health shares.

80.     The purpose and effect of defendants' plan, scheme and course of conduct was to artificially inflate and maintain the price of Natural Health shares.

41

81.     Defendants, who are the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Natural Health personnel to members of the investing public, including plaintiff and the Class, and the securities analysts.

82.     As a result of the foregoing, the market price of Natural Health securities was artificially inflated during the Class Period.  In ignorance of the falsity of defendants' statements, plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of Natural Health securities during the Class Period in purchasing Natural Health shares at prices which were artificially inflated as a result of defendants' false and misleading statements.

83.     Had plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Natural Health shares at the artificially inflated prices that they did.

84.     By virtue of the foregoing, defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

86.     This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against
### The Individual Defendants

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.     This second claim under § 20(a) of the Exchange Act is alleged against the Individual Defendants only, based on the primary violation of § 10b and Rule 10b-5 by Natural Health as stated in the First Claim above.

89.     The Individual Defendants acted as controlling persons of Natural Health within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading information disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  These defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Natural Health, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

92.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

93.     This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(A)     Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(B)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 8, 2006

Respectfully submitted,

_Thomas E. Bilek_
_____

Thomas E. Bilek
State Bar No. 02313525
**HOEFFNER & BILEK, L.L.P.**
1000 Louisiana, Suite 1302
Houston, TX  77002
(713) 227-7720
FAX (713) 227-9404

Phillip Kim, Esq.
Laurence Rosen, Esq.
**THE ROSEN LAW FIRM, P.A.**
350 Fifth Avenue, Suite 5508
New York, NY  10118
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

Christopher S. Hinton, Esq.
**THE HINTON LAW FIRM**
350 Fifth Avenue, Suite 5508
New York, NY  10118
Telephone: (646) 723-3377
Facsimile: (212) 202-3827

COUNSEL FOR PLAINTIFFS

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Natural Health Trends Corp., its current and former officers and directors and affiliated parties. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the complaint against Natural Health Trends Corp. and certain of its officers and directors and affiliated parties and authorized the filing thereof by the Rosen Law Firm, P.A., whom I retain as counsel in this action for all purposes.

2.     I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.     I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     The following is a list of all of the purchases and sales I have made in Natural Health Trends Corp. securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.
See Schedule A

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws.

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of Aug, 2006.

Signature: _____
Name:
Address:
Phone:
E-mail:

## SCHEDULE A

| Quantity Purchased | Purchase Price | Date Purchased | Quantity Sold | Sell Price | Date Sold |
|---|---|---|---|---|---|
| 1000 | 7.50 | 11/19/2003 | 1800 | 7.95 | 11/24/2003 |
| 1000 | 7.50 | 11/19/2003 | 1200 | 7.95 | 11/24/2003 |
| 500 | 7.45 | 11/19/2003 | 300 | 14.30 | 2/17/2004 |
| 500 | 7.45 | 11/19/2003 | 200 | 14.30 | 2/17/2004 |
| 500 | 13.85 | 2/4/2004 | 500 | 14.30 | 2/17/2004 |
| 500 | 13.65 | 2/10/2004 | 800 | 18.25 | 3/11/2004 |
| 800 | 15.80 | 3/3/2004 | 200 | 18.25 | 3/11/2004 |
| 200 | 15.80 | 3/3/2004 | 1000 | 19.15 | 3/17/2004 |
| 1000 | 18.70 | 3/16/2004 | 100 | 24.50 | 5/21/2004 |
| 1000 | 20.50 | 3/19/2004 | 100 | 24.65 | 5/21/2004 |
| 750 | 20.75 | 3/23/2004 | 100 | 24.50 | 5/21/2004 |
| 200 | 21.10 | 3/29/2004 | 300 | 24.50 | 5/21/2004 |
| 300 | 21.10 | 3/29/2004 | 100 | 24.50 | 5/21/2004 |
| 900 | 20.15 | 3/30/2004 | 300 | 24.50 | 5/21/2004 |
| 1250 | 19.75 | 3/30/2004 | 500 | 15.05 | 6/29/2004 |
| 100 | 20.15 | 3/30/2004 | 300 | 15.05 | 6/29/2004 |
| 500 | 18.25 | 3/31/2004 | 200 | 15.05 | 6/29/2004 |
| 400 | 21.50 | 4/12/2004 | 500 | 15.05 | 6/29/2004 |
| 1000 | 21.50 | 4/12/2004 | 500 | 15.05 | 6/29/2004 |
| 600 | 21.50 | 4/14/2004 | 450 | 10.50 | 12/1/2004 |
| 2000 | 13.50 | 6/25/2004 | 500 | 10.55 | 12/3/2004 |
| 1000 | 14.00 | 2/1/2005 | 500 | 10.55 | 12/3/2004 |
| | | | 500 | 10.55 | 12/3/2004 |
| | | | 650 | 10.55 | 12/10/2004 |
| | | | 2400 | 10.55 | 12/10/2004 |
| | | | 1000 | 11.15 | 1/12/2005 |
| | | | 1000 | 14.10 | 2/11/2005 |

%JS 44 (Rev. 11/04)  CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Gary Zegami, on behalf of himself and all others similarly situated

## DEFENDANTS
Natural Health Trends Corp, et al.

**3-06CV1654-D**

(b) County of Residence of First Listed Plaintiff **Dallas**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Thomas E. Bilek, Hoeffner & Bilek LLP    (713) 227-7720
1000 Louisiana, Suite 1302, Houston, Texas, 77002

Attorneys (If Known)

RECEIVED
SEP 1  2006
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Brief description of cause: 15 U.S.C. 78, 17 CFR 240 - Violation of securities laws

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE                   DOCKET NUMBER

DATE
Sept. 8, 2006

SIGNATURE OF ATTORNEY OF RECORD
Thomas E. Bilek

## FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____