UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

GARY ZAGAMI, BRIAN KELLY, AND       §
RICK PATMORE, on behalf of themselves   §
and all others similarly situated,       §
                                         §
                   Plaintiff(s),         §        Civil Action No.: 3-06-CV-1654-D
                                         §
v.                                       §
                                         §        CLASS ACTION
NATURAL HEALTH TRENDS CORP.,            §
MARK D. WOODBURN, TERRY L.              §
LaCORE, and RANDALL A. MASON,           §
                                         §
                   Defendants.           §

**DEFENDANTS NATURAL HEALTH TRENDS CORPORATION AND RANDALL A.
MASON'S REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   PLAINTIFFS HAVE PLED, AT MOST, A DERIVATIVE BREACH-OF-
FIDUCIARY-DUTY CLAIM, NOT A SECURITIES-FRAUD CLAIM ...........................2

III.  PLAINTIFFS CANNOT IMPUTE WOODBURN'S AND LaCORE'S
SCIENTER TO NHTC .........................................................................................3

    A.    *Respondeat superior* liability does not work .........................................3

    B.    The adverse-interest exception precludes the imputation of Woodburn's
and LaCore's scienter to NHTC ................................................................5

        1.    Plaintiffs allege that Woodburn and LaCore acted adversely to
NHTC ............................................................................................5

        2.    Plaintiffs cannot sidestep the adverse-interest exception with an
"innocent shareholder" argument .................................................7

        3.    The "sole actor" rule does not negate the adverse-interest
exception .......................................................................................8

IV.  NHTC DID NOT HAVE A DUTY TO DISCLOSE THE RELATED-PARTY
TRANSACTIONS .................................................................................................9

    A.    The related-party transactions were not material to NHTC and thus not
required to be disclosed under Reg. S-K or GAAP ...................................9

    B.    NHTC's disclosures were not incomplete ...............................................12

V.   PLAINTIFFS CANNOT DEMONSTRATE LOSS CAUSATION ...................................13

    A.    The October 6, 2005 press release did not disclose any *facts* related to the
omitted facts here—it only disclosed the beginning of an investigation and
the termination of Woodburn and LaCore ..............................................13

    B.    Plaintiffs are not entitled to recover any damages for the August 11, 2006
disclosure ................................................................................................17

VI.  PLAINTIFFS CANNOT DEMONSTRATE THAT MASON SHOULD BE HELD
LIABLE AS A CONTROL PERSON .......................................................................18

# <u>TABLE OF AUTHORITIES</u>

## FEDERAL CASES

*Abbott v. Equity Group, Inc.,*
  2 F.3d 613 (5th Cir. 1993) ........................................................................19

*Akin v. Q-L Investments, Inc.,*
  959 F.2d 521 (5th Cir. 1992) ....................................................................12

*In re Atlantic Finance Management,*
  784 F.2d 29 (1st Cir. 1986) .......................................................................8

*In re Baker Hughes Sec. Litigation,*
  136 F. Supp. 2d 630 (S.D. Tex. 2001) ..............................................17, 20

*Bell Atlantic Corp. v. Twombly,*
  127 S. Ct. 1955 (2007) ..................................................................14, 19, 20

*In re Bradley Pharms., Inc. Sec. Litigation,*
  421 F. Supp. 2d 822 (D.N.J. 2006) ..........................................................18

*In re Bristol-Myers Squibb Sec. Litigation,* No. Civ. A. 00-1990,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) ..............................................17

*Brumbaugh v. Wave System Corp.,*
  416 F. Supp. 2d 239 (D. Mass. 2006) ......................................................18

*In re CNET Networks, Inc.,*
  483 F. Supp. 2d 947 (N.D. Cal. 2007) .....................................................20

*In re Craftmatic Sec. Litigation,*
  890 F.2d 628 (3rd Cir. 1989) .....................................................................3

*D.E. & J Ltd. Partnership v. Conaway,*
  284 F. Supp. 2d 719 (E.D. Mich. 2003).....................................................17

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005).........................................................................13, 17, 18

*In re Electronic Data System Corp. Sec. & ERISA Litigation,*
  298 F. Supp. 2d 544 (E.D. Tex. 2004)........................................................17

*In re Enron Corp. Sec. Deriv. & ERISA Litigation,* Civ. A. H-01-3624,
  2003 WL 230688 (S.D. Tex. Jan. 28, 2003)............................................5, 19

*Erie R. Co. v. Tompkins,*
   304 U.S. 64 (1938) ................................................................................3

*F.D.I.C. v. Shrader & York,*
   991 F.2d 216 (5th Cir. 1993) ..............................................................5

*First Virginia Bankshares v. Benson,*
   559 F.2d 1307 (5th Cir. 1977) ...........................................................12

*In re Fleming Cos. Sec. & Deriv. Litigation,* No. Civ. A. 503MD1530TJW,
   2004 WL 5278716 (E.D. Tex. June 16, 2004) ..................................19

*Greater Penn. Carpenters Pension Fund v. Whitehall Jewellers, Inc.,*
   2005 WL 61489 (N.D. Ill. Jan. 10, 2005) .........................................18

*Greenberg v. Crossroads System, Inc.,*
   364 F.3d 657 (5th Cir. 2004) .............................................................18

*In re Healthsouth Corp. S'holders Litigation,*
   845 A.2d 1096 (Del. Ch. 2003) ...........................................................8

*Helwig v. Vencor, Inc.,*
   251 F.3d 540 (6th Cir. 2001) .............................................................12

*In re Hienergy Techs., Inc.,*
   2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) ..................................18

*Iron Workers Loc. 16 Pens. V. Hilb Rogal & Hobbs,*
   432 F. Supp. 2d 571 (E.D. Va. 2006) .................................................9

*In re K-Telegraph International, Inc. Sec. Litigation,*
   300 F.3d 881 (8th Cir. 2002) .............................................................12

*Kapps v. Torch Offshore, Inc.,*
   379 F.3d 207 (5th Cir. 2004) ..............................................................9

*King v. Gibbs,*
   876 F.2d 1275 (7th Cir. 1989) ............................................................4

*Kunzweiler v. Zero.Net, Inc.,*
   2002 WL 1461732 (N.D. Tex. Jul. 3, 2002) ....................................11

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) .......................................................13, 15

*McGonigle v. Combs,*
  968 F.2d 810 (9th Cir. 1992) ............................................................3

*McNamara v. Bre-X minerals Ltd.,*
  46 F. Supp. 2d 628 (E.D. Tex. 1999)..............................................19

*In re Mediators, Inc.,*
  105 F.3d 822 (2d Cir. 1997)..............................................................9

*Morgan v. Kingdom of Saudi Arabia,*
  27 F.3d 169 (5th Cir. 1994) ..............................................................4

*In re Motorola Securities Litigation,* No. 03 C 287,
  2007 WL 487738 (N.D. Ill. Feb. 8, 2007) ......................................18

*Official Committee of Unsecured Creditors of Color Tile, Inc.,*
  322 F.3d 147 (2d Cir. 2003)..............................................................9

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,*
  267 F.3d 340 (3rd Cir. 2001) ............................................................9

*Oran v. Stafford,*
  226 F.3d 275 (3d Cir. 2000)..............................................................9

*In re Parmalat Securities Litigation*
  375 F. Supp. 2d 278 (S.D.N.Y. 2005)..............................................18

*Paul F. Newton & Co. v. Texas Commerce Bank,*
  630 F.2d 1111 (5th Cir. 1980) ..........................................................4

*Ryan v. Flowserve Corp.,*
  444 F. Supp. 2d 718 (N.D. Tex. 2006) ............................................13

*S.E.C. v. Pace,*
  173 F. Supp. 2d 30 (D.D.C. 2001) ....................................................6

*Southland Sec. Corp. v. Inspire Insurance Solutions Inc.,*
  365 F.3d 353 (5th Cir. 2004) ............................................................4

*In re Splash Tech. Holdings, Inc. Sec. Litigation,* No. C99-00109 SBA,
  2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ................................19

*Teachers' Retirement System of La. v. Hunter,*
  477 F.3d 162 (4th Cir. 2007) ..........................................................14

*Texas Industrial, Inc. v. Radcliff Materials, Inc.,*
451 U.S. 630 (1981)..................................................................................................3

*In re Tyco International Ltd.,* No. MDL 02-1335-B, 02-266-B,
2004 WL 2348315 (D.N.H. Oct. 14, 2004) ..........................................................2, 7, 8

*Unite Here v. Cintas Corp.,* No. 06 Cir. 7061,
2006 WL 2859279 (S.D.N.Y. Oct. 6, 2006) ..............................................................10

## STATUTES

17 C.F.R. § 229.404(a)....................................................................................................10

## RULES

F.R.C.P. 9(b) ...................................................................................................................19

F.R.C.P. 8(a) ...................................................................................................................19

## I.      INTRODUCTION

Plaintiffs' Opposition ("Opp.") is contradictory and self-defeating.  Plaintiffs argue that

Woodburn and LaCore's failure to disclose payments they received from an NHTC distributor

and a loan the Company made to Woodburn's father was fraudulent because disclosure would

have alerted investors that "two top officers were treating the Company as their personal piggy-

bank and funneling improper payments to themselves." (Opp. at 17.)  That is, the disclosures

"would have alerted investors that Woodburn and LaCore had subordinated NHTC's independent

interests in favor of themselves." (Opp. at 17.)  These claims show that Woodburn and LaCore's

alleged actions cannot be imputed to NHTC because, as pleaded, they were directly adverse to

NHTC and outside the scope of the officers' employment.  These claims also clarify that

plaintiffs are alleging true derivative claims and not securities-fraud claims.  The law is well

settled that where alleged omissions are material only because they would disclose an

executive's potential breaches of fiduciary duty—which is *exactly* what plaintiffs argue in their

Opposition—the claims are derivative in nature and cannot support a claim for securities fraud.

Further, NHTC had no duty to disclose the alleged related-party transactions because they were

immaterial to a reasonable investor.

The CAC is also defective because plaintiffs have not adequately pled the necessary

element of loss causation.  That is, plaintiffs have not shown that NHTC's October 6, 2005 or

August 11, 2006 press releases revealed any curative information to investors concerning the

alleged related-party transactions.  The October 6 release did not reveal ***any facts*** whatsoever

concerning the transactions; indeed, NHTC first disclosed information about these transactions

on November 15.  And the August 11, 2006 disclosure did not reveal any ***new facts*** that had not

already been disclosed in the November 15, 2005 release.  Without a curative disclosure on

either of these dates, plaintiffs cannot show the necessary causal connection between their

allegations of fraud and the drop in NHTC's stock price.  Moreover, plaintiffs failed to plead in

the CAC that the November 15 press release caused a decline in NHTC stock, and they cannot

fix that defect by argument in their Opposition.  As a result, plaintiffs cannot prove that their

losses were caused by any curative disclosure by NHTC, and their case should be dismissed.

Finally, plaintiffs' argument that Mason has control-person liability fails because

plaintiffs did not plead facts showing that Mason had any involvement in or control over the

alleged related-party transactions.  Plaintiffs failed to plead that Mason, as an individual, was

even aware of these transactions, let alone that he controlled the disclosure of these transactions.

Accordingly, the Court should dismiss the claims against him.

## II.    PLAINTIFFS HAVE PLED, AT MOST, A DERIVATIVE BREACH-OF-FIDUCIARY-DUTY CLAIM, NOT A SECURITIES-FRAUD CLAIM

Plaintiffs misconstrue NHTC's argument that their claims are derivative in nature—

NHTC did not argue that mismanagement allegations could never support a securities claim.

There is no debate that in certain situations, an executive's misconduct can support both a

breach-of-fiduciary-duty claim and a securities-fraud violation.  As plaintiffs note, the alleged

actions of Tyco's executives provide a good example of such misconduct—the executives

received millions in unauthorized compensation as an incentive to engage in a multi-billion

dollar accounting-fraud scheme.  (Lead Plaintiff's Memorandum of Law in Opposition to

Defendants' Motion to Dismiss ("Opp.") at 38 (citing *In re Tyco Int'l Ltd.*, No. MDL 02-1335-B,

02-266-B, 2004 WL 2348315, *6 (D.N.H. Oct. 14, 2004)).)  The *Tyco* court repeatedly stressed

that the plaintiffs alleged much more than a mere failure to disclose unauthorized compensation.

*Id.* at *2-4.  But that is all plaintiffs allege here, and it demonstrates why their allegations

support, at best, a breach-of-fiduciary-duty claim.

NHTC had a duty to disclose the Star Search payments *only* if they were material to NHTC. *McGonigle v. Combs*, 968 F. 2d. 810, 817 (9th Cir. 1992). Plaintiffs allege that the omissions are material because they "would have alerted investors that Woodburn and LaCore had subordinated NHTC's independent interests in favor of themselves." (Opp. at 17.) In other words, the alleged misconduct and omissions are alleged to be material only because they would "place potential investors on notice that management is culpable of a breach of faith…" *In re Craftmatic Sec. Litig.*, 890 F. 2d 628, 640 (3rd Cir. 1989). There was no duty to disclose the transactions *but for* this assertion of materiality.[1] This is the key distinction that demonstrates plaintiffs' claims are truly derivative claims for breach of fiduciary duty—not securities claims.

## III.   PLAINTIFFS CANNOT IMPUTE WOODBURN'S AND LaCORE'S SCIENTER TO NHTC

### A.   *Respondeat superior* liability does not work

Under *respondeat superior* and general agency principles, plaintiffs claim that Woodburn and LaCore's conduct should be imputed to NHTC. (Amended Class Action Complaint ("CAC") ¶ 126.) Plaintiffs' argument is deficient in part because they rely on non-existent law. There is no "federal common law" of *respondeat superior*. (Opp. at 32.) Indeed, as the Supreme Court has repeatedly noted, there is "no federal general common law." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).)[2] Thus, for example, the Fifth Circuit has held that "[s]tate law, not federal common law, governs whether an officer's or employee's action is within the scope of employment in

---

[1] As shown in Section IV, however, there was no duty to disclose at all because the transactions were not material to NHTC.

[2] While the Supreme Court has recognized the need and authority to formulate what is often referred to as "federal common law," these instances are "few and restricted," and fall into two categories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," and those in which Congress has given the courts the power to develop substantive law. *Texas Indus.*, 451 U.S. at 640.

determining the applicability of the FSIA" (Foreign Sovereign Immunities Act of 1976). *Morgan v. Kingdom of Saudi Arabia*, 27 F.3d 169, 173 (5th Cir. 1994); *see also King v. Gibbs*, 876 F.2d 1275, 1282 (7th Cir. 1989) (refusing to apply a "federal common law" right of indemnification under the federal securities laws). Not surprisingly, plaintiffs cite no case applying a "federal common law" theory of *respondeat superior*. (Opp. at 32.)

Plaintiffs argue that it is Woodburn's and LaCore's concealment of the alleged related-party transactions—not the transactions themselves—that violates the securities laws and gives rise to *respondeat superior* liability. (Opp. at 32.) But Woodburn and LaCore were not, and could not have been, authorized as agents to conceal information unknown to NHTC. Plaintiffs argue that Woodburn and LaCore's alleged decision to conceal the Star Search payments, which allegedly led to materially incomplete SEC reports, was done within the scope of their duties. (Opp. at 32.) If this were the law (which it is not), then *respondeat superior* liability would always exist in a securities fraud case. It defies common sense to hold that an agent concealing unauthorized compensation from its principal is acting with the principal's authorization.

Plaintiffs' cases on this point are easily distinguishable in that, in each one, there was no real challenge to whether the individual defendants' misconduct was within the scope of their employment. (Opp. at 31.) In addition, the actions of the executives—unlike the allegations in this case—were designed to benefit their employers' financial results. For example, in *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F. 2d 1111, 1114 (5th Cir. 1980), a registered representative of a brokerage firm engaged in a conspiracy to manipulate the price of a stock by facilitating phony trades. The brokerage firm was a market maker for the stock. Thus, his actions were well within the scope of his employment. Likewise, in *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 378-80 (5th Cir. 2004), the court applied *respondeat*

*superior* against Inspire for the false statements of its CEO concerning the positive financial impact of a major software contract. Obviously, the CEO's false statements concerning the software deal were made within the scope of his employment. Finally, Judge Harmon correctly applied *respondeat superior* in *Enron* because the massive accounting fraud committed by Enron executives was designed to generate false revenue for the Company and keep billions of dollars in debt off the books—their actions were well within the scope of their employment. *In re Enron Corp. Sec. Deriv. & ERISA Litig.*, Civ. A. H-01-3624, 2003 WL 230688, *7 (S.D. Tex. Jan. 28, 2003).

In any event, as shown below, the adverse-interest exception precludes the imputation of Woodburn and LaCore's alleged actions to NHTC.

## B. The adverse-interest exception precludes the imputation of Woodburn's and LaCore's scienter to NHTC

As plaintiffs note, the adverse-interest exception "provides that 'a principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting *adversely* to the principal and entirely for his own or another's purposes.'"  (Opp. at 27-28 (citing *F.D.I.C. v. Shrader & York*, 991 F.2d 216, 223 (5th Cir. 1993).)  Plaintiffs posit three arguments for why this well-settled rule does not shield NHTC: (1) Woodburn and LaCore were not acting adversely to NHTC; (2) the "sole actor" rule precludes application of the adverse-interest exception because Woodburn and LaCore and NHTC are one and the same; and (3) Woodburn and LaCore made misstatements or omissions to innocent shareholders with the apparent authority of NHTC. None of these arguments has any merit.

### 1. Plaintiffs allege that Woodburn and LaCore acted adversely to NHTC

The heart of plaintiffs' claim is that Woodburn and LaCore received undisclosed payments from Star Search and failed to tell NHTC or its auditors. (CAC ¶ 22.) They allegedly

took these payments from Star Search to benefit themselves, *not* NHTC.  Plaintiffs themselves allege that Woodburn and LaCore's actions were directly adverse to NHTC:

- "Disclosure of Defendants' related party transactions would have informed investors that Woodburn and LaCore had the ability to dominate and control the company so as to direct its assets to themselves in a manner that could be detrimental to the Company and its shareholders." (Opp. at 14.)

- "Investors have a right to know-and would reasonably consider it important-when the head of a publicly-owned company is stealing any quantity of money from their company." (Opp. at 16 (quoting *S.E.C. v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001)).)

- "[T]here is no doubt that investors would have valued the worth of NHTC as an investment much differently had it known that two top officers were treating the Company as their personal piggy-bank and funneling improper payments to themselves...." (Opp. at 17.)

- "Disclosure of the related party transactions would have alerted investors that Woodburn and LaCore had subordinated NHTC's independent interests in favor of themselves...." (Opp. at 17.)[3]

Plaintiffs then ignore their own arguments and, paradoxically, contend that Woodburn and LaCore were acting to further NHTC's "joint" interests and thus the adverse-interest exception does not apply.  (Opp. at 29.)  Plaintiffs also speculate that NHTC benefited from terminating Loghry and placing Star Search in his former position.[4]  Whatever the effect of Loghry's termination may have been, this does *not* show a "joint" interest with respect to the conduct at issue—Woodburn and LaCore's alleged concealment of the related-party transactions from NHTC's auditors and investors.  (Opp. at 32.)  Placing Star Search in Loghry's position— whether it benefited NHTC or not—is not the conduct at issue.  Plaintiffs have alleged no

---

[3] Of course, NHTC does not endorse plaintiffs' characterization of Woodburn and LaCore's actions.  But in the context of a motion to dismiss, plaintiffs' allegations are assumed to be true.

[4] Plaintiffs argue that by terminating the Loghry distributorship and placing Star Search in his position, "NHTC was relieved of the obligation of issuing a very substantial amount of stock to Loghry." (Opp. at 29.) Plaintiffs also argue that "Woodburn and LaCore may have terminated Loghry because they believed Star Search would do a better job as a 'front-line' distributor for NHTC, than Loghry." (Opp. at 29.) These claims do *not* show a "joint" interest with respect to the conduct at issue.

credible basis for the Court to conclude that the alleged concealment of the Star Search payments also benefited NHTC.

Plaintiffs' reliance on the District of New Hampshire's unreported decision in *In re Tyco Int'l Ltd.*, 2004 WL 2348315, at *5, is misplaced. In that case, unlike here, the Tyco executives' actions benefited both themselves *and* Tyco. (Opp. at 30.) In *Tyco*, the plaintiffs alleged two schemes: one that involved top executives secretly looting hundreds of millions of dollars and another that involved massive accounting fraud. *Tyco*, 2004 WL 2348315, at *2. The *Tyco* court noted that "the accounting fraud and looting schemes are both interrelated and interdependent." *Id.* The looting scheme "concerned the transfer of hundreds of millions of dollars from Tyco to the individual defendants in unauthorized compensation for their participation in a larger criminal scheme to inflate the price of Tyco's stock through fraudulent accounting practices." *Id.* at *4. For this reason, the court held that the adverse-interest exception did not apply because "the individual defendants did not act 'entirely for their own benefit' when they engaged in the looting." *Id.* at 5. "[T]he looting furthered the fraud scheme by giving the individual defendants a financial incentive to implement the scheme." *Id.* Here, in contrast, plaintiffs plead no particularized facts demonstrating that Woodburn and LaCore's alleged concealment of the related-party transactions from NHTC's auditors and investors benefited NHTC in any way.[5]

### 2.   Plaintiffs cannot sidestep the adverse-interest exception with an "innocent shareholder" argument

Plaintiffs argue that the adverse-interest exception is itself subject to an exception and does not apply "when an innocent third-party relies on representations made with apparent authority." (Opp. at 30 (citing *In re Tyco Int'l Ltd.*, 2004 WL 2348315, *6).) In other words,

---

[5] In fact, plaintiffs argue, at least once, the exact opposite—they say that Star Search's payments to Woodburn and LaCore demonstrate that NHTC paid Star Search at a higher than necessary rate. (Opp. at 14-15.) Although baseless, this underscores the lack of benefit to NHTC from Woodburn and LaCore's alleged actions.

plaintiffs contend that the adverse-interest exception does not apply in securities-fraud cases. That is absolutely wrong.

If plaintiffs' theory were accepted, then public companies sued for securities fraud based on the alleged misconduct of their officers could never invoke the adverse-interest exception— even where, as here, the alleged misconduct was alleged to be directly adverse to the company. Shareholders always could claim that they innocently relied on the officers' failure to disclose his or her alleged misconduct. This is not the law—courts indeed have refused to impute an officer's knowledge or intent to the corporation in securities-fraud cases where the officer's actions were directly adverse to the company. *See e.g., In re Healthsouth Corp. S'holders Litig.,* 845 A. 2d 1096, 1108 n. 22 (Del. Ch. 2003) (holding that when executives have a self-interest in concealing information, "their knowledge cannot be imputed to the corporation").

Plaintiffs' cited authority again misses the mark. As noted above, the *Tyco* court held that the adverse-interest exception did not apply because certain officers engaged in massive accounting fraud for Tyco's direct benefit. *In re Tyco Int'l Ltd.,* 2004 WL 2348315, at *4. Thus, the court's statements concerning "apparent authority" were dicta, and ill-informed dicta at that since it was based on the First Circuit's analysis in *In re Atlantic Fin. Mgmt.,* 784 F.2d 29, 32 (1st Cir. 1986), which did not even consider the adverse-interest exception—there was never a claim in that case that the individual defendants engaged in conduct directly adverse to the corporate defendant.

### 3.     The "sole actor" rule does not negate the adverse-interest exception

Plaintiffs' effort to negate the adverse-interest exception using the "sole actor" rule is a nonstarter. (Opp. at 30-31.) "The general principle of the 'sole actor' [rule] provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests."

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 359 (3rd Cir. 2001). The sole-actor rule applies when the agent who is alleged to have committed the fraud was the sole or controlling shareholder of the corporation.[6] But here plaintiffs allege that Woodburn owned only 10% of NHTC's stock and LaCore owned about 16%. (CAC ¶ 34, n. 7.)[7] Accordingly, the sole-actor rule simply does not apply—Woodburn and LaCore and NHTC are not one and the same. And any contention that Woodburn and LaCore dominated or controlled NHTC's board is belied by the fact that the board terminated them for failing to cooperate with the audit committee's internal investigation. (CAC ¶ 103.)

## IV.   NHTC DID NOT HAVE A DUTY TO DISCLOSE THE RELATED-PARTY TRANSACTIONS

### A.   The related-party transactions were not material to NHTC and thus not required to be disclosed under Reg. S-K or GAAP

As a general matter, which plaintiffs attempt to obscure, SEC regulations and GAAP standards do not create a duty to disclose under Section 10(b). *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000); *see also Iron Workers Loc. 16 Pens. v. Hilb Rogal & Hobbs*, 432 F. Supp. 2d 571 (E.D. Va. 2006) (holding that violation of Regulation S-K does not necessarily lead to failure to disclose under 10b-5). Moreover, plaintiffs oversimplify the materiality requirements of GAAP, FAS 57, Regulation S-K and Regulation S-X in an attempt to gloss over the weakness of their case.[8] They note correctly that these guidelines require disclosure of only those related-

---

[6] Opp. at 30 (citing *In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997) (applying the sole-actor rule where the agent was the "sole shareholder" of the Company) and *Official Committee of Unsecured Creditors of Color Tile, Inc.*, 322 F.3d 147, 165 (2d Cir. 2003) (applying the sole-actor rule where the agent was the "controlling shareholder" of company).

[7] Woodburn and LaCore owned much less than 26% of NHTC's stock. All of Woodburn's shares were jointly owned with LaCore and, not counting unexercised options and warrants, they together owned 6% of the outstanding stock. (*See* RJN Ex. 10.)

[8] Plaintiffs attempt to confuse the standard by citing *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 217 (5th Cir. 2004), regarding disclosure of information required under Item 303 of Regulation S-K. This is completely inapplicable to any of plaintiffs' claims because Item 303 does not apply to related-party transactions. Nevertheless,

party transactions that are material to investors, but then attempt to describe materiality as a mere mathematical formula—according to plaintiffs, if a transaction is greater than $60,000, it is material; if it is less than $60,000, then it is not. (Opp. at 9-12.) This is wrong—the instructions to Item 404 of Regulation S-K explain that "the materiality of interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of a particular case." 17 C.F.R. § 229.404(a), instr. 1.

All of the circumstances of this case show that neither the loan to Woodburn's parents nor the payments by NHTC to Star Search were significant to investors, and thus prove a lack of materiality. The $256,000 loan to Woodburn's parents was immaterial due to its *de minimis* size in relation to NHTC's total revenue: the loan represented a mere .0019% of NHTC's $133,225,000 total revenue for 2004. (Request for Judicial Notice ("RJN") Ex. 2 and Ex. 4.) In light of these circumstances, no reasonable investor would have cared about an amount so small, making it immaterial and not worthy of disclosure under Regulations S-K and S-X. Indeed, other courts have determined that related-party transactions for more than $60,000 that represent a *de minimis* amount relative to the company's total income are immaterial as a matter of law. *See, e.g., Unite Here v. Cintas Corp.*, No. 06 Cir. 7061, 2006 WL 2859279, *9 (S.D.N.Y. Oct. 6, 2006). Plaintiffs attempt to distinguish *Unite Here* by asserting that investors would "care more" about a loan that represented .0019% of a company's revenue than one that represented .000025%, but they fail to cite any legal authority suggesting that materiality can be determined to fall somewhere within the thousandths-of-a-percent difference that separates the facts in this case from those in *Unite Here*. (Opp. at 12.) Thus, in keeping with the *Unite Here* precedent,

---

plaintiffs concede, as they must, that regardless of the specific applicable standard, all securities regulations create a duty to disclose only *material* information. (Opp. at 11.)

this Court should find that a related-party transaction representing such a tiny percentage of the company's revenue cannot be material as a matter of law.

The commission payments NHTC made to Star Search were also immaterial as a matter of law when all the circumstances are considered in their totality.  NHTC properly recorded the commission payments in its financial statements, and the commissions were consistent with the Company's normal course of business—these were simply payments that NHTC made under a compensation plan that applied to all of its distributors.  (CAC ¶ 22(a)-(c).)  Although plaintiffs try to characterize the payments from Star Search to Woodburn and LaCore as having been "funneled" through NHTC, this is mere speculation without any factual basis in the CAC.  The payments did not come from NHTC, and they were not authorized or paid by anyone at NHTC.  (Opp. at 18-21; CAC ¶ 22.)  What Star Search chose to do with *its* money after NHTC paid out its normal distributor payments was its business; it was not NHTC's concern because it would have paid Star Search the same amount of money, whether or not Star Search paid anything to Woodburn and LaCore.  Thus, it was immaterial to NHTC investors.  Accordingly, NHTC did not have a duty to disclose Star Search's payments to Woodburn and LaCore under GAAP, Regulation S-K or Regulation S-X because they were immaterial to NHTC.

Plaintiffs argue that NHTC essentially admitted that Star Search's payments to Woodburn and LaCore were material because NHTC disclosed the payments in its November 15, 2005 press release.  (Opp. at 17-18.)  Plaintiffs apparently misunderstand the law of disclosure.  There was no admission of materiality.  Public companies are under an obligation to disclose information necessary to complete or update prior disclosures—once NHTC revealed that it had commenced an internal investigation, it was then required to report the findings of that investigation in the interests of complete disclosure.  (Opp. at 7 (citing *Kunzweiler v. Zero.Net,*

*Inc.*, 2002 WL 1461732, *10 (N.D. Tex. Jul. 3, 2002)).)[9] NHTC's subsequent disclosure that its investigation had revealed payments from Star Search to Woodburn and LaCore does not show that these payments were material to NHTC or its investors—it merely shows that NHTC made a complete disclosure of all relevant facts surrounding its internal investigation, including the results of that investigation.

### B.     NHTC's disclosures were not incomplete

Plaintiffs have failed to plead, or persuasively argue, that the Company had a duty to disclose either the loan to Woodburn's parents or the Star Search payments to Woodburn and LaCore.  NHTC only had a duty under the securities laws to disclose *material* related-party transactions.  NHTC never represented that the related-party transactions mentioned in NHTC's SEC filings were a complete and exhaustive list of all related-party transactions.  The Company did not incur an obligation to disclose the immaterial transactions at issue by disclosing material related-party transactions.

Furthermore, as discussed thoroughly above, no one at NHTC other than Woodburn and LaCore knew before the internal investigation that the $256,000 loan was made to an entity affiliated with Woodburn's father, or that Star Search was making payments to Woodburn and LaCore personally.  *See supra* at 6.  The case plaintiffs cite, *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 527 (5th Cir. 1992), is easily distinguished on this point.  In *Akin*, the court's decision hinged on the fact that the company's accountants "knew of the related party relationships,"

---

[9] *See also First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir. 1977) ("[A] duty to speak the full truth arises when a defendant undertakes to say anything."); *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("[A] party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects…[and] provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.")

while in this case, there are *no facts* alleging that either NHTC or its accountants knew of the related-party relationships until the investigation revealed them.

## V.   PLAINTIFFS CANNOT DEMONSTRATE LOSS CAUSATION

### A.   The October 6, 2005 press release did not disclose any *facts* related to the omitted facts here—it only disclosed the beginning of an investigation and the termination of Woodburn and LaCore

Plaintiffs misstate NHTC's and Mason's argument regarding the *Dura* standard for establishing loss causation—defendants never said that the factual disclosure of the alleged fraud must precisely match the allegedly omitted or misstated facts. (Opp. at 40.) What defendants argued, and plaintiffs cannot deny, is that they must show a direct causal link between the alleged omission and their economic loss when the truth about that omission is revealed. (Defendants Natural Health Trends Corporation and Randall A. Mason's Brief in Support of Their Motion to Dismiss ("Mot."). at 17-20 (citing, *e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).) While so-called fact-for-fact pleading is not required, as the *Ryan v. Flowserve Corp.* court noted,[10] courts recognize that to show the necessary causal link, plaintiffs must sufficiently allege that the *subject of the fraudulent omission was the cause* of the loss that they suffered— in other words, the curative disclosure must reveal the truth about the allegedly withheld information.[11]

---

[10] 444 F. Supp. 2d 718, 726-28 (N.D. Tex. 2006).

[11] *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 & n.4 (2d Cir. 2005) ("These allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations ... Merrill's concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public.")

There is no connection—under any pleading standard[12]—between plaintiffs' allegations about the omitted information and the information disclosed to the market on October 6, 2005. Plaintiffs' section 10(b) claim is based on an alleged failure to disclose payments from Star Search to Woodburn and LaCore, and a loan to an entity owned by Woodburn's parents. No curative or "truthful" information about these transactions was disclosed anywhere in the October 6 press release—indeed, the transactions are not discussed at all, and in fact, the Company had not yet discovered them.

Plaintiffs attempt to bolster the October 6 release with allegations from the Loghry lawsuit in an effort to tie the stock-price drop to those allegations, but those allegations are *not* contained in the press release nor is the Loghry complaint referenced there. (Opp. at 39-40.) The only information the press release discloses is an investigation of alleged misconduct by Woodburn and LaCore and their termination as officers. (RJN Ex. 5.) The press release does refer to a lawsuit "involving Mr. LaCore and [an] unrelated third party." (RJN Ex. 5.) But the Loghry lawsuit actually began as a suit by NHTC against Loghry, followed by a counterclaim from Loghry against the Company, one of its subsidiaries, Woodburn, LaCore, and Lisa Grossman. (Supplemental Request for Judicial Notice ("Supp. RJN") Exs. 8, 9.) It defies common sense to believe that NHTC chose to describe this lawsuit as one only between Loghry

---

[12] Contrary to plaintiffs' assertion that the Supreme Court's opinion in *Dura* does not require a heightened pleading standard for loss causation, some courts have interpreted *Dura* as at least not ruling out a holding that Rule 9(b) governs a pleading for loss causation. *E.g., Teachers' Retirement Sys. of La. v. Hunter,* 477 F.3d 162, 186 (4th Cir. 2007). Furthermore, plaintiffs neglect to point out that the Supreme Court very recently strengthened the traditional Rule 8 pleading standard, rejecting the former "no set of facts" formulation in favor of a higher standard of "plausibility." *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1964-70 (2007). Indeed, the *Twombly* court noted that *Dura* "alluded to the practical significance of the Rule 8 entitlement [to relief] requirement" by explaining "that something **beyond the mere possibility** of loss causation must be alleged, lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Id.* at 1966 (emphasis added) (internal quotation omitted). Here, under the *Twombly* Rule 8 pleading standard, plaintiffs have failed to plead factual matter supporting a causal connection between their loss and the alleged omission. *See id.* at 1965 (holding in an antitrust case that Rule 8 required plaintiffs to plead "enough factual matter (taken as true) to suggest that an [illegal] agreement was made").

and LaCore.  Thus, it is clear from the Company's public filings that the Company referred to allegations in a different lawsuit as prompting the Company's investigation.  But if the Court nevertheless takes plaintiffs' allegation as true, ***the Loghry complaint did not assert that Star Search paid Woodburn and LaCore.***  (Supp. RJN Ex. 9.)  Plaintiffs offer no authority to support incorporating the complaint itself or any allegations raised later in the Loghry lawsuit into the October 6 press release, and such attenuated allegations cannot serve as the basis for establishing loss causation.

Plaintiffs try to squeeze liability out of the October 6 press release by asserting that the terminations of Woodburn and LaCore for failure to cooperate in the internal investigation were foreseeable results "and certainly within the zone of risk—of Woodburn and LaCore's fraudulently concealing the related-party transactions." (Opp. at 41.)  This is faulty logic and completely ignores the loss-causation requirement of *Dura*.  As the *Lentell* court explains,

> [T]o establish loss causation, "a plaintiff must allege. . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," *i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security*. Otherwise the loss in question was not foreseeable.

396 F.3d at 173 (citation omitted) (second emphasis added).  The court goes on to explain that the Second Circuit's cases "require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk," and that "loss causation has to do with the relationship between plaintiff's investment loss and the information misstated or *concealed* by the defendant." *Id.* at 173-74 (second emphasis added).

Here, what was allegedly concealed were the Star Search payments to Woodburn and LaCore and the loan to Woodburn's parents.  Plaintiffs argue that the allegations in the Loghry lawsuit regarding Loghry's termination from a distributorship in favor of Star Search led to

Woodburn and LaCore's termination, and that this was a foreseeable result of Woodburn and

LaCore's concealing the payments. (Opp. at 41.) This analysis is wrong on a number of levels.

As the Company disclosed and plaintiffs acknowledge, it was Woodburn and LaCore's *failure to*

*cooperate with the investigation* that led to their termination, not the specific allegations in the

Loghry lawsuit or any other lawsuit. Notably, the Loghry complaint made no reference to the

Star Search payments to Woodburn and LaCore and certainly not to the loan to Woodburn's

parents. (Opp. at 39, 41.) Woodburn and LaCore's decision not to cooperate with an internal

investigation is simply too attenuated from the information concealed to establish causation.

On October 6, NHTC did not know what the results of the investigation would be. The

losses suffered by investors after the October 6 press release were not, and could not be, caused

by facts not yet known on that date. The attenuated connection between plaintiffs' investment

losses after the October 6 disclosure and the concealed information about the Star Search

payments and the loan to Woodburn's parents should not establish loss causation because "the

loss-causation requirement—as with the foreseeability limitation in tort—'is intended to fix a

legal limit on a person's responsibility, even for wrongful acts.'" 396 F.3d at 174 (citation and

internal quotation omitted).

To hold otherwise unfairly penalizes companies for disclosing internal investigations to

the market. Plaintiffs ask the Court to find, in effect, that if a company announces an internal

investigation, and that announcement is followed by a stock-price drop, and then the

investigation discovers facts giving rise to a securities claim, the announcement of the

investigation itself—before the omitted facts were known—gives rise to the securities claim.

*Dura* requires that the disclosure must be related to the omitted facts—here the drop was due to

the uncertainty of what the investigation's outcome would be and of what effect Woodburn and

LaCore's termination would have on the Company. Contrary to plaintiffs' speculation, this is not a case of a shrewdly crafted press release to slowly disclose facts.[13] The October 6 press release did *not* disclose *any* facts about the Star Search payments or related-party transactions because they were not yet known.[14]

### B.  Plaintiffs are not entitled to recover any damages for the August 11, 2006 disclosure

Plaintiffs argue that NHTC's August 11, 2006 disclosure of an SEC investigation was a "corrective disclosure," but it did not reveal any new information about Star Search's payments to Woodburn and LaCore. (Opp. at 45-46.) All it said was that the SEC had begun an investigation. There is no allegation that the SEC investigation had been omitted wrongfully from prior public disclosures, so any drop after this disclosure does not entitle plaintiffs to recover damages because they have not alleged that the price was artificially inflated after November 15, 2005. (CAC ¶ 94); *Dura*, 125 S. Ct. at 347 (holding that plaintiffs must "provide … some indication of the loss and the causal connection that the plaintiff has in mind").

The cases plaintiffs cite do not support their argument that the August 11 disclosure "demonstrates the necessary causal nexus between the related-party transactions and the losses

---

[13] This case differs from plaintiffs' cited cases because in each of those cases plaintiffs alleged facts indicating that the defendant company knew facts that it did not disclose in its purportedly corrective release. *In re Electronic Data Sys. Corp. Sec. & ERISA Litig.*, 298 F. Supp. 2d 544, 547-553, 560-61 (E.D. Tex. 2004) (also using the "touches upon" standard rejected by *Dura*); *In re Bristol-Myers Squibb Sec. Litig.*, No. Civ. A. 00-1990, 2005 WL 2007004, *21 (D.N.J. Aug. 17, 2005) (holding the disclosure was related to the company's undisclosed knowledge of an issue). Here, the Company had to perform an internal investigation before it learned the facts necessary to make a corrective disclosure. (CAC ¶¶ 86, 93.) In *D.E. & J Ltd. Partnership v. Conaway*, 284 F. Supp. 2d 719, 748-49 (E.D. Mich. 2003), a pre-*Dura* case, the court held that plaintiffs had not demonstrated loss causation because they had not alleged a stock-price decline following an announcement revealing the fraud to the public.

[14] The Company promptly disclosed the results of its investigation once it was complete. (RJN Ex. 2.) But plaintiffs' arguments about the November 15, 2005 press release are not properly before the Court because they failed to plead the subsequent stock-price drop in the CAC. (Opp. at 43-45); *see In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 646 (S.D. Tex. 2001) (holding a plaintiff cannot amend a deficient complaint through his opposition). Plaintiffs had five months between the filing of the first complaint and the CAC to get their allegations correct. The Court should not grant them further leave to amend.

suffered by investors." (Opp. at 45.) To the contrary, in each case, the defendant company

announced an SEC investigation related to the misstated or omitted information *before or as* its

corrective disclosure, not *after* a fully corrective disclosure had already been released, as NHTC

did here.[15] Nothing in these cases supports the proposition that disclosure of an SEC

investigation nine months *after* a fully corrective disclosure establishes a causal nexus between

the omitted information and investor losses.[16] Once the market knows the omitted information, it

is incorporated into the stock price and can no longer be the cause of any price inflation.[17]

## VI. PLAINTIFFS CANNOT DEMONSTRATE THAT MASON SHOULD BE HELD LIABLE AS A CONTROL PERSON

The Fifth Circuit has provided several different alternative methods by which plaintiffs

may allege control-person liability: "day-to-day control of the corporation operations; knowledge

of the underlying primary violation by the controlled person; or facts showing that the defendant

---

[15] *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 824-25 (D.N.J. 2006) (company's press release disclosed SEC inquiry into revenue-recognition problems and a delay in filing its financial statements followed later by announcement of a restatement); *Greater Penn. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 WL 61489, *5 (N.D. Ill. Jan. 10, 2005) (SEC and DOJ investigations announced along with other partial disclosures before a restatement); *In re Hienergy Techs., Inc.*, 2005 WL 3071250, *4 (C.D. Cal. Oct. 25, 2005) (disclosure of Wells notice was first disclosure of some of allegedly misrepresented information); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 255-56 (D. Mass. 2006) (announcement of SEC investigation (corrective disclosure announcing SEC investigation into "certain public statements made by [company] during [time frame at issue], as well as certain trading in [company's] securities during such time").

[16] Plaintiffs' citation to *In re Parmalat Securities Litigation* makes no sense. (Opp. at 46.) The *Parmalat* plaintiffs did not assert that a post-class-period disclosure should establish loss causation—the court there merely noted that investors could recover losses for the date that the concealed risk of Parmalat's misrepresentations materialized (*i.e.*, when its liquidity crisis was publicly disclosed), even thought the full extent of the fraud was not revealed until later. 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005). This is very different from the situation here because the November 15, 2005 disclosure was a fully corrective disclosure.

*In re Motorola Securities Litigation* also is not helpful to plaintiffs. No. 03 C 287, 2007 WL 487738, at *47-48 (N.D. Ill. Feb. 8, 2007); (Opp. at 46.) The *Motorola* court, on summary judgment, allowed plaintiffs to pursue a post-class-period corrective disclosure in part because it found that it reflected "new news" about the ultimate failure of the transactions that had been misrepresented in Motorola's public disclosures. *Id.* That is not the situation here. All of the information about the transactions at issue was fully disclosed to the public on November 15, 2005. The announcement of the SEC investigation revealed no "new news" about the concealed transactions and cannot be a basis for establishing loss causation. *Dura*, 125 S. Ct. at 347.

[17] *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 n.6, 666 n. 10 (5th Cir. 2004) (noting that in an efficient market "it is assumed that all public information concerning a company is known to the market and reflected in the market price of the company's stock" and that confirmatory information cannot be the basis for a fraud-on-the-market claim).

had the requisite power directly or indirectly to control or influence corporate policies." *In re*

*Fleming Cos. Sec. & Deriv. Litig.*, No. Civ. A. 503MD1530TJW, 2004 WL 5278716, at *43

(E.D. Tex. June 16, 2004). Plaintiffs concede that they cannot demonstrate day-to-day control,

and as discussed below, they cannot show knowledge of the underlying primary violation either.

Their remaining argument is that the CAC adequately alleges that Mason had actual

power to directly or indirectly control or influence corporate policy based on his position as a

director and as audit committee chairman. (Opp. at 47-48.) Plaintiffs have not alleged sufficient

facts to show this type of control.[18] Even if the Court applies the notice-pleading standard of

Federal Rule of Civil Procedure 8(a), plaintiffs must plead facts presenting a plausible ground for

relief. *Twombly*, 127 S. Ct. at 1964. Mere allegations of Mason's position and title are not

enough to demonstrate a plausible case that he had the ability to control the policy regarding the

disclosure of the disputed transactions. *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619-20 (5th

Cir. 1993) (noting that the Eighth Circuit has cited other Fifth Circuit authority to support the

proposition that to show control-person liability a plaintiff must show "that the defendant

possessed the power to control the specific transaction or activity upon which the primary

violation is predicated"); *see also McNamara v. Bre-X minerals Ltd.*, 46 F. Supp. 2d 628, 638

(E.D. Tex. 1999) ("[I]t is clear that the Fifth Circuit squarely follows [this part] of this [Eighth

Circuit] test").[19]

---

[18] The Fifth Circuit has not addressed the pleading standard to use in evaluating control-person claims. Other courts have applied Federal Rule of Civil Procedure 9(b)'s heightened standard because the Court necessarily must make a finding that the complaint alleges the primary violation of section 10(b) with the required particularity. Thus, the circumstances of the control relationship should also be pled with particularity. *E.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C99-00109 SBA, 2000 WL 1727377, *25 (N.D. Cal. Sept. 29, 2000).

[19] *See also, In re Enron*, 2003 WL 230688, at *5 ("Moreover, Lead Plaintiff fails to plead adequately that any of them was a controlling person because Lead Plaintiff fails to plead an underlying primary violation by a controlled person and particularized facts, including the power to control or influence corporate policy directly or indirectly, regarding the controlling person's culpable participation in the fraud that he perpetuated.")

Plaintiffs seek to enhance the facts they actually pled by citing additional documents to provide details about the Audit Committee's role in the Company's corporate governance. (Opp. at 48 & nn.19-20.) The CAC is completely devoid of these details and they are improperly raised here,[20] but even if the Court were to consider them, they fail to establish a reasonable expectation that discovery will reveal evidence that Mason had the power to control the Company's disclosures regarding alleged secret related-party transactions. *See Twombly*, 127 S. Ct. at 1965. Even if the Audit Committee reviewed and approved the transactions submitted to it, that does not mean Mason had any control over what specific disclosures were made. Furthermore, the fact remains that regardless of whether Mason had a role in reviewing related-party transactions, he simply had no way to control whether the transactions at issue were disclosed because they were not revealed to him.[21] Indeed, plaintiffs' argument that Woodburn was the "sole actor" in connection with the Star Search payments and the loan to an entity owned by his parents negates their argument that Mason had the power to control the disclosure of the transactions. (Opp. at 30-31.)

Plaintiffs simply have not pled enough to hold Mason liable for control over the disputed transactions, and thus he must be dismissed from this lawsuit.

---

[20] *See Baker Hughes*, 136 F. Supp. 2d at 646.

[21] The Court should disregard plaintiffs' baseless argument that Mason knew of the Star Search payments. (Opp. at 49-50.) Plaintiffs take the now-dead group-pleading presumption to absurd lengths. If plaintiffs had even a shred of support for their claim, then they would have alleged in the CAC that Mason was liable for a primary violation of section 10(b). Despite plaintiffs' efforts to pick and choose which statements in NHTC's disclosures they want to rely upon (which they cannot do), they cannot escape the fact that NHTC fired Woodburn and LaCore after the investigation and did not fire Mason. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) ("Plaintiff [is] not entitled to pick and choose which of defendants' statements in public documents favor [him] and have all others ignored."). The only plausible inference to be drawn from this fact is that NHTC concluded after the investigation (as it disclosed) that Mason was unaware of the payments and received no pecuniary benefit from them.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

*/s/ Paul R. Bessette*
Paul R. Bessette
State Bar No. 02263050
pbessette@akingump.com
Michael J. Biles
State Bar No. 24008578
mbiles@akingump.com
Jennifer R. Brannen
State Bar No. 24006888
jbrannen@akingump.com
300 W. 6th Street, Suite 2100
Yusuf A. Bajwa
State Bar No. 24047754
ybajwa@akingump.com
Austin, Texas  78701
Telephone: (512) 499-6200
Facsimile:  (512) 499-6290

**Attorneys for Defendants Natural Health
Trends Corp. and Randall A. Mason**

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing pleading has been served on the following counsel of record via CM/ECF notification or U.S. first class mail on this the 22nd day of July 2007.

Edwin J. Tomko
CURRAN TOMKO TARSKI LLP
1700 Pacific Avenue, Suite 4545
Dallas, TX  75201
**Attorneys for Defendant Terry L. LaCore**

Christopher E. Kirkpatrick
HAYNES AND BOONE LLP
901 Main Street, Suite 3100
Dallas, Texas  75202
**Attorneys for Defendant Mark Woodburn**

Thomas E. Bilek
THE BILEK LAW FIRM, L.L.P.
1000 Louisiana Street, Suite 1302
Houston, TX  77002

Christopher S. Hinton
THE HINTON LAW FIRM
350 Fifth Ave., Suite 5508
New York, NY  10118

Phillip Kim
Laurence Rosen
THE ROSEN LAW FIRM, P.A.
350 Fifth Ave., Suite 5508
New York, NY  10118
**Attorneys for Plaintiffs**

/s/ Michael J. Biles
Michael J. Biles