Laurence M. Rosen, Esq. (*pro hac vice*)
　　Email: lrosen@rosenlegal.com
Phillip Kim, Esq. (*pro hac vice*)
　　Email: pkim@rosenlegal.com
**THE ROSEN LAW FIRM, P.A.**
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
**LEAD COUNSEL FOR PLAINTIFFS**

Joel M. Fineberg
State Bar No. 07008520
　　Email:　jfineberg@fineberglaw.com
R. Dean Gresham
State Bar No. 24027215
　　Email:　dgresham@fineberglaw.com
**FINEBERG / GRESHAM**
3811 Turtle Creek Blvd., Suite 1900
Dallas, Texas 75219
Telephone: (214) 219-8828
Facsimile: (214) 219-8838
**LIASION COUNSEL FOR PLAINTIFFS**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| GARY ZAGAMI, BRAIN KELLY, and RICK PATMORE, on behalf of themselves and all others similarly situated, | ) ) ) ) CIVIL ACTION NO.: 3-06CV1654-D |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) CLASS ACTON |
| NATURAL HEALTH TRENDS CORP, MARK WOODBURN, TERRY L. LaCORE, AND RANDALL A. MASON, | ) ) ) ) |
| Defendants. | ) ) ) |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATION OF SECURITIES LAWS

Lead Plaintiffs Gary Zagami, Brian Kelly and Rick Patmore (collectively "plaintiffs"), individually and on behalf of all other persons similarly situated, by plaintiffs' undersigned attorneys, for plaintiffs' complaint allege, based upon the investigation made by and through plaintiffs' counsel, which included relevant public filings made by Natural Health Trends Corp ("Natural Health," "NHT" or the "Company") with the Securities and Exchange Commission (the "SEC"), and testimony of witnesses submitted in court, as well as press releases, news articles, analyst reports, court filings, and media reports concerning the Company. This complaint is based upon plaintiffs' personal knowledge as to plaintiffs' own acts, and upon information and belief as to all other matters, except where indicated otherwise.

## NATURE OF ACTION

1.     Plaintiffs bring this action as a class action on behalf of themselves and all other persons or entities who purchased Natural Health common stock other than defendants and any persons and entities related or affiliated with defendants, during the period beginning April 16, 2002 through November 15, 2005 (the "Class Period") to recover damages caused to the Class by defendants' violations of the federal securities laws.

2.     This action arises from defendants' issuance of annual reports and proxy statements that were materially false and misleading for failing to disclose $2.75 million in related party transactions between the Company and the individual defendants, who were the Company's senior-most officers, directors and largest shareholders.

3.     SEC regulations and federal common law mandate that all material related party transactions be disclosed in the body of annual reports and proxy statements.

4.     Failure to disclose the related party transactions rendered the Company's annual reports and proxy statements issued to investors during the Class Period false and

misleading.

5.        In addition, Generally Accepted Accounting Principles mandate that all material related party transactions be disclosed in the Company's financial statements.

6.        Defendants' failure to disclose the material related party transactions in the Company's financial statements was a violation of Generally Accepted Accounting Principles and rendered false and misleading each of the Company's annual financial statements issued to investors during the Class Period.

## JURISDICTION AND VENUE

7.        This action arises under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5.

8.        This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.        Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

10.       In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.       Lead Plaintiffs Gary Zagami, Brian Kelly, and Rick Patmore purchased

Natural Health shares during the Class Period and were damaged thereby as demonstrated in the PSLRA certifications each has previously filed with the Court and which are incorporated by reference herein.

12.     Defendant Natural Health is a Delaware Corporation with its principal place of business located at 2050 Diplomat Drive, Dallas, Texas 75234.  The Company, through its various operating subsidiaries, purports to be an international direct-selling company operating in more than 29 markets throughout Asia, North America and Eastern Europe. The Company markets personal care products nutritional supplements.

13.     Defendant Mark D. Woodburn, ("Woodburn") served as President, Secretary and a director of the Company from 2000 until October 2005. Woodburn also served as Chief Financial Officer from April 1999 through August 2004. Defendant Woodburn's services as President and a director ended on October 3, 2005 after his resignation from those positions in connection with the misconduct alleged herein.  Defendant Woodburn's employment by the Company in any capacity ended on November 10, 2005 when he was terminated by the Company as a result of his participation in the scheme which gives rise to this action.[1]

14.     Defendant Terry L LaCore ("LaCore") served as the Chief Executive Officer of Lexxus International, the Company's chief operating subsidiary, from March 2001 and as a director of the Company from March 2003 until his resignation on October 3, 2005.  Defendant LaCore's employment in any capacity ended on November 10, 2005 when he was terminated by the Company as a result of his participation in the scheme which, in part, gives rise to this action.

15.     Defendant Randall A. Mason ("Mason") served as a purportedly independent

---

[1] Certain public statements by the Company indicate Woodburn and LaCore were terminated on November 10, 2005 while other public filings indicate defendants served the Company until November 13, 2005.

director beginning May 2003.  During the Class Period, Defendant Mason served as the Chair of the Audit Committee and as a member of the Compensation and Nominating Committees. As a member of the Audit Committee, Defendant Mason was charged with reviewing and helping to ensure the integrity of the Company's financial statements as well as reviewing the adequacy of the Company's internal accounting controls. The Audit Committee's Charter provided that each of its members, including Mason, had the duty to: "Review and approve all related-party transactions" and to "review and discuss any disclosures made by the Company's CEO and CFO to the Committee … related to … (ii) any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls and procedures for financial reporting."[2]  On November 11, 2005, Defendant Mason resigned as Chairman and member of the Audit Committee after it was discovered that that he could no longer be considered "independent."  Thereafter, he remained as a director and was elected as the Chairman of the Board of Directors beginning March 28, 2006. During the Class Period, Defendant Mason was involved, in part, with the scheme which gives rise to this action.

16.    Defendants Woodburn, LaCore and Mason are collectively referred herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.    The Company operates a multi-level marketing business offering various cosmetic and lifestyle enhancement products through its wholly-owned subsidiary Lexxus International, Inc. (now known as "NHT Global") and sells nutraceutical products in a range of categories through its wholly-owned eKaire.com, Inc. ("eKaire") subsidiary.  The company

---

[2]   The Audit Committee Charter is found in NHT's Proxy Statement, dated April 25, 2003 at p.

distributes its products through a network of individual distributors in North America, Latin America, Australia, Asia, and New Zealand. The Company has described its distribution model as follows:

> Generally, network marketing is based upon an organizational structure where independent distributors of a company's products are compensated for sales made to consumers. But, even more significantly, distributors are compensated for sales generated by distributors recruited by such distributor and all subsequent distributors recruited by their "down line" network of distributors. This can be very lucrative for individual distributors who develop extensive networks of distributors that sell company products and recruit additional distributors.
>
> *    *    *
>
> Distributors are independent contractors who purchase products directly from the respective subsidiary for resale to retail consumers or for personal consumption. Distributors may elect to work on a full-time or a part-time basis. The growth of a distributor's business depends largely upon the ability to recruit a down-line and the strength of our products in the marketplace.

18.     The Company's common shares are publicly traded on the NASDAQ.  As a result, the Company is obligated by law to file all annual and quarterly reports on forms 10K and 10Q, as well as proxy statements on form 14A with the U.S. Securities and Exchange Commission ("SEC").

19.     The annual reports and annual proxy statements filed by Natural Health during the Class Period were materially false and misleading because each failed to disclose a series of material related party transactions between the Company and its senior-most officers and directors.

20.     The failure to disclose the material related party transactions also violated Generally Accepted Accounting Principles and rendered false and misleading all of the Company's annual financial statements issued during the Class Period.

---

A-5, ¶ D4 & ¶ E1, available at www.sec.gov.

### The Related Party Transactions

21.     On November 15, 2005, the Company issued a press release and filed an 8-K with the SEC disclosing for the first time $2.75 million in material related party transactions between Natural Health and a company jointly owned and controlled by defendants Mark Woodburn, Terry LaCore and Randall Mason.

22.     The salient facts concerning the undisclosed related party transactions were as follows:

   a)  In approximately 2001, LaCore and Woodburn placed Star Search International LLC ("Star Search") a company owned and controlled by Steve Francisco, in one or more of the highest level and most lucrative ("front-line") positions in the Company's multi-level-marketing hierarchy. (*See*, Exhibit 1).[3]

   b)  This enviable position gave Star Search a guaranteed commission on all product sales by thousands of distributors that were beneath Star Search (in its "downline") in NHT's multi-level-marketing hierarchy.

   c)  Star Search earned approximately $7.5 million in commissions from NHT as a distributor during the period from 2001 through August 17, 2005. (*See*, Ex. 1-F, p. 46-58).

   d)  As Star Search received commission checks from NHT, it made corresponding payments equal to approximately one-third (33.3%) of the commissions it received to Woodbridge Development Corporation ("WDC").  WDC is an entity partially owned by Woodburn's father and defendant audit committee chairman Randall Mason and which was controlled by Woodburn and LaCore.[4]

---

[3]   The identity of the distributor and the entity making the payments was never disclosed by NHT, but rather obtained from Court files in a litigation pending in U.S. District Court for the Northern District of Texas, Dallas Division, 3:04-cv-0139-L.  A copy of the declaration of Clinton Howie with Sub-Exhibits A-O attached containing the relevant declarations, deposition testimony and related evidence are attached hereto and incorporated by reference herein as Exhibit 1.

[4]   The Company also stated its belief, without stating the basis therefore, that defendant Mason was unaware that these payments were directed by Messrs. Woodburn and LaCore to an entity partially owned by him until uncovered by the Audit Committee's independent investigator on November 10, 2005 and that Mr. Mason received no pecuniary benefit from the payments.

e) Star Search paid approximately $2.4 million to WDC in a series of payments from at least April 16, 2002 to August 17, 2005 for the benefit of LaCore and Woodburn.[5]

f) WDC subsequently transferred the $2.4 million in funds to another entity jointly owned and controlled by Woodburn and LaCore for their benefit.

g) Of the $2.5 million in total related party payments made by Star Search, Woodburn received approximately $1.4 million and LaCore received $1.1 million.

h) Upon information and belief, Woodburn and LaCore utilized WDC to receive the payments from Star Search because WDC had a large tax loss carry-forward that was used to offset the income from Star Search and avoid payment of federal income taxes.

i) Upon information and belief, Star Search paid $100,000 of the $2.5 million to Woodburn and LaCore directly prior to deciding to utilize WDC as an intermediary.

j) Of the $7.5 million the Company paid to Star Search from 2001 through August 17, 2005, Star Search paid $2.5 million of that amount or one third (33.3%) to WDC or directly to Woodburn and LaCore.

23.    The November 15, 2005 press release and 8-K also disclosed for the first time another related party transaction involving a loan made by the Company under the direction of Mr. Woodburn to an entity controlled by his parents in the amount of $256,000 in February 2004, which had been previously recorded on the Company's financial statements as a loan to an unrelated third party. On November 10, 2005, an Audit Committee investigator learned that the Company actually loaned the funds to an entity owned and controlled by the parents of Mr. Woodburn.

## The Omitted Information Was Material

24.    The November 15, 2006 press release stated that "[s]ince payments were directed [from the Company] into an entity that is partially owned by Mr. Mason, he no longer

---

[5]    A schedule listing payments made from Star Search to WDC is attached as Ex. 1-F, p. 46-58.

can be considered "independent" in accordance with the rules of The Nasdaq Stock Market and under the federal securities laws. Therefore, effective November 11, 2005, Mr. Mason resigned as Chairman and a member of the Company's Audit Committee."

25.     The required resignation of defendant Mason from the Audit Committee and his reclassification of his status from independent director to non-independent director evidences that the undisclosed related party transactions described above were material information for investors.

26.     The November 15, 2005 press release also states that the Company intends to amend certain disclosures in previous filings with the Securities and Exchange Commission related to payments made by Star Search to Messrs. Woodburn and LaCore and to re-characterize the loan made by the Company to the entity controlled by Mr. Woodburn's parents. If the related party transactions were not material information, there would be no need to amend the prior SEC filings.

27.     Thereafter, each quarterly and annual report issued by the Company included detailed disclosures of the material related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶ 22-23 above.

28.     Disclosure of the related party transactions was necessary to inform investors that LaCore and Woodburn had the ability to dominate and control the company so as to direct the Company's assets to themselves in a manner that could be detrimental to the Company and its shareholders.

29.     The related party transactions between the Company and the Individual Defendants, using Star Search as a conduit, were material information required to be disclosed to investors by NHT in each of its annual reports and proxy statements issued during the Class

Period.

## SEC REGULATIONS MANDATE DISCLOSURE

30.     SEC Regulation S-K ("Reg. S-K") [together with the General Rules and Regulations under the Securities Act of 1933 ("Securities Act") and the Exchange Act and the forms under these Acts] states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on from 14A. (*See*, Reg. S-K, §229.10).[6]

31.     Reg. S-K at §229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $60,000, and in which any related person had or will have a direct or indirect material interest."[7]

32.     Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $60,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

33.     Reg. S-K §229.303, Item 404 (b)(1)(6) also mandates disclosure of any other relationships that the registrant is aware of between the nominee or director and the registrant that are substantially similar in nature and scope to those relationships listed in paragraphs (b)(1)

---

[6] SEC Regulation S-B ("Reg S-B") requires identical disclosures for related party transactions. The Company filed its 10-Ks during the Class Period on form 10KS-B. Given that the Company's market capitalization exceeded $25 million during the Class Period, it would appear the Reg S-K would be applicable, rather than Reg. S-B, but since both are nearly identical for purposes of required related party disclosures as alleged in this complaint, Reg. S-K shall be referred to herein.

[7]   The dollar amount for required disclosure was $60,000 for Reg. S-K at all times during the Class Period. The $60,000 threshold was increased to $120,000 by the SEC effective January 2007 under Reg. S-K, though not for Reg S-B.

through (5).

34.    A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.  The Individual Defendants were each related persons as defined by Reg. S-K and the related party transactions exceeded $60,000 in each fiscal year and hence disclosure under Reg. S-K was required.[8]

## DUTY TO DISCLOSE UNDER GAAP

35.    SEC and NASDAQ rules and regulations require that publicly traded companies such as Natural Health include financial statements that comply with Generally Accepted Accounting Principles ("GAAP") in their annual reports filed with the SEC. (*See* §13 of the Exchange Act; Rule 10-01(d) of Regulation S-X).

36.    GAAP encompasses the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

37.    Management is responsible for preparing financial statements that conform to GAAP. The AICPA Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and  for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as  events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

---

[8]  Woodburn was President and a director of NHT and owned about 10% of NHT's stock. LaCore was a director and held about 16% of NHT's stock. Together LaCore and Woodburn held about 26% of NHT's stock.  Mason was a director of NH.

AU § 110.02 (1998).

38.    The Company represented in each of its annual financials statements filed with the SEC that its financial statements were prepared in accordance with GAAP.

39.    Statement of Financial Accounting Standards No. 57 ("SFAS 57") establishes requirements for disclosure of transactions between a company and related parties, such as officers, directors and their immediate family members. A copy of SFAS 57 is attached hereto as Exhibit 2 and is incorporated by reference herein.

40.    According to professional standards set by the American Institute of Certified Public Accountants, SFAS is the preferred source for determination of GAAP requirements. Failure to follow SFAS is a violation of Rule 203 of the AICPA code of professional conduct.[9]

41.    SFAS 57 states that financial statements shall include disclosures of material related party transactions, including the nature of the relationship, a description of the transaction, and the dollar amounts involved.[10]

42.    The payments from the Company to Messrs. Woodburn and LaCore made through Star Search, and the loan to Woodburn's parents were material related party transactions as defined by SFAS 57.

43.    The failure to disclose these related party transactions in the notes to the Company's financial statements violated SFAS 57 and therefore violated GAAP.

44.    Because each of the financial statements issued by the Company during the Class

---

[9]   The American Institute of Certified Public Accountants ("AICPA") is the national, professional organization for all Certified Public Accountants.   According to its mission statement, the AICPA establishes professional standards in accounting and auditing, assists members in continually improving their professional conduct, performance and expertise; and monitors such performance to enforce current standards and requirements.

[10]   Other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business.

Period failed to disclose the material related party transactions described in ¶¶ 22-23 above, each financial statement violated GAAP and hence, each is materially false and misleading.

**LIST OF SEC FILIINGS RENDERED FALSE AND MISLEADING
FOR FAILURE TO DISCLOSE THE RELATED PARTY TRANSACTIONS**

45.    The Class Period begins on April 16, 2002, when the Company filed its Annual Report with the SEC on Form 10-KSB for its fiscal year ended December 31, 2001 (the "2001 Annual Report").

46.    The 2001 Annual Report purported to comply with Reg. S-K by listing in Item 12 of the 2001 Annual Report under the heading "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS" all of the related party transactions of the Company.  Only one related party transaction was listed, a loan to the Company's former president and director, Robert L. Richards for $70,000.

47.    Audited financial statements for the Company were included as part of the 2001 Annual Report. The audited financial statements omitted any mention of the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶ 22-23 above.

48.    For the reasons stated in ¶¶24-34 above, the 2001 Annual Report was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

49.    For the reasons stated in ¶¶ 35-44 above, the financial statements included as part of the 2001 Annual Report violated GAAP and were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

50.    On February 13, 2003, the Company filed a proxy statement on form 14A with the SEC (the "February 2003 Proxy").

51.     The February 2003 Proxy purported to comply with Reg. S-K by disclosing all of the related party transactions between the Company and all officers, directors and 5% shareholders.

52.     The February 2003 Proxy listed the $70,000 loan to Robert Richards, a consulting agreement with Benchmark Consulting Group (owned by defendant Woodburn), and option agreements with Benchmark and LaCore.

53.     The February 2003 Proxy failed to disclose any information concerning the related party transactions with Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶ 22-23 above.

54.     For the reasons stated in ¶¶24-34 above, the February 2003 Proxy was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

55.     On March 31, 2003, the Company filed its Annual Report with the SEC on Form 10-KSB for its fiscal year ended December 31, 2002 (the "2002 Annual Report").

56.     The 2002 Annual Report purported to comply with Reg. S-K by listing in Item 12 of the 2002 Annual Report under the heading "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS" all of the related party transactions of the Company.  Instead of listing each related party transaction, the 2002 Annual Report simply incorporated the list of related party transactions by reference to the Company's definitive proxy statement to be filed pursuant to Regulation 14A under the Exchange Act.

57.     The relevant definitive proxy statement was filed on April 25, 2003. As described in ¶64 below, the proxy statement, while mentioning certain related party transactions, failed to disclose the related party transactions between the Company, Star Search, WDC, the

Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

58.     Audited financial statements for the Company were included as part of the 2002 Annual Report. The audited financial statements omitted any mention of the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶ 22-23 above.

59.     For the reasons stated in ¶¶24-34 above, the 2002 Annual Report was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

60.     For the reasons stated in ¶¶35-44 above, the financial statements included as part of the 2002 Annual Report violated GAAP and were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

61.     On April 25, 2003, the Company filed a proxy statement on form 14A with the SEC (the "April 2003 Proxy").

62.     The April 2003 Proxy purported to comply with Reg. S-K by disclosing all of the related party transactions between the Company and all officers, directors and 5% shareholders.

63.     The April 2003 Proxy listed the consulting agreement with Benchmark Consulting Group (owned by defendant Woodburn), option agreements with Benchmark and LaCore and the purchase of $1.2 million of software from MarketVision, Inc., a company partially owned by defendant Woodburn.

64.     The April 2003 Proxy, while mentioning certain related party transactions, failed to disclose any information concerning the related party transactions with Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

65.      For the reasons stated in ¶¶24-34 above, the April 2003 Proxy was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

66.      On April 13, 2004, the Company filed its Annual Report with the SEC on Form 10-KSB for its fiscal year ended December 31, 2003 (the "2003 Annual Report").

67.      The 2003 Annual Report purported to comply with Reg. S-K by listing in Item 12 of the 2003 Annual Report under the heading "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS" all of the related party transactions of the Company.  Instead of listing each related party transaction, the 2003 Annual Report simply incorporated the list of related party transactions by reference to the Company's definitive proxy statement to be filed pursuant to Regulation 14A under the Exchange Act.  However Natural Health did not file a proxy statement with the SEC during 2004.

68.      Audited financial statements for the Company were included as part of the 2003 Annual Report.  Note 11 to the audited financial statements purported to identify all of the related party transactions, as required by SFAS 57, but failed to disclose the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents as described in ¶¶22-23 above.

69.      For the reasons stated in ¶¶24-34 above, the 2003 Annual Report was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

70.      For the reasons stated in ¶¶34-44 above, the financial statements included as part of the 2003 Annual Report violated GAAP and were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

71.     On March 31, 2005, the Company filed its Annual Report with the SEC on Form 10-KSB for its fiscal year ended December 31, 2004 (the "2004 Annual Report").

72.     The 2004 Annual Report purported to comply with Reg. S-K by listing in Item 13 of the 2004 Annual Report under the heading "RELATED PARTY TRANSACTIONS" all of the related party transactions of the Company, referencing a number of related party transactions with the Individual Defendants, including a property lease with LaCore's brother, an "oral consulting agreement" with Woodburn's father, payments to Woodburn's wife who served as an employee and the acquisition MarketVision LLC owned by Woodburn, but failing to disclose any information at all concerning the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

73.     Audited financial statements for the Company were included as part of the 2004 Annual Report. The audited financial statements referenced certain related party transactions, but omitted any information concerning the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

74.     For the reasons stated in ¶¶23-34 above, the 2004 Annual Report was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23above.

75.     For the reasons stated in ¶¶34-44 above, the financial statements included as part of the 2004 Annual Report violated GAAP and were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

76.     On April 21, 2005 and April 26, 2005, the Company filed a form S-1 and S-1/A respectively registering with the SEC securities of the Company for public sale (the "Form

S-1s").

77.     The Form S-1s purported to comply with Reg. S-K by listing under the heading "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS" all of the Company's related party transactions of the Company, referencing a number of related party transactions with the Individual Defendants, including a lease agreement with LaCore's brother, an oral consulting agreement with Woodburn's father, payments to Woodburn's wife who served as an employee, and the acquisition of MarketVision LLC owned by Woodburn, but failed to disclose any information at all concerning the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

78.     Audited financial statements for the Company were included as part of the 2004 Annual Report. The audited financial statements referenced certain related party transactions in Item 13, but omitted any information concerning the related party transactions between the Company, Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

79.     For the reasons stated in ¶¶24- 34 above, the Form S-1s were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

80.     For the reasons stated in ¶¶34-44 above, the financial statements included as part of the Form S-1s violated GAAP and were materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

81.     On April 27, 2005, the Company filed a proxy statement on form 14A with the SEC (the "April 2005 Proxy").

82.     The April 2005 Proxy purported to comply with Reg. S-K by disclosing all of the related party transactions between the Company and all officers, directors and 5% shareholders.

83.     The April 2005 Proxy, while referencing a number of related party transactions with the Individual Defendants, including a lease agreement with LaCore's brother, an oral consulting agreement with Woodburn's father, payments to Woodburn's wife who served as an employee, and the acquisition of MarketVision LLC owned by Woodburn, failed to disclose any information concerning the related party transactions with Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶22-23 above.

84.     For the reasons stated in ¶¶24-34 above, the April 2005 Proxy was materially false and misleading for failing to disclose those related party transactions described in ¶¶22-23 above.

85.     Each of the Individual Defendants personally signed the materially misleading annual reports and proxy statements described above in their capacity as directors and/or officers of the Company.  The materially misleading statements therein may therefore be imputed to the Individual Defendants as their own statements.

### THE TRUTH IS DISCLOSED CAUSING PLAINTIFFS' LOSSES

86.     On October 6, 2005, after the close of NASDAQ trading, the Company issued a press release and filed a form 8-K with the SEC stating that "effective October 3, 2005, each of Mark D. Woodburn, the Company's President, and Terry L. LaCore, the Chief Executive Officer of the Company's Lexxus International, Inc. subsidiary, will no longer serve as officers of the Company due to their failure to cooperate with an ongoing investigation conducted by the Company's Audit Committee. Although each of Messrs. Woodburn and LaCore have resigned as

members of the Company's Board of Directors effective October 3, 2005, they will continue to be employed as the Company's Global Managing Director – Operations and Global Managing Director – Business Development, respectively."

87.     The audit committee investigation related to allegations concerning the material related party transactions described in ¶¶22-23 above made in a lawsuit brought by a former independent distributor of the Company, John Loghry, against NHT for fraud and breach of contract, among other claims.  This is confirmed by the Company in its November 15, 2005 press release (described below). A copy of the counterclaim of Loghry against the Company is attached as Exhibit 3 and incorporated by reference herein.

88.     In his lawsuit Loghry alleged that after he had created a powerful 1,500 person sales force for the Company, he was given several highly profitable "front-line" positions at the very pinnacle of the Company's multi-level marketing hierarchy and was also promised a large stock position in NHT. Loghry alleged that LaCore and Woodburn had reneged on the promise to issue him Company stock and then subsequently terminated him from his valuable frontline distributorship position and instead gave the distributorship to Steve Francisco, owner of Star Search, the independent distributor that was making the related party payments to Woodburn and LaCore through WDC.

89.     In the Loghry lawsuit, evidence was adduced demonstrating that LaCore and Woodburn had knowingly secured a false statement from at least one independent distributor, Thomas K. Crowley, to justify the termination of Loghry from his position as an independent distributor for the Company.  (See, Exhibit 1-A).

90.     Upon information and belief, LaCore and Woodburn terminated Loghry and gave his valuable frontline distributorship positions to Steve Francisco and Star Search, in return

for the promise that Star Search would make the related party payments to Woodburn and LaCore described in ¶¶22-23 above.

91.    The closing price of NHT stock on October 6, 2005 was $15.55 per share. The next trading day, as a result of the adverse news released the night before concerning the termination of LaCore and Woodburn because of their failure to cooperate with the audit committee investigation into their material related party transactions, NHT's share price opened at $14.87 and continued to drop, ultimately closing the day at $11.66 per share, down 25% from the prior day's closing price.

92.    Over the next two trading days, NHT's share price continued to drop as a result of the adverse information closing the day on October 11, 2005 at $9.32 per share, down 40% from the closing share price on October 6, 2005, the price prior to disclosure of the adverse news concerning the Individual Defendants' termination from their officer and director positions in connection with the related party transactions.

93.    On November 15, 2005, the Company issued a press release announcing quarterly earnings, as well as additional details concerning the audit committee investigation of defendants Woodburn and LaCore described in the October 6, 2005 press release.

94.    The November 15, 2005 press release disclosed the details of the related party payments Woodburn and LaCore had received from Star Search, an independent distributor of the Company's products, from 2001 to August 2005. It also described the related party loan to Woodburn's parents. The press release stated in relevant part :

Investigation Results

As previously disclosed, the Company's Audit Committee of the Board of Directors initiated an investigation in August 2005 regarding allegations of misconduct by Messrs. Mark Woodburn and Terry LaCore asserted by an unrelated third party arising out of a lawsuit involving Mr. LaCore and such

unrelated third party [John Loghry].

On November 10, 2005, an independent investigator retained by the Company's Audit Committee [Mr.Taebel] learned that an entity controlled by Messrs. Woodburn and LaCore received payments from an independent distributor of the Company's products during 2001 through August 2005. The Company believes that Messrs. Woodburn and LaCore received from such independent distributor a total of approximately $1.4 million and $1.1 million, respectively. The Company believes that the fees paid by the Company to such independent distributor were not in excess of the amounts due under the Company's regular distributor compensation plan.

Approximately $2.4 million of the funds paid by the independent distributor to Messrs. Woodburn and LaCore were paid at the direction of Messrs. Woodburn and LaCore to an entity that is partially owned by Mr. Woodburn's father and Randall A. Mason, a member of the Company's Board of Directors and Chairman of the Company's Audit Committee. The funds were subsequently paid to an entity controlled by Messrs. Woodburn and LaCore at their direction. The Company believes that Mr. Mason was unaware that these payments were directed by Messrs. Woodburn and LaCore to an entity partially owned by him until uncovered by the Audit's Committee's independent investigator on November 10, 2005. Further, the Company believes that Mr. Mason received no pecuniary benefit from the payments made by the independent distributor. Since payments were directed into an entity that is partially owned by Mr. Mason, he no longer can be considered "independent" in accordance with the rules of The Nasdaq Stock Market and under the federal securities laws. Therefore, effective November 11, 2005, Mr. Mason resigned as Chairman and a member of the Company's Audit Committee. Mr. Mason remains as a director.

On November 14, 2005, in light of the information learned by the Company's Audit Committee on November 10, 2005, the Company has terminated the employment of each of Messrs. Woodburn and LaCore. No severance has been paid by the Company to Messrs. Woodburn and LaCore and the Company is investigating claims of action against them.

In addition, a loan made by the Company under the direction of Mr. Woodburn in the aggregate principal amount of $256,000 in February 2004 was previously recorded as a loan to a third party. On November 10, 2005, the Audit Committee investigator learned that the Company actually loaned the funds to an entity owned and controlled by the parents of Mr. Woodburn. The loan was repaid in full, partially by an entity controlled by a third party and partially by an entity controlled by Mr. Woodburn in December 2004.

The Audit Committee's investigation is ongoing and the Company is seeking additional independent directors for its Board of Directors and the committees thereof. The Company intends to amend certain disclosures in previous filings

with the Securities and Exchange Commission related to payments made by the independent distributor to Messrs. Woodburn and LaCore and to re-characterize the loan made by the Company to the entity controlled by Mr. Woodburn's parents.

Mr. Hesse said, "As soon as we confirmed the improprieties committed by Mark and Terry, the Company acted as soon as possible to discipline them to protect the Company's best interest. ….

95.     The adverse news in the November 15th press release concerning the details of the audit committee's investigation of Defendants' material related party transactions, and the resulting termination of Woodburn and LaCore and resignation of Mason from the Audit Committee, caused NHT's stock price to immediately drop. As a result of this adverse news, NHT's stock price closed at $8.90 on November 15, 2005, down $1.65 or 16% from the prior day's closing price of $10.55, on unusually heavy trading volume.

96.     The November 15, 2005 press release contained a number of news items related to the Company's quarterly and year-to-date financial performance. All of the news items in the release were overwhelmingly positive and upbeat, with the exception of the adverse news concerning the details of the material related party transactions discovered in the audit committee's investigation and the resulting termination of Woodburn and LaCore and Defendant Mason's resignation from the audit committee.

97.     The stock drop on November 15, 2005 can be attributed solely to the adverse news concerning the details of the audit committee's investigation, and the resulting termination of Woodburn and LaCore and resignation of Mason because all the other news items in the November 15, 2005 press release reflected positively on, and boded well for, the Company.

98.     The November 15, 2005 press release also confirmed that the October 6, 2005 press release announcing the termination of Woodburn and LaCore as officers for failure to cooperate in the audit committee investigation directly related to, and resulted from, the audit

committee's investigation of the material related party transactions.

99.      On August 11, 2006, after the close of trading, the Company issued a press release announcing that the SEC is conducting an investigation into the material related party transactions between the Company and the Individual Defendants described above.

100.      The next trading day NHT's share price opened at $2.47, down $0.57 or 18.7% lower from the prior day's close of $3.04 per share.  The share price decline was caused by the prior evening's adverse disclosure of the SEC investigation concerning the related party transactions described in ¶¶22-23 above.

### ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER

101.      Mark Woodburn has admitted in sworn testimony in the Loghry lawsuit that Star Search made several million dollars in payments to WDC for the benefit of himself and LaCore. (*See*, Ex. 1- p. 39-45).    Attached as Exhibit 1-F, p. 43-45 and incorporated by reference herein, is a ledger showing most of the related party payments from Star Search to WDC.

102.      During LaCore's deposition in the Loghry lawsuit, LaCore denied under oath receiving any related party payments through Star Search. (*See*, Ex. 1-G, p. 65).  This denial has been proven false by the subsequent statements of the Company and Woodburn admitting to the $2.4 million in related party transactions made through Star Search to LaCore and Woodburn.

103.      Woodburn was the CFO of the Company from April 1999 until August 2004.  In April 2004 the Company had to restate its financial statements for each quarter in 2001, 2002 and 2003 as well as the Form 10-KSB for the years ended December 31, 2001 and 2002.

104.      The restatement was required because the Company had applied the incorrect

accounting treatment with respect to:

      (i)   revenue recognition with respect to administrative enrollment fees;
      (ii)  revenue cut-off between 2002 and 2003;
      (iii) reserves established for product returns and refunds;
      (iv)  the gain recorded in connection with the sale of a subsidiary in 2001;
      (v)   income tax provisions; and
      (vi)  stock option based compensation.

105.      On March 23, 2005, the Company announced that it would restate its financial statements once again, this time for the year ended December 31, 2003 as certain commission and transportation-related expenses incurred as of December 31, 2003 were under-accrued and certain revenues not earned until 2004 were improperly recorded as revenue for the year ended December 31, 2003.

106.      The Company had to restate its financial statements *twice* while Woodburn was CFO and President. For each restatement revenue was restated materially lower for prior periods.

107.      Following the restatements, in each case, the Company issued statements in its 10K, signed by Woodburn, LaCore and Mason, that more effective internal financial controls had been implemented to help ensure accurate financial reporting. Thus, each of the Individual Defendants had a heightened awareness of the importance of adhering to GAAP and providing accurate financial information to the Company's auditors and investors.

108.      In its November 15, 2005 press release, the Company's CEO stated: "As soon as we confirmed the improprieties committed by Mark and Terry, the Company acted as soon as possible to discipline them to protect the Company's best interest." The Company disciplined Woodburn and LaCore by terminating their employment and directorships.

109.      At all relevant times, Woodburn was aware that the Company was required to

disclose all material related party transactions in its annual reports, financial statements and proxy statements because the annual reports, proxy statements and financial statements each included disclosure of certain related party transactions, such as a consulting agreement with Woodburn's father and transactions with MarketVision LLC, an entity partially owned by Woodburn.

110.    As CFO, Woodburn selectively disclosed certain related party transactions in the annual reports and proxy statements during the Class Period, but knowingly failed to disclose the $2.75 million in material related party transactions with Star Search, WDC, the Individual Defendants and Woodburn's parents described in ¶¶ 22-23 above.

111.    As part of each annual audit, under Generally Accepted Auditing Standards, the Company's auditor is obligated to inquire, either orally or in writing, of each senior officer and each director as to the existence of any related party transactions with the Company.

112.    In addition, prior to issuing an unqualified or "clean" audit opinion, an auditor will require that a Company's Chief Executive Officer sign a "management representation letter." These written representations are mandated as a professional standards requirement under the Statements on Auditing Standards No. 85 ("SAS 85").[11]

113.    Under SAS No. 85, a public company's independent auditors are required to obtain written representations from a company's senior management, normally the chief executive, as part of the audit process. (*See* also AU 333.06). These representations are contained in what is known in auditing jargon as a "management representation letter." The management representation letter should cover all periods covered by the auditor's report. Management representation letters are used to provide information to the auditors about matters

---

[11] Statements on Auditing Standards are promulgated under Generally Accepted Auditing Standards ("GAAS") by the American Institute of Certified Public Accountants.

that cannot be objectively tested because they depend on management's knowledge, such as management's intentions and the completeness of information provided to the auditor. A copy of a standard management representation letter is attached as Exhibit 4 hereto and incorporated herein by reference.

114. The management representation letter required Woodburn to represent to the Company's independent auditors each reporting period that as of that date, among other things:

i. He had disclosed all related party transactions relevant to the Company and that he was not aware of any other such matters required to be disclosed in the financial statements.

ii. All the accounting records have been made available to the auditor for the purpose of its audit and all the transactions undertaken have been properly reflected and recorded in the accounting records.

iii. The financial statements are fairly presented in conformance with Generally Accepted Accounting Principles.

115. Woodburn must have signed a knowingly false management representation letter to the auditors prior to issuance of the financial statements in each annual report filed during the Class Period, otherwise the auditors would have disclosed the related party transactions set forth in ¶¶22-23, as eventually occurred once the transactions were discovered in November 2005.

116. Included as an exhibit to each of the Company's annual report filed with the SEC on form 10-KSB during the Class Period was a certification of defendant Woodburn as President and CFO, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), attesting to the following:

1. I have reviewed this annual report on Form 10-KSB of Natural Health Trends Corp.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and I have:

    a)   designed such internal controls to ensure that material information relating to the registrant and its subsidiaries (collectively, the "Company") is made known to me by others within the Company, particularly during the period in which this annual report is being prepared;

    b)   evaluated the effectiveness of the registrant's internal controls as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c)   presented in this annual report my conclusions about the effectiveness of the disclosure controls and procedures based on my evaluation as of the Evaluation Date;

5. I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors:

    a)   all significant deficiencies (if any) in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

117. Each of the Sarbanes-Oxley certifications were knowingly false because Woodburn knew of the material related party transactions, and was aware that such transactions

were required to be disclosed in the annual reports, proxy statements and financial statements of the Company and that failure to disclose such transactions rendered the annual reports, financial statements and proxy statements false and misleading.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

### The Affiliated Ute Presumption Of Reliance

118.   Neither Plaintiffs nor the Class need prove reliance – either individually or as a class –because under the circumstances of this case, which involves a failure to disclose the material related party transactions described in ¶¶22-23 above, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972).   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.   This complaint is based primarily on defendants' non-disclosure of the material related party transactions described in ¶¶22-23 above in violation of Generally Accepted Accounting Principals and federal securities regulations.

### FRAUD-ON-THE-MARKET DOCTRINE

119.   At all relevant times, the market for NHT securities was an efficient market for the following reasons, among others:

(a)    Beginning February 22, 2005, NHT's stock met the requirements for listing, and was listed and actively traded on the NASDAQ National Market System, a highly efficient and automated market (prior to that time the stock was actively traded on the NASDAQ OTC Bulletin Board);

(b)    During the class period, on average, approximately 226,604 shares of NHT stock were traded on a weekly basis.  During the Class Period approximately 4.9 million NHT shares were outstanding, an average of 1.25 million of which were owned by officers and directors.  Even after adjusting the average weekly volume, by dividing it in half, to compensate for *potential* double counting of

trades, 2.3% of the outstanding float (3.0% excluding insider shares) were traded on a weekly basis, demonstrating a very active and broad market for NHT stock and permitting a *strong* presumption of an efficient market;

(c)     As a regulated issuer, NHT filed periodic public reports with the SEC and the NASDAQ;

(d)     During the Class Period, NHT was eligible to file registration statements on Form S-3 with the Securities & Exchange Commission;

(e)     NHT regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     NHT was followed by several securities analysts employed by third party research firms and by brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, as well as available publicly, during the Class Period. These included:  Sprott Securities, Gifford Securities and Stockdiagnostics.com. Each of these reports was publicly available and entered the public marketplace for review and action by investors;

(g)     More than fifteen NASD member firms were active market-makers in NHT stock at all times during the Class Period; and

(h)     Unexpected material news about NHT was rapidly reflected and incorporated into the Company's stock price during the Class Period.

120.    As a result of the foregoing, the market for NHT's securities promptly digested current information regarding NHT from all publicly available sources and reflected such information in NHT's stock price. Under these circumstances, all purchasers of NHT securities during the Class Period suffered similar injury through their purchase of NHT securities in an efficient market at artificially inflated prices and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

121.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of Natural Health during the Class Period and who suffered damages (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs,

successors, or assigns and any entity in which defendants have or had a controlling interest.

122.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. According to the Company's filings with the Securities and Exchange Commission ("SEC") the Company had 8,199,933 shares outstanding as of August 7, 2006 and more than 4,000 individual beneficial owners of its stock. Record owners and other members of the Class may be identified from records maintained by Natural Health or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.    Plaintiffs' claims are typical of the claims of the members of the Class as plaintiffs purchased Natural Health shares during the Class Period and all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

124.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

125.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants omitted to state material facts necessary to prevent the statements made to the investing public from being false and misleading during the Class Period concerning its financial statements;

(c)     whether defendants acted knowingly or recklessly in making materially misleading representations or omitting to state material facts during the Class Period;

(d)     whether the market prices of the Company's common share was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and the proper measure of such damages.

126.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## STATUTE OF LIMITATIONS

127.  Plaintiffs had no reason to suspect fraud at any time during the Class Period until at the very earliest October 6, 2005 when the Company disclosed the adverse information concerning allegations against Woodburn and LaCore arising from the Loghry lawsuit.

128.  As a result, the statute of limitations was tolled during the Class Period until at least October 6, 2005.

# FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder as Against Woodburn, LaCore and the Company

129.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

130.    This first claim is alleged against defendants Woodburn, LaCore and the Company only.

131.    Throughout the Class Period, defendant NHT acted through Woodburn, the Company's President, CFO and director and LaCore, CEO of its main subsidiary Lexxus and a director.  The misconduct, willfulness, motive, knowledge, and recklessness of Woodburn and LaCore is therefore imputed to NHT rendering the Company primarily liable for the securities law violations of Woodburn and LaCore committed while performing in their official capacities as Company representatives.  In the alternative and additionally, NHT is liable for the acts of Woodburn and LaCore under the doctrine of respondent superior.

132.    Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly omitted to disclose the material related party transactions which were necessary to disclose in order to make the statements made not misleading to plaintiff and the other members of the Class in connection with the purchase and sale of Natural Health shares.

133.    The purpose and effect of defendants' omissions of material fact was to artificially inflate and maintain the price of Natural Health shares.

134.     Defendants, who are the top officers of the Company, had actual knowledge of the material omissions set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Natural Health personnel to members of the investing public, including plaintiff and the Class, and the securities analysts.

135.     As a result of the foregoing, the market price of Natural Health securities was artificially inflated during the Class Period. In ignorance of the falsity of the defendants' statements plaintiff and the other members of the Class relied, to their damage, on the absence of any information concerning the related party transactions described above and/or the integrity of the market price of Natural Health securities during the Class Period in purchasing Natural Health shares at prices which were artificially inflated as a result of defendants' false and misleading statements.

136.     Had plaintiffs and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased Natural Health shares at the artificially inflated prices that they did.

137.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

138.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

139.     This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act Against
### The Individual Defendants

140.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

141.     This second claim under §20(a) of the Exchange Act is alleged against the Individual Defendants, based on the primary violation of §10b and Rule 10b-5 by Natural Health as stated in the First Claim above.

142.     The Individual Defendants acted as controlling persons of Natural Health within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their stock ownership, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading information disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.   These defendants were aware of the material related party transactions and were in a position to ensure their disclosure as required by law.

143.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

144.     As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as

controlling persons of Natural Health, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

145.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

146.    This action is being brought within two years after the discovery of the untrue statements and omissions and within five years after their issuance.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

(A)    Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

(B)    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: April 25, 2008

Respectfully submitted,

**s/ Joel M. Fineberg**

Joel M. Fineberg
    Email:  jfineberg@fineberglaw.com
R. Dean Gresham
    Email:  dgresham@fineberglaw.com
**FINEBERG / GRESHAM**
3811 Turtle Creek Blvd., Suite 1900
Dallas, Texas 75219
Telephone: (214) 219-8828
Facsimile: (214) 219-8838
**LIASION COUNSEL FOR PLAINTIFFS**

Laurence M. Rosen, Esq. (*pro hac vice*)
    Email: lrosen@rosenlegal.com
Phillip Kim, Esq. (*pro hac vice*)
    Email: pkim@rosenlegal.com
**THE ROSEN LAW FIRM, P.A.**
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
**LEAD COUNSEL FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system. As such, this pleading was served on all counsel who are deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by regular mail on this 25th day of April, 2008.

**s/ Joel M. Fineberg**
**JOEL M. FINEBERG**