## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| GARY ZAGAMI, BRIAN KELLY, AND RICK PATMORE, on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No.: 3-06-CV-1654-D |
| v. | § § § | CLASS ACTION |
| NATURAL HEALTH TRENDS CORP., MARK D. WOODBURN, TERRY L. LaCORE and RANDALL A. MASON, | § § § § | |
| Defendants. | § | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION ........................................................................................................1

II.     SUMMARY OF CASE……………………….....................................................3

III.    NHTC's NON-PAYMENT OF $200,000 TO THE SETTLEMENT FUND.....................4

IV.     THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS
        FAIR, ADEQUATE, AND REASONABLE.......................................................5

        A.      The Fifth Circuit Favors Settlements and Presumes the Fairness of a
                Settlement Proposed by Competent and Experienced Counsel ...............................5

        B.      The Fifth Circuit's Fairness Factors .........................................................8

                1.      The Settlement Is Not the Product of Fraud or Collusion...........................8

                2.      The Complexity, Expense and Likely Duration of
                        This Litigation.......................................................................………...9

                3.      The Stage of the Proceedings at Which Settlement Was Achieved and
                        The Amount of Discovery Completed ......................................................12

                4.      The Probability of Success on the Merits ................................................13

                5.      The Range of Possible Recovery and Difficulty of
                        Proving Damages ........................................................................…...16

                        a.  The Risk of Establishing Damages.......................................................16

                        b.  The Substantial Benefits Provided By the Settlement Are
                        Well Within The Range of Reasonableness...............................................17

                6.      The Opinion of Lead Plaintiffs' Counsel and Settlement
                        Class Members Favor Approval of the Settlement ....................................19

V.      THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF DUE
        PROCESS AND RULE 23 OF FEDERAL RULES OF CIVIL PROCEDURE..............20

VI.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE...................................21

VII.    THE ACTION SHOULD BE FINALLY CERTIFIED AS A CLASS ACTION
        FOR THE PURPOSE OF SETTLEMENT........................................................................22

VIII.   CONCLUSION....................................................................................................................22

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**FEDERAL CASES**

*Ahearn v. Fibreboard Corp.,*
     162 F.R.D. 505 (E.D. Tex. 1995).......................................................................................19

*Alaska Electrical Pension Fund v. Flowserve,*
     ---F.3d---, 2009 WL 1740648(5th Cir. June 19, 2009).....................................................10

*Backman v. Polaroid Corp.,*
     910 F.2d 10 (1st Cir. 1990)..............................................................................................11

*Beecher v. Able,*
     575 F.2d 1010 (2d Cir. 1978)...........................................................................................21

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
     603 F.2d 263 (2d Cir. 1979).............................................................................................11

*Blackie v. Barrack,*
     524 F.2d 891 (9th Cir. 1975) ...........................................................................................16

*Class Plaintiffs v. Seattle,*
     955 F.2d 1268 (9th Cir. 1992) .........................................................................................21

*Cotton v. Hinton,*
     559 F.2d 1326 (5th Cir. 1977) ........................................................................5, 11, 13,19

*Detroit v. Grinnell Corp.,*
     495 F.2d 448 (2d Cir. 1974)..................................................................................17, 20, 21

*Dura Pharms., Inc. v. Broudo,*
     544 U.S. 336 (2005).......................................................................................................3,10

*Ernst & Ernst v. Hochfelder,*
     425 U.S. 185 (1976).....................................................................................................13, 14

*Fickinger v. C.I. Planning Corp.,*
     646 F. Supp. 622 (E.D. Pa. 1986) ...................................................................................17

*Fla. Trailer & Equipment Co. v. Deal,*
     284 F.2d 567 (5th Cir. 1960) .........................................................................................5, 11

*Huttenstine v. Mast,,*
　　537 F. Supp.2d 795 (E.D.N.C. 2008)
　　*aff'd* 2009 WL 1743693 (4th Cir. June 22, 2009) ............................................................4

*Ibarra v. Texas Employment Comm'n,*
　　823 F.2d 873 (5th Cir. 1987) ............................................................................5, 11

*In re Apple Sec. Litig.,*
　　No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 ..................................................11

*In re AT&T Corp.,*
　　455 F.3d 160 (3d Cir. 2006)............................................................................................18

*In re Cendant Corp.,*
　　260 F.3d 183 (3d Cir. 2001)............................................................................................18

*In re Chicken Antitrust Litig. Am. Poultry,*
　　669 F.2d 228 (5th Cir. 1982) ........................................................................................21

*In re Corrugated Container Antitrust Litig.,*
　　643 F.2d 195 (5th Cir. 1981) ........................................................................................13

*In re Equity Funding Corp. of Am. Sec. Litig.,*
　　603 F.2d 1353 (9th Cir. 1979) ......................................................................................20

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
　　142 F.R.D. 588 (S.D.N.Y. 1992) ..................................................................................21

*In re Ikon Office Solutions, Inc.,*
　　194 F.R.D. 166 (E.D. Pa. 2000)....................................................................................21

*In re Lease Oil Antitrust Litig.,*
　　186 F.R.D. 403 (S.D. Tex. 1999)....................................................................................8

*In re Letterman Bros. Energy Sec. Litig.,*
　　799 F.2d 967 (5th Cir. 1986) ........................................................................................16

*In re Mego Fin. Corp. Sec Litig.,*
　　213 F.3d 454 (9th Cir. 2000) ........................................................................................13

*In re Nucorp Energy Sec. Litig.,*
　　661 F. Supp. 1403 (S.D. Cal. 1987)..............................................................................11

*In re Warfarin Sodium Antitrust Litig.,*
　　391 F.3d 515 (3d Cir. 2004)..........................................................................................18

iv

*Lelsz v. Kavanagh,*
    783 F. Supp. 286 (N.D. Tex. 1991) ............................................................6, 19

*Maher v. Zapata Corp.,*
    714 F.2d 436 (5th Cir. 1983) ..............................................................5, 12, 20

*Manchaca v. Chater,*
    927 F. Supp. 962 (E.D. Tex. 1996) ..............................................................13

*McNary v. Am. Sav. & Loan Ass'n,*
    76 F.R.D. 644 (N.D. Tex. 1977) .....................................................................8

*Mercury Air Group, Inc. v. Mansour,*
    237 F.3d 542 (5th Cir. 2001) ........................................................................14

*Meyer Citizens & So. Nat'l Bank,*
    677 F. Supp. 1196 (M.D. Ga. 1988) .............................................................11

*Miller v. Republic Nat'l Life Ins. Co.,,*
    559 F.2d 426 (5th Cir. 1977) ................................................................5, 11, 20

*Mullane v. Cent. Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950).......................................................................................21

*Neff v. Via Metro. Transit Auth.,*
    179 F.R.D. 185 (W.D. Tex. 1998) ..................................................................9

*Newman v. Stein,*
    464 F.2d 689 (2d Cir. 1972).........................................................................17

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.,*
    487 F.3d 261 (5th Cir. 2007) ........................................................................10

*Parker v. Anderson,*
    667 F.2d 1204 (5th Cir. 1975) ...............................................................5, 8, 11

*Pearson v. Ecological Sci. Corp.,*
    522 F.2d 171 (5th Cir. 1975) ....................................................................5, 11

*Pettaway v. Am. Cast Iron Pipe Co.,*
    576 F.2d 1157 (5th Cir. 1978) ........................................................................6

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986)......................................................................................16

*Reed v. GMC,*
    703 F.2d 170 (5th Cir. 1983) ..................................................................................6, 8

*Reynolds v. White,*
    584 F.2d 280 (8th Cir. 1978) .......................................................................................21

*Rubenstein v. Republic Nat'l Life Ins. Co.,*
    74 F.R.D. 337 (N.D. Tex. 1976) ....................................................................................8

*Rubenstein v. Collins,*
    20 F.3d 160 (5th Cir. 1994) .........................................................................................14

*Salinas v. Roadway Express, Inc.,*
    802 F.2d 787 (5th Cir. 1986) ........................................................................................8

*San Antonio Hispanic Police Officers' Org. Inc. v. San Antonio,*
    188 F.R.D. 433 (W.D. Tex. 1999) ..................................................................................9

*TSC Indus v. Northway, Inc.,*
    426 U.S. 438 (1976)......................................................................................................13

*Trans World Airlines, Inc. v. Hughes,*
    312 F. Supp. 478 (S.D.N.Y. 1970), *modified*,
    449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973)..............................................11, 12

*United States v. Texas Educ. Agency,*
    679 F.2d 1104 (5th Cir. 1982) ......................................................................................6

*White v. NFL,*
    822 F. Supp. 1389 (D. Minn. 1993)..............................................................................21

*W. Va. Chas. Pfizer & Co.,*
    314 F. Supp. 710 (S.D.N.Y. 1970),
    *aff'd,* 440 F.2d 1079 (2d Cir. 1971) .......................................................................11, 18

*Williams v. First Nat'l Bank,*
    216 U.S. 582 (1910).................................................................................................5, 11

*Young v. Katz,*
    447 F.2d 431 (5th Cir. 1971) .........................................................................................6

*Zerkle v. Cleveland Cliffs Iron Co.,*
    52 F.R.D. 151 (S.D.N.Y. 1971) .....................................................................................17

## FEDERAL STATUTES

15 U.S.C. § 78j    …………………………………………………………..14, 16

Federal Rules of Civil Procedure
Rule 23…………………………………………………………………………..20
Rule 23(e)………………………………………………………………… .1

## SECONDARY AUTHORITIES

*Manual For Complex Litigation* (2d ed. 1985)
      § 30.14……………………………………………………………………6

## I.    INTRODUCTION

Lead Plaintiffs Gary Zagami, Brian Kelly, and Rick Patmore ("Lead Plaintiffs" or "Plaintiffs") through their counsel, the Rosen Law Firm, P.A. ("Lead Counsel" or "Plaintiffs' Counsel") submit this memorandum of law pursuant to Rule 23(e) of the Federal Rules of Civil Procedure in support of the proposed settlement (the "Settlement")[1] of the above-captioned consolidated class action (the "Litigation").  Through nearly three years of hard fought litigation and extensive arm's length settlement negotiations, Lead Counsel has achieved a Settlement that it believes is an excellent result for the Settlement Class and merits the approval of the Court—a recovery of $2.75 million in cash, plus interest—an amount representing approximately 15% of Lead Plaintiffs' estimate of provable damages, assuming Lead Plaintiffs were able to establish liability.  The Settlement resolves all claims against defendants Natural Health Trends Corp. ("NHTC" or the "Company"), Mark D. Woodburn, Terry L. LaCore, and Randall A. Mason (collectively "Defendants").

The Settlement was achieved only after hard-fought litigation and an extensive investigation by Lead Counsel.  Lead Counsel reviewed and analyzed voluminous publicly available information concerning NHTC, located and interviewed numerous witnesses, consulted with experts, opposed Defendants' motions to dismiss, served numerous discovery requests to Defendants and non-parties, deposed the NHTC's former CEO, and participated in extensive arm's-length negotiations with the aid of nationally recognized mediator.  The Settlement makes possible a recovery of a substantial portion of the damages suffered by the Class, which includes all persons who purchased the publicly traded common stock of defendant Natural Health Trends

---

[1]    The specific terms and conditions of the Settlement are contained in the Stipulation and Agreement of Settlement dated March 19, 2009 (the "Stipulation"), which was previously filed with the Court.  Capitalized terms not defined herein are defined in the Stipulation.

Corp. ("NHTC") during the period from April 16, 2002 through November 15, 2005, inclusive ("Class Period").

As explained herein, the Settlement represents a realistic assessment by knowledgeable attorneys of the risks of further proceedings including the fact that NHTC is a micro-cap company with few hard assets, a checkered history of profitability, and no realistic means to tap the capital markets to satisfy a greater judgment. Indeed, NHTC's common stock trades around fifty cents a share and has a market capitalization of $6 million. The Settlement confers an immediate and substantial benefit on the Settlement Class and eliminates the risk, expense and uncertainty of continued litigation under circumstances where a more favorable outcome was at great risk. By any objective measure, the Settlement is fair, reasonable, and adequate.

Lead Counsel firmly believes that this Settlement is an excellent recovery for the Class based on their extensive investigation, analysis of the evidence obtained, past experience in litigating other similar cases, the significant risk, expense, and uncertainty of continued litigation and the serious disputes between the parties concerning the merits. Members of the Class appear to agree. Pursuant to the Preliminary Approval Order dated April 6, 2009, 8,040 copies of the Notice and Pendency of Class Action Settlement (the "Notice") were mailed to potential Settlement Class Members, including sophisticated institutional investors. The Summary Notice was published in *Investor's Business Daily* and over *PRNewswire* on May 11, 2009. The deadline for filing objections or to request exclusion from the Settlement Class was June 26, 2009. No objections were filed by Class Members to any aspect of the Settlement, Plan of Allocation of settlement proceeds, counsel's request for an award of attorneys' fees and expenses or the award to Lead Plaintiffs. Nor has any Class Member sought exclusion from the Class.

As set forth herein and in the Declaration of Laurence M. Rosen in Support of Final

Approval of Class Action Settlement and Plan of Allocation, And Award of Attorneys' Fees and Expenses and Award to Lead Plaintiffs ("Rosen Declaration").  Lead Counsel firmly believes that the Settlement for $2.75 million in cash when weighed against the substantial risk, expense and delay of continued litigation is an excellent result and is unquestionably fair, reasonable, and adequate.  Moreover, the Plan of Allocation tracks the theory of damages asserted by Lead Plaintiffs, is consistent with the principles set forth in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), and is necessarily fair, reasonable, and adequate.

## II.     SUMMARY OF CASE

An overview of Lead Plaintiffs' claims, the history of litigation, and the considerable work performed on behalf of the Class is set forth in more detail in the Rosen Declaration.  The Court is respectfully referred to the Rosen Declaration for a full discussion of the factual and procedural history of the case as well as the factors bearing on the reasonableness of the Settlement, the Plan of Allocation, and Lead Counsel's request for an award of attorneys' fees and expenses and award to Lead Plaintiffs.

## III.    NHTC's NON-PAYMENT OF $200,000 TO THE SETTLEMENT FUND

To date, only $2.55 million of the $2.75 million Settlement Amount has been paid.  Pursuant to the Stipulation, Defendants' Insurer was obligated to pay $2.5 million of the Settlement Amount and NHTC was obligated to pay the balance of $250,000.  NHTC was required to pay the $200,000 balance (the "Outstanding Amount") by July 3, 2009.  On June 29, 2009 Lead Counsel was contacted by NHTC's counsel indicating that NHTC would not be able to pay the Outstanding Amount until September 2009, because NHTC was waiting for some monies to become available in Hong Kong.  Lead Plaintiffs request the Court enter final judgment against NHTC for the unpaid $200,000 portion of the Settlement, and stay execution o

of the judgment until October 1, 2009, to permit NHTC to pay the $200,000.  NHTC does not

object to the entry of Judgment against under these terms.  *See* Rosen Declaration, ¶¶ 6-10.

Through the operation of paragraph 30 of the Stipulation, the Settlement cannot be

terminated through non-payment by NHTC.  *See e.g. Huttenstine v. Mast*, 537 F. Supp.2d 795

(E.D.N.C. 2008) *aff'd* 2009 WL 1743693 (4th Cir. June 22, 2009).  Rather, paragraph 30

provides for the enforcement of the Stipulation through the entry of judgment for the $200,000

owed by NHTC to the Class pursuant to the Stipulation and Agreement of Settlement.  *See*

Rosen Declaration, ¶ 7.   Accordingly, Plaintiffs submit herewith a modified Order and Final

Judgment, which includes two final paragraphs entering judgment against Defendant NHTC in

favor of Lead Plaintiffs in the amount of $200,000 and staying execution of the judgment until

October 1, 2009.  Lead Plaintiffs request the Court enter the modified Order and Final Judgment

finally approving the Settlement.  *See* Rosen Declaration ¶ 10, & Ex. 1.

## IV.    THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, ADEQUATE, AND REASONABLE

### A.    The Fifth Circuit Favors Settlements and Presumes the Fairness of a Settlement Proposed by Competent and Experienced Counsel

The standard for reviewing a proposed settlement of a class action, as enunciated by the

Fifth Circuit, is whether the proposed settlement is "fair, adequate and reasonable" and has been

entered into without collusion between the parties. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th

Cir. 1977), *See also Ibarra v. Texas Employment Comm'n,* 823 F.2d 873, 878 (5th Cir. 1987);

*Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir. 1982).  In applying this standard, the Court

must determine whether, in light of the claims and defenses asserted by the parties, the proposed

compromise represents a "reasonable evaluation of the risks of litigation." *Fla. Trailer &*

*Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960).

It has long been settled that compromises of disputed claims are favored by the courts. *Williams v. First Nat'l Bank,* 216 U.S. 582, 595 (1910). The Fifth Circuit has repeatedly held that, as a result of their highly-favored status, settlements "will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." *Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426, 428 (5th Cir. 1977) (quoting *Pearson v. Ecological Sci. Corp.,* 522 F.2d 171, 176 (5th Cir. 1975)).

Settlements of class actions and shareholder litigation are "particularly favored" and are not to be lightly rejected by the courts. *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983); *see also Cotton*, 559 F.2d at 1331. In the context of class actions, the Fifth Circuit has held that "there is an overriding public interest in favor of settlement "because such suits "have a well deserved reputation as being most complex." *Id.* Thus, in determining whether to approve a settlement, courts are not required to decide the merits of the action or substitute their own judgment for that of the parties or that of counsel. *See Maher*, 714 F.2d at 455.

In weighing the benefits obtained by the settlement against the benefits dependent on the likelihood of recovery upon the plaintiffs' causes of action, courts cannot be expected to balance the scales perfectly. The trial court should not require a proponent of a proposed settlement to "'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Cotton*, 559 F.2d at 1330 (citation omitted). The very object of a compromise "is to avoid the determination of sharply contested and dubious issues." *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971) (citations omitted).

Courts in this Circuit recognize that "a presumption of correctness is said to attach to a

class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery." *Lelsz v. Kavanaugh*, 783 F. Supp. 286, 297 (N.D. Tex. 1991) (quoting *Manual For Complex Litigation* §30.41 (2d ed. 1985)); *see also United States v. Texas Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982); *Cotton*, 559 F.2d at 1330. Moreover, the Fifth Circuit has acknowledged that courts must rely to a large degree on the judgment of competent counsel, terming such counsel the "linchpin" of an adequate settlement. *Reed v. GMC*, 703 F.2d 170, 175 (5th Cir. 1983). Thus, if experienced counsel determine that a settlement is in the class's best interests, "the attorney's views must be accorded great weight." *Pettaway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978).

When examined under the applicable criteria, it is evident that this is a fair and reasonable recovery for the Class. It is Lead Plaintiffs' counsel's judgment that there is a serious question as to whether a more favorable monetary result against Defendants could or would be attained through further litigation, trial, and the inevitable post-trial motions and appeals. The proposed Settlement, which achieves a certain and substantial recovery for Class Members, unquestionably warrants this Court's approval.

This case was carefully investigated and has been vigorously litigated since its commencement. Lead Counsel has made a thorough and detailed investigation into the facts and applicable legal principles. This investigation included, among other things, a review and analysis of voluminous publicly filed documents, court records, financial reports, and press releases concerning NHTC's related party transactions and financial statements; consultation with experts in accounting, materiality, loss causation and damages; a thorough review of the applicable legal and factual issues; an analysis of the defenses asserted by Defendants; interviews with scores of percipient witnesses and deposition discovery, including several former

distributors and employees of NHTC and the former CEO of NHTC who had knowledge of the NHTC's internal investigation of the related party transactions; and researching and preparing oppositions to Defendants' motions to dismiss. *E.g.* Rosen Declaration ¶¶ 11, 57-61.

Additionally, during the settlement negotiations, the parties extensively debated the merits and defenses to Lead Plaintiffs' claims. Lead Plaintiff Rick Patmore was present at the mediation and was an active participant. His attendance was directed by the other two Lead Plaintiffs. The Settlement was reached only after Lead Counsel in consultation with Lead Plaintiffs, thoroughly evaluated the risks of continued litigation, including, but not limited to the risk of proving loss causation at the class certification and summary judgment stages, proving scienter at trial. *See* Rosen Declaration ¶¶ 57-67. Given the substantial additional effort, expense, and uncertainties necessary to overcome summary judgment, and to conduct a trial on the merits and handle the inevitable post-trial motions and appeals, along with the substantial risk that Lead Plaintiffs and the Settlement Class would receive nothing, Lead Counsel submits that the proposed Settlement is an excellent result and should be approved by the Court.

**B.      The Fifth Circuit's Fairness Factors**

The only question for the court to determine in evaluating a proposed settlement "is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval." *McNary v. Am. Sav. & Loan Ass'n*, 76 F.R.D. 644, 649 (N.D. Tex. 1977) (citations omitted); *Rubenstein v. Republic Nat'l Life Ins. Co.,* 74 F.R.D. 337, 347 (N.D. Tex. 1976). The Fifth Circuit has established the following six factors to be considered in determining whether a proposed settlement is fair:

> 1.      whether the settlement was a product of fraud or collusion;
>
> 2.      the complexity, expense, and likely duration of the litigation;

3.      the stage of proceedings and the amount of discovery completed;

4.      the probability of plaintiffs' success on the merits;

5.      the range of possible recovery and the certainty of damages; and

6.      the opinions of the participants, including class counsel, class

        representatives, and the absent class members.

*In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 431-35 (S.D. Tex. 1999) (citing *Reed*, 703 F.2d

at 172); *Parker*, 667 F.2d at 1209; *Salinas v. Roadway Express, Inc.,* 802 F.2d 787, 789 (5th Cir.

1986). This Settlement easily passes muster when examined in light of these six criteria.

### 1.      The Settlement Is Not the Product of Fraud or Collusion

There is absolutely no hint of collusion in this Settlement. Lead Counsel has years of

experience in litigating securities fraud class actions and has negotiated numerous other class

settlements which have been approved by this and other courts throughout the country.

Moreover, Defendants were represented by very capable and highly experienced counsel who

zealously defended their clients. The Litigation was hard-fought and involved motions to

dismiss, formal discovery, and an arm's length mediation.

Lead Counsel negotiated the Settlement fully informed about the strengths and

weaknesses of their claims and the defenses that Defendants would assert. During the mediation

and subsequent negotiations in documenting the Settlement, each side zealously advanced their

respective positions, in order to negotiate a Settlement in the best interest of their clients. The

agreement-in-principle was followed by negotiation regarding the terms of the Settlement,

including the scope of releases and the establishment of opt-out thresholds. In sum, the

Settlement is the result of extensive arm's length negotiations between experienced counsel

knowledgeable about the strengths and weaknesses of the claims made and the potential defenses

to them.  *See e.g., San Antonio Hispanic Police Officers' Org., Inc. v. San Antonio,* 188 F.R.D. 433, 458 (W.D. Tex. 1999)(finding that there was no evidence of collusion, but rather, that "the settlement was the result of hard fought, arm's length negotiations."); *Neff v. Via Metro. Transit Auth.*, 179 F.R.D. 185, 209 (W.D. Tex. 1998) (same).

### 2.    The Complexity, Expense and Likely Duration of This Litigation

This Litigation is a complex securities class action brought under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and thus it is replete with difficult issues of proof in establishing liability.  The existence of the following factors make it more likely that, without the Settlement, the case would require additional large expenditures and years of litigation, and there would be a significant risk that the Class would obtain a result far less beneficial than the one provided by the Settlement.

(a)    Defendants are represented by experienced nationally recognized law firms who are familiar with the defense of complex securities class actions such as this Litigation.  Since the inception of the Litigation, Defendants have denied liability and have asserted affirmative defenses and facially reasonable explanations in response to Lead Plaintiffs' allegations.

(b)    Defendants have continuously challenged whether Plaintiffs can prove loss causation and damages.  Because the Court has set a fairly early schedule for the filing of a class certification motion, Plaintiffs would be required to prove by a preponderance of the evidence loss causation in order to enjoy the fraud-on-the-market presumption of reliance and satisfy the predominance requirement of Rule 23.  *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007).  Even

if Plaintiffs were successful in proving loss causation in this regard, Plaintiffs would be subject to additional challenges on loss causation at summary judgment and at trial. *See Alaska Electrical Pension Fund v. Flowserve*, --F.3d--, 2009 WL 1740648 at * 5 (5th Cir. Jun. 19, 2009) (*per curiam*) (A.J. (ret.) O'Connor). Such an endeavor would have been time consuming and costly and invariably involve a "battle of the experts", and uncertainty because the alleged corrective disclosures do contain negative information that does not explicitly refer to the alleged misconduct. *See* Rosen Declaration ¶¶ 47-49.

(c)      Another difficult issue to prove would be whether Defendants acted with scienter in publishing allegedly false and incomplete financial statements. *See* Rosen Declaration ¶ 51. A trial of this Litigation would likely require several weeks or months and involve the introduction of hundreds of exhibits dealing with complex financial matters, vigorously contested motions, and the expenditure of hundreds of thousands of dollars in additional out-of-pocket costs that would reduce the Class's recovery. Not only would a lengthy trial consume Court resources, but the case would also be subject to lengthy appeals.

(d)      The prosecution of this Litigation at trial would necessarily involve complex issues resulting in conflicting expert testimony, especially on damages, loss causation and proper application of accounting rules and principles concerning related party transactions, the outcome of which is by no means certain. Hence, if there were further litigation, and a trial there would be a risk that the Lead Plaintiffs might fail to convince the fact finder that Defendants violated the federal securities laws-- resulting in a judgment in Defendants' favor.[2]

---

[2] *See In re Nucorp Energy Sec. Litig.*, 661 F. Supp. 1403,1414 (S.D. Cal. 1987)(even after some defendants settled for $41 million, a six-month jury trial that focused on an accounting fraud

(e)     Even if the Class could eventually recover a larger judgment after trial, given the time value of money, a certain and immediate recovery in this Litigation is a good result.  The Company has limited financial resources, has struggled to achieve profitability, has a market capitalization of only $6.0 million, and is in the very competitive personal care products industry, all within the backdrop of the global economic slowdown.  Indeed, NHTC's precarious financial position is embodied in their failure to pay the remaining $200,000 to the Settlement Fund.  *See* Rosen Declaration ¶¶ 55-56.  Moreover, any future judgment obtained after trial would still be subject to the continuing risks and vicissitudes of litigation, through possible appeals.  Even very large judgments, recovered after lengthy litigation and trial, can be completely lost on appeal or post-trial motions.[3]

Thus, Lead Counsel believes that were this Litigation tried through to conclusion rather than settled, the risk of obtaining a recovery less than the amount of the proposed Settlement would be great, and the litigation would be complex and expensive.  An additional period of pretrial proceedings and a lengthy trial would not serve the interests of the Settlement Class,

---

claim resulted in a verdict for the non-settling defendants).  *See also Meyer v. Citizens & S. Nat'l Bank,* 677 F. Supp. 1196, 1207-08 (M.D. Ga. 1988).

[3]   For example, in *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991), the jury rendered a verdict for plaintiffs after an extended trial.  Based upon the jury's findings, recoverable damages could have exceeded $100 million. However, weeks later, the court overturned the verdict, entering judgment n.o.v. for the individual defendants and ordered a new trial with respect to the corporate defendant.  In another case, the class won a jury verdict and a motion for j.n.o.v. was denied, but on appeal the judgment was reversed and the case dismissed.  *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990).  *See also W.Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), *aff'd*, 440 F.2d 1079 (2d Cir. 1971); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial); *Trans World Airlines, Inc. v. Hughes,* 312 F. Supp. 478 (S.D.N.Y. 1970) (overturning $145 million judgment after years of appeals), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973).

especially in light of the substantial and immediate recovery provided for by the Settlement.

### 3. The Stage of the Proceedings at Which Settlement Was Achieved and the Amount of Discovery Completed

The Settlement comes at a relatively early stage in the Litigation, foreclosing the extraordinary expense of continuing discovery and trial preparation, and the burden to the Court of extended and complex litigation. Notwithstanding the relatively early stage in the proceedings, both the knowledge of Lead Counsel and the proceedings themselves have reached a stage where an intelligent evaluation of the Litigation and the propriety of the Settlement can be made. As set forth in the Rosen Declaration ¶¶ 57-67, Lead Counsel conducted a thorough investigation of the facts during the course of the Litigation. Lead Counsel was to conduct significant informal discovery on the matters alleged despite the stay of discovery pursuant to the PSLRA. Lead Counsel reviewed and analyzed voluminous publicly available documents, interviewed numerous witnesses and consulted with experts throughout the Litigation. The briefing on Defendants' motions to dismiss further attuned Lead Counsel and Plaintiffs to the factual and legal issues in dispute and the risks of continued litigation. When formal discovery commenced, Lead Counsel served numerous discovery requests to Defendants and nonparties and conducted the deposition of Robert Hesse, the Company's former CEO who had knowledge of the Company's internal investigation. Additionally, in preparation of the mediation of the action, Plaintiffs prepared a detailed mediation statement exploring the legal and factual issues in this case which was extensively discussed during the mediation. This provided Lead Counsel and Lead Plaintiffs additional context to their claims. Thus, the parties reached an agreement to settle at a point when they had a "full understanding of the legal and factual issues surrounding [the] case." *Manchaca v. Chater,* 927 F. Supp. 962, 967 (E.D. Tex. 1996). Nothing more is required. Indeed, Courts have even held that formal discovery is not a "necessary ticket to the

bargaining table." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (citing *Cotton*, 559 F.2d at 1332); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000)(same).

Having obtained sufficient information to properly evaluate the case and the propriety of settlement, Lead Counsel and Lead Plaintiffs have settled the Litigation on a highly favorable basis to the Class without the substantial expense, risk, delay and uncertainty of continued litigation.

### 4.    The Probability of Success on the Merits

As in every complex case of this kind, Lead Plaintiffs faced formidable obstacles to recovery at trial, both with respect to liability and damages as further discussed in the Rosen Declaration ¶¶ 45-56.

Having passed the pleading stage, Lead Plaintiffs would be put to their proofs.  As discussed above, Lead Plaintiffs immediately faced the challenge of class certification and proof of loss causation.    Additionally, Lead Plaintiffs would have the challenging burden of establishing the liability of Defendants to the satisfaction of the jury and the Court.  Lead Plaintiffs would have had to prove, *inter alia*, that the alleged omissions and misstatements concerning the related party transactions were material, *TSC Indus v. Northway, Inc.,* 426 U.S. 438 (1976), and, made with scienter (actual knowledge or reckless disregard for the truth), *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976).  Accordingly, in order to prevail on the §10(b) claims, Lead Plaintiffs would have to prove that each of the Defendants was responsible for an omission or a misstatement that was material, that the omissions or misstatements impacted the market price of NHTC stock and caused damage to the Class, and that each Defendant acted with scienter.  *See generally Mercury Air Group, Inc. v. Mansour,* 237 F.3d 542, 546 (5th Cir. 2001);

*Rubenstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994).

Although Lead Plaintiffs believe their §10(b) claims are strong, and Lead Plaintiffs are confident as to the likelihood of their success, establishing liability at trial would by no means be guaranteed. Lead Plaintiffs asserted that Defendants issued false and materially misleading financial statements that did not comply with generally accepted accounting principles ("GAAP") because they failed to disclose approximately $2.75 million in related party transactions between the Company and the individual defendants, Woodburn and LaCore. Such a question would have presented competing experts and would have involved complex and extensive expert testimony.

As to scienter, Lead Plaintiffs' burden is to prove that each individual Defendant either knew that NHTC's financial statements were false and misleading, or was reckless in not knowing and not causing such to be disclosed. Lead Plaintiffs recognize that the proof of scienter for each individual is always difficult and complex, as it involves the exploration of the state of mind of individuals concerning what they knew about NHTC's related party transactions at particular points in time—knowledge that could, and probably would, vary among the individual Defendants. Lead Plaintiffs believe that they could establish that the Defendants violated the securities laws and did so with the requisite intent to deceive, or at least with a reckless disregard for truth. However, the risk of establishing that all Defendants acted with the requisite scienter cannot be ignored, especially since it is likely that Defendants would argue that they relied in good faith on the advice of accounting professionals. *See* Rosen Declaration ¶ 51.

Assuming Lead Plaintiffs survived the Defendants' attacks on anticipated summary judgment motions, presenting these complex issues to a jury posed a particular risk to Lead Plaintiffs' hopes for success at trial. Lead Plaintiffs could not be certain that the jury would

14

reach a factual determination in Lead Plaintiffs' favor. Thus, Lead Plaintiffs' faced the risk that Defendants' arguments may find favor with a jury and result in the Settlement Class losing at trial.

The risks of establishing liability posed by conflicting testimony and evidence would be exacerbated by the following risks inherent in all complex shareholder litigation including: the unpredictability of a lengthy and complex jury trial; the risk that witnesses could suddenly become unavailable or jurors could react to the evidence in unforeseen ways; the risk that the jury would find that some or all of the misstatements and omissions were not material during part or all of the Class Period; and the risk that the jury would find that Defendants reasonably believed in the appropriateness of their actions at the time and that Lead Plaintiffs failed to prove that Defendants acted with scienter.

In short, both sides have developed factual and legal support for their respective positions. It is difficult to predict which view would prevail at the trial, but Lead Plaintiffs recognize that there is always a real risk that, despite their best efforts, Lead Plaintiffs would be unsuccessful.

**5.      The Range of Possible Recovery and Difficulty of Proving Damages**

**a.      The Risk of Establishing Damages**

Even if Lead Plaintiffs were successful in establishing liability at trial, they would face substantial risks in proving damages. *See* Rosen Declaration, ¶ 50. Lead Plaintiffs believe that had all of the alleged material facts with respect to NHTC's $2.75 million in related party transactions between the Company and the individual defendants, NHTC's common stock would have traded at levels substantially lower than during the Class Period than the levels at which it traded. While Lead Plaintiffs believe that they could prove damages, Lead Plaintiffs,

nevertheless, recognize that a jury could be influenced by Defendants' experts who would contend, among other things, that the market loss suffered by the Settlement Class was due at least in part to general economic conditions and other factors unrelated to Defendants' alleged conduct. If Defendants were successful with their arguments, recoverable damages could be eliminated or substantially reduced.

Lead Plaintiffs further recognize that the traditional measure of damages for a defrauded investor under §10(b) is the "out-of-pocket" measure. *Randall v. Loftsgaarden*, 478 U.S. 647, 662 (1986) (citing *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir. 1975)). Under this measure a defrauded buyer recovers the difference between the price paid for the securities and the "fair value" of the investment in the absence of fraud at the time of the purchase, the difference being the artificial inflation caused by defendants' misstatements and/or omissions. *See In re Letterman Bros. Energy Sec. Litig.,* 799 F.2d 967, 972 (5th Cir. 1986). The determination of fair value is a technical and complex procedure involving the analysis of many factors, including corporate asset value, cash flow, income, and growth prospects for the future, industry and economic trends, the quality of management, and the nature and amount of liabilities.

In sum, the determination of damages is a complicated and uncertain process, which would involve conflicting expert testimony. Expert testimony could rest on many subjective assumptions, any of which could be rejected by a jury as speculative or unreliable. At trial, the damage assessments of Lead Plaintiffs' and Defendants' experts were sure to vary substantially, and in the end, this crucial element at trial would therefore be reduced to a "battle of experts." The reaction of a jury to such expert testimony is highly unpredictable and in such a battle, Lead Counsel recognize the possibility that a jury could be swayed by experts for the Defendants, and find that there were no damages or only a fraction of the amount of damages that Lead Plaintiffs

alleged.

In light of the above, Lead Counsel were cognizant of the fact that, had the case proceeded to trial, it may have been very difficult to recover all or even most of the damages sustained.   Consequently, Lead Counsel believes that the Settlement obtained represents an excellent result for the Class.

**b.      The Substantial Benefits Provided by the Settlement are Well Within the Range of Reasonableness**

 Courts agree that determination of a "reasonable" settlement is not susceptible to a single mathematical equation yielding a particularized sum.   Rather, as Judge Friendly explained, "in any case there is a range of reasonableness with respect to a settlement."  *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir. 1972); *Fickinger v. C.I. Planning Corp.,* 646 F. Supp. 622, 630 (E.D. Pa. 1986); *accord Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151, 159 (S.D.N.Y. 1971).  Courts recognize that "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974).

Lead Plaintiffs' damage expert estimated that provable damages in this action were approximately $18.3 million.   In order to obtain this recovery, one must assume complete success on all liability and damage issues.  *See* Rosen Declaration ¶ 50.  Of course, in a manner of this complexity, and the numerous issues of fact and law the jury would have to decide, it is highly unlikely that a jury would find in Lead Plaintiffs' favor on every issue.   Moreover, Defendants would vigorously contest Lead Plaintiffs' experts' conclusions and offer their own experts who would testify that Lead Plaintiffs' damages were significantly less or that Lead

17

Plaintiffs did not suffer any damages as a result of the alleged misconduct. As Judge Wyatt observed in *Chas. Pfizer*, 314 F. Supp. at 743-744, "[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."

Moreover, the Settlement represents 15% of Plaintiffs' best case scenario for estimated damages. *See* Rosen Declaration ¶ 15. According to the NERA Economic Consulting Mid-Year Update,[4] the average settlement amount for the first half of 2008 was $32 million. However, 70% of all settlements during the same period were for less than $10 million. The median settlement amount was $6.2 million. The median percentage of recovery as compared to investor losses for the first half of 2008 was 2.8%. *See also In re Cendant Corp. Litig.*, (typical recoveries in securities class actions range from 1.6% to 14% of total losses). Then compared with the "present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing," the Settlement reached in this case surpasses even the very high end of that range. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 515, 538 (3d Cir. 2004); *see also In re AT&T Corp.*, 455 F.3d 160, 170 (3d Cir. 2006) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean the proposed settlement is grossly inadequate and should be disapproved. Rather, the percentage of recovery must represent a material percentage of recovery in light of all risks considered …").

In light of the substantial risks of establishing both liability and damages, as well as the expense, delay, and uncertainties of continued litigation, Lead Plaintiffs believe that the Settlement constitutes a substantial recovery and is unquestionably better than other possible alternatives—little or no recovery. As a result, the substantial monetary recovery is well within

---

[4] This report is available at: http://www.nera.com/image/BRO_Recent_Trends_0708_final.pdf.

the range of reasonableness, and thus final approval is merited. *See Young*, 447 F.2d at 433 ("In weighing the benefits held forth by the agreement of settlement against benefits dependent on the likelihood of recovery upon the plaintiffs' cause of action, the courts cannot be expected to balance the scales with the nicety of an apothecary.  The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'") (internal quotations omitted).

> ### 6.    The Opinion of Lead Plaintiffs' Counsel and Settlement Class Members Favor Approval of the Settlement

As indicated above, "a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery.'" *Lelsz*, 783 F. Supp. at 297 (citation omitted).  It is appropriate for the Court to "rely upon the judgment of experienced counsel for the parties'" in approving a class action settlement.  *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 528 (E.D. Tex. 1995) (quoting *Cotton,* 559 F.2d at 1330). Here, experienced and highly capable counsel after extensive arm's-length negotiations have concluded that the Settlement is an excellent result and in the best interest of the Settlement Class. This conclusion was reached after Lead Counsel acquired a thorough understanding of the case through an extensive independent investigation, the proceedings in the Litigation, and the mediation process.

Moreover, the support from the Members of the Settlement Class is significant.  The time to submit objections has passed, and no objections to any aspect of the Settlement have been submitted by any Settlement Class Member.  *See* Rosen Declaration ¶¶ 57-68.  The fact that no objections have been filed by any Settlement Class Member strongly supports approval of the Settlement.  *Maher,* 714 F.2d at 456 n.35; *Grinnell Corp.,* 495 F.2d at 463.

## V.    THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF DUE PROCESS

**AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

An extensive notice program, by mail and by means of publication, has been completed by Lead Plaintiffs.  The Court approved the notice procedures in the Preliminary Approval Order.

As a result, 8,040 copies of the Notice of Pendency and Settlement Class Action (the "Notice") describing the Settlement terms, the Plan of Allocation, and the Settlement hearing were mailed to potential Settlement Class Members.  On May 11, 2009, the Summary Notice was published in *Investor's Business Daily and PR Newswire*.  *See* Rosen Declaration ¶ 72 & Ex. 2.

This notice program was tailored to reach Class Members. The Notice explains the Litigation, Settlement, Plan of Allocation, the fee and expense request, as well as the rights and options of Settlement Class Members.  The Notice also explains how to obtain additional information regarding any aspect of the Settlement or Litigation.  The published notice clearly and concisely provides information concerning the Settlement, including the estimated per share recovery for Class Members.  *See* Rosen Declaration ¶ 72 & Ex. 2, Ex. C thereto.  This notice program complies with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process and is similar to the procedures approved in other cases.[5]

**VI.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE**

Assessment of a plan of allocation of settlement proceeds in a class action under Rule 23 of the Federal Rules of Civil Procedure is governed by the same standards of review applicable

---

[5] *See Miller,* 559 F.2d at 429. *See also In re Equity Funding Corp. of Am. Sec. Litig.,* 603 F.2d 1353, 1361  (9th Cir. 1979) (found notice sufficient where it informed class members of the subject matter of the litigation, the terms of the proposed settlement and the proposed plan of allocation of the settlement proceeds); *Reynolds v. NFL,* 584 F.2d 280, 285 (8th Cir. 1978) (citing *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)).

to the settlement as a whole—the plan must be fair, reasonable, and adequate. *See In re Ikon Office Solutions, Inc.,* 194 F.R.D. 166, 184 (E.D. Pa. 2000); *Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1284 (9th Cir. 1992). District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members…equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir. 1982). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/ Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement fund among eligible class members. Here, the Plan of Allocation was developed by Lead Counsel with the assistance of their damages consultant and will result in a fair distribution of the available proceeds among those Settlement Class Members who submitted valid claims in light of the two stock drops in this case. *See* Rosen Declaration ¶¶ 76-77. The Plan of Allocation does not discriminate against any of two stock drops, and the Settlement Fund allows for *pro rata* distributions of a per-share amount based on the drop in the stock price upon each of the three disclosures. Moreover, consistent with principles set forth in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005) there are no recognized losses for "in and out" purchasers—purchasers who bought and sold prior any revelation of the truth relating to the alleged fraud. Thus, the plan of allocation assigns a recognized loss to each Class Member based on the purchase of the shares acquired during the Class Period less the amounts related to the two alleged stock drops. In this manner, each member of the Class will receive an identical *pro-rata* share of the Net Settlement Fund. Plaintiffs' Counsel and their financial consultant determined

21

this was the fairest method of allocation the Net Settlement Fund.

Accordingly, the Plan of Allocation should be approved as fair, reasonable and adequate.

## VII.    THE ACTION SHOULD BE FINALLY CERTIFIED AS A CLASS ACTION FOR THE PURPOSE OF SETTLEMENT

In the Preliminary Approval Order, dated April 6, 2009, the Court preliminarily certified the proposed Class for settlement purposes.  Nothing has changed since, and no Class Member has objected to Settlement or sought exclusion.  Thus the Court should finally certify this action as a Class Action for the purpose of Settlement.  *See* Rosen Declaration ¶¶ 98-104.

## VIII.   CONCLUSION

The Settlement achieved for the Class by Lead Counsel through protracted arm's-length negotiations is an excellent result, given the serious risks inherent in further litigation, the complexity, expense and delay involved in taking this case to trial, and the considerable risk in collecting any sizeable judgment obtained after trial and inevitable appeals. Accordingly, Lead Plaintiffs and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate, and should be approved by the Court in all respects.  Moreover, the Plan of Allocation of settlement proceeds tracks the theory of damages asserted by Lead Plaintiffs and is necessarily fair, reasonable, and adequate and should be approved by the Court.

Dated:  July 7, 2009                    Respectfully submitted,

                                        THE ROSEN LAW FIRM, P.A.

                                        /s/  Laurence M. Rosen, Esq.
                                        Laurence M. Rosen, Esq. *(pro hac vice)*
                                            Email: lrosen@rosenlegal.com
                                        Phillip Kim, Esq. *(pro hac vice)*
                                            Email: pkim@rosenlegal.com
                                        350 Fifth Avenue, Suite 5508
                                        New York, New York 10118
                                        Tel: (212) 686-1060
                                        Fax: (212) 202-3827
                                        Lead Counsel for Lead Plaintiffs

                                                -and-

                                        FINEBERG|GRESHAM
                                        Joel M. Fineberg, Esq. (State Bar No. 07008520)
                                            Email: jfineberg@fineberglaw.com
                                        R. Dean Gresham, Esq. (State Bar No. 24027215)
                                            Email: dgresham@fineberglaw.com
                                        3811 Turtle Creek Blvd., Suite 1900
                                        Dallas, TX 75219
                                        Tel: (214) 219-8828
                                        Fax: (214) 219-8838
                                        Liaison Counsel for Lead Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 7th day of July, 2009, a true and correct copy of the foregoing document was served by CM/ECF notification or U.S. first class mail on the following counsel:

Paul R. Bessette
Michael J. Biles
Jennifer R. Brannen
GREENBERG TRAURIG, LLP
600 Congress Avenue, Suite 300
Austin, Texas 78701
Counsel for Defendants Natural Health
Trends Corp. and Randall A. Mason

Edwin J. Tomko
Jason M. Ross
CURRAN TOMKO TARSKI LLP
2001 Bryan Street, Suite 2050
Dallas, Texas 75201
Counsel for Defendant Terry L. LaCore

Daniel H. Gold
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700,
Dallas, Texas 75219
Counsel for Defendant Mark D. Woodburn


/s/ Phillip Kim